H13KFRIM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LUIS PINEDA, et al.,

4                    Plaintiffs,

5              v.                          15 CV 3774 (GBD)

6    FRISOLING, INC., et al,

7                    Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        January 3, 2017
                                         10:50 a.m.
10
     Before:
11
                     HON. GEORGE B. DANIELS,
12
                                         District Judge
13
                         APPEARANCES
14
     MICHAEL FAILLACE & ASSOCIATES PC
15        Attorneys for Plaintiffs
     BY:  GERRALD ELLIS
16
     EUGENE DAVID KUBLANOVSKY
17        Attorney for Defendants

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Case called)

2          THE LAW CLERK:  Will the parties please stand and make

3    their appearances, beginning with the plaintiff.

4          MR. ELLIS:  Good morning, your Honor.  Gerrald Ellis,

5    with Michael Faillace & Associates, for plaintiffs.

6          THE COURT:  Good morning, Mr. Ellis.

7          MR. KUBLANOVSKY:  Good morning, your Honor.  Eugene

8    Kublanovsky, of Kublanovsky Law, for the defendants.

9          THE COURT:  Good morning, Mr. Kublanovsky.

10         There's a motion pending.  It has to do with who's the

11   employer.  I have three people.  Let me first turn to you,

12   Mr. Ellis, before I hear from Mr. Kublanovsky.

13         Is it still your position that Costanzo, Peter and

14   Maria are all employers?

15         MR. ELLIS:  It's our position that Peter and Maria are

16   employers.  We're willing to dismiss Costanzo.

17         THE COURT:  All right, so we don't have to argue about

18   Costanzo.

19         Then let me turn, Mr. Kublanovsky, to you.  Is it your

20   position that neither one of these people are employers?

21         MR. KUBLANOVSKY:  It is our position that that is the

22   case.  Certainly before the patriarch of the family died --

23   your Honor, I can go through the facts if you want.

24         THE COURT:  You can go through them briefly.  I think

25   I pretty much understand it.  The patriarch of the family died,

H13KFRIM

1   Peter took over?

2          MR. KUBLANOVSKY:  Correct.  And that's essentially the

3   argument.

4          THE COURT:  I guess Peter is at least the employer for

5   the period of time after his father died?

6          MR. KUBLANOVSKY:  I think we would have a more

7   difficult time arguing -- at least that after he took over, as

8   of April 20th, 2014, that he assumed certain of the duties.

9   That said, as we state in our papers, that he assumed the same

10  responsibilities in carrying out those responsibilities as his

11  father undertook for 24-some-odd years, so it took him about a

12  year of six or so months following what his father had

13  continued doing at the restaurant until he actually understood

14  what his father had done.

15          The basis of our case, your Honor, is that prior to

16  Peter taking over from his father, he was an employee of the

17  restaurant and assisted his father, as did Peter's sister, as

18  employees.

19          THE COURT:  Well, that doesn't give me a basis to

20  dismiss him from the case.

21          MR. KUBLANOVSKY:  I think, taken into --

22          THE COURT:  He is currently the employer?

23          MR. KUBLANOVSKY:  Yes, sir.

24          THE COURT:  And he's been the employer since his

25  father died?

H13KFRIM

1          MR. KUBLANOVSKY:  Yes, sir.

2          THE COURT:  And part of this lawsuit is suing for a

3   period of time after his father died?

4          MR. KUBLANOVSKY:  Yes, sir.

5          THE COURT:  So he was the employer.  So he doesn't get

6   to go home.  He's still a defendant in this case.

7          MR. KUBLANOVSKY:  I think it would certainly be harder

8   to argue, although to be perfectly candid, your Honor, that he

9   would escape liability.

10          THE COURT:  If I limit a judgment, I don't know at

11   this point, but I'm not sure that I need to get in and try to

12   narrow that issue at this point.  I'm just trying to figure out

13   whether he is a legitimate defendant, not the extent of his

14   liability.  It seems to me that there's not much of an

15   argument, as you say, candidly, to be made that, at least after

16   the father died -- if there's an argument to be made that the

17   evidence will demonstrate at a trial that he had a different

18   role before his father died but it seems to me that's a factual

19   question because I don't know how active the father was at what

20   period of time and at what point the father was ill and at what

21   point he handed over the responsibilities that would have

22   tipped it to employer.

23          Is it your position that he was never the employer

24   before the father died?

25          MR. KUBLANOVSKY:  Yes, absolutely, and that is

H13KFRIM

1    undisputed.  And we have some affidavits, including by a

2    current employee that has been there for over 20 years, that

3    has worked with all the plaintiffs and has worked with both

4    Peter and Maria and the patriarch of the family, Renato, who

5    had said as much, that Peter was not an employer, it was the

6    father that had to total control at all times, of all

7    management responsibilities and all employment

8    responsibilities.

9            THE COURT:  And what --

10           MR. ELLIS:  Your Honor, if I may, it's absolutely

11   disputed that he was an employer before that.  It's not

12   undisputed.

13           THE COURT:  So what is the period of time that we're

14   talking about?  What is the employment period of time at issue

15   here?  When to when?

16           MR. KUBLANOVSKY:  The employment period of time that

17   the plaintiffs --

18           THE COURT:  Yes.

19           MR. KUBLANOVSKY:  I'm sorry, just so I understand the

20   question, the period of time that my clients were employers or

21   the period of time that the plaintiffs were employed?

22           THE COURT:  The period of time that the plaintiff is

23   suing for.

24           MR. KUBLANOVSKY:  It would be the six years prior to

25   February 7, 2015, I would imagine, February 7, 2015, being the

H13KFRIM

1    day that they walked out of the restaurant.

2               THE COURT:  February 7, 2015, and they worked six

3    years, at least six years?

4               MR. KUBLANOVSKY:  Some of them worked at least six

5    years.  I believe one of the plaintiffs only worked about a

6    year.

7               THE COURT:  All right.  So we have one plaintiff and

8    that would be who, Pineda?  Who goes back to February 7th of --

9    2009, is that six years?

10              MR. KUBLANOVSKY:  I believe that's correct, your

11   Honor.

12              THE COURT:  Who is the plaintiff who's suing for that

13   entire period of time?

14              MR. KUBLANOVSKY:  I believe it would be

15   Mr. Guayllasac --

16              THE COURT:  Okay.

17              MR. KUBLANOVSKY:  -- Mr. Arizmendi, I believe

18   Mr. Diaz.

19              THE COURT:  Okay.  So maybe --

20              MR. KUBLANOVSKY:  I think four out of the five at

21   least go back six years.  I believe only one -- Mr. Ellis can

22   correct me -- worked there less than one year, because that was

23   the only individual that was actually hired by Peter after he

24   assumed control of the restaurant.

25              THE COURT:  When did the father die?

1          MR. KUBLANOVSKY:  On April 20th of 2014.

2          THE COURT:  April 20th, 2014?

3          MR. KUBLANOVSKY:  Correct.

4          THE COURT:  Okay.  On what basis do you want me to

5     conclude -- and then we'll go to Maria -- on what basis do you

6     want me to conclude that Peter -- what responsibilities didn't

7     he have prior to April 20th of 2014 that you say would not make

8     him personally liable for wages?

9          MR. KUBLANOVSKY:  I believe, both under the test under

10    New York Labor Law as well as the FLSA, they both apply the --

11         THE COURT:  I'm sorry, Mr. Ellis, could you just move

12    over that chair so I can see?

13         MR. ELLIS:  Sure.

14         MR. KUBLANOVSKY:  -- they both apply the economic

15    reality test.  And under that test, as your Honor knows, some

16    of the considerations -- whether the employer had the ability

17    to hire and fire employees, how they supervised, controlled the

18    employee work schedules and conditions of employment,

19    determined the rate of pay and how they were paid, and whether

20    they maintained employment records -- both Peter and certainly

21    Maria, definitely Peter, did not have any of these

22    responsibilities.  They solely laid with their father.  It took

23    Peter, as I mentioned, approximately six months just to figure

24    out how his father ran the restaurant.

25              Even with respect to payroll -- that was an

1    interesting disputed fact, that Peter and/or Maria paid the

2    plaintiffs -- they did not pay the plaintiffs.  What they did

3    was they took an envelope of wages, that was calculated by

4    their father, and distributed them when their father was busy

5    working at the restaurant and they were the ones on the floor

6    and they were the ones helping to clean up.  So, at times maybe

7    they were the couriers but they did not calculate or set wages.

8    They did not set, obviously, the work schedules.  That was

9    solely within the control of their father.

10            THE COURT:  So what was Peter's job?

11            MR. KUBLANOVSKY:  Peter helped in the kitchen, he

12   helped as a host when it was --

13            THE COURT:  Was he an employee?

14            MR. KUBLANOVSKY:  He was an employee, yes, he was paid

15   a wage, but he received the same envelope of wages, as did

16   Maria, from their father.  And they did not supervise any of

17   the employees because that was their father's responsibility

18   and their father supervised them as well as the employees.

19            THE COURT:  So what --

20            MR. ELLIS:  Your Honor, if I may --

21            THE COURT:  No, just a second.  I want to keep my mind

22   straight here.

23            What is it that you say transformed Peter into the

24   employer when his father died?

25            MR. KUBLANOVSKY:  I think certainly it had to be the

 1   taking over the restaurant and assuming control --

 2          THE COURT:  How does he take over the restaurant?  No

 3   employee has the right to just say, okay, the owner of the

 4   restaurant just died, I'm taking over the restaurant.

 5          MR. KUBLANOVSKY:  True.

 6          THE COURT:  He obviously had to have been in some

 7   position where he was presumptively the person who was going to

 8   direct the activities on behalf of the father.  It's sort of --

 9   this isn't Vito Corleone and Michael.  Vito gets killed and

10   Michael is automatically the godfather.  Somehow he doesn't get

11   transformed into the employer because he decides he wants to

12   step up and take over the restaurant.

13          MR. KUBLANOVSKY:  While not as dramatic, your Honor,

14   quite honestly, that is in truth what happened.  I don't want

15   it to make light of it.

16          THE COURT:  But none of the plaintiffs were in a

17   position to do that.  They couldn't compete with him for doing

18   that.  He had to have some authority, to be begin with, that

19   made him presumptively the person who was going to be the

20   employer when the father had nothing to say about it.

21          MR. KUBLANOVSKY:  And I think with the key word being

22   the father.  This was a family-run restaurant for 20 years and

23   Peter had worked there since 1993, about one year after it

24   opened.  So if anyone was going to take over, it would be

25   Peter.

H13KFRIM

         Now --

         THE COURT:  Well, why is that so?  Tell me, what would

legally make Peter the employer or legally give him the right

to take over the restaurant?  Simply because he's related to

the owner?

         MR. KUBLANOVSKY:  I don't think it would be simply

because of that, but that gave him certainly the wherewithal,

and I believe that was his father's intentions, that his family

would take over.  And the reason --

         THE COURT:  Which family?

         MR. KUBLANOVSKY:  That the Migliorinis would continue

running -- the "Migliorinis" being his father, his --

         THE COURT:  But you're making a distinction between

Maria and Costanzo and Peter?

         MR. KUBLANOVSKY:  I am.

         THE COURT:  So how is it that Peter becomes the

employer and Maria and Costanzo don't become the employer?

Because their status that you have just given me is exactly the

same as his; they're family members.

         MR. KUBLANOVSKY:  From a legal perspective, your

Honor, this was a corporate entity doing business as Piccolo

Angolo -- that was the name of the restaurant -- and by virtue

of that, they did have some corporate formalities in place.

The elder Mr. Migliorini, Renato Migliorini, owned a 50 percent

interest in the corporation.

H13KFRIM

1             THE COURT:  So what makes Peter the boss?

2             MR. KUBLANOVSKY:  Well, his son and daughter owned

3    25 percent each.

4             THE COURT:  Well, you wouldn't argue that makes him

5    the employer?

6             MR. KUBLANOVSKY:  I would not argue that solely makes

7    him the boss, no, but that, coupled with the fact that he was

8    in the kitchen, that he was playing various duties in the

9    restaurant, that also his father had maintained --

10            THE COURT:  Employer duties?

11            MR. KUBLANOVSKY:  Not employer duties.

12            THE COURT:  Well, then --

13            MR. KUBLANOVSKY:  The distinction I'm trying to

14   make -- it's an important one, your Honor --

15            THE COURT:  Right.

16            MR. KUBLANOVSKY:  -- because he was on the floor of

17   the restaurant and he knew certainly how the kitchen

18   functioned, he knew how the host functioned, he knew how the

19   waitstaff functioned, because he ran those duties from an

20   employee perspective.  From a managerial perspective, they

21   wanted to keep the restaurant going.  It was his father's

22   life's work and he grew up in the restaurant.  He took over.

23            It was just a family assumption that Peter would be

24   the one that would be able to run the restaurant and,

25   hopefully, keep it operational, which he has been able to do

H13KFRIM

1  with great difficulty.  That's why I said it was not as

2  dramatic as the Vito Corleone example but it's a very small,

3  tight Italian family in a restaurant, that's probably no bigger

4  than the jury box.  It was assumed that Peter would have the

5  wherewithal.  He was the one that would be best positioned, and

6  so that's the position he put himself in.

7         THE COURT:  From the way it's characterized, would it

8  be unfair to say that when -- I forget the father's name.

9         MR. KUBLANOVSKY:  Renato.

10         THE COURT:  -- when Renato was not around, people took

11  orders from Peter?

12         MR. KUBLANOVSKY:  They took orders from Peter via his

13  father.  This is very important to understand.

14         THE COURT:  Suppose the father wasn't around?

15         MR. KUBLANOVSKY:  The father was around almost all the

16  time.  He practically lived in the restaurant.  And the times

17  that he was not -- especially when he got ill, he was not

18  around then -- Peter would go to his bedside, literally take

19  the orders for the day, and carry them back.

20         THE COURT:  I know, but if there was a decision that

21  had to be made, that had to be made on the spot, and the father

22  wasn't there, Peter would make that decision?

23         MR. KUBLANOVSKY:  Peter would make the decision,

24  certainly, but he would table any decision regarding the

25  management or payroll or any of that, any of those indicative

H13KFRIM

1   characteristics under the economic reality test.  That's why

2   it's important to recognize the limitations on Peter's

3   authority, because they were solely with respect to what he was

4   comfortable in deciding.

5          THE COURT:  Well, where were those limitations?  I

6   don't understand.  Who put limitations on his authority?

7   What's the evidence that Renato put any limitations on Peter's

8   authority when Renato was not around?  If I'm the waiter and I

9   decide I don't like a customer and I punch the customer in the

10  face, you're telling me that Peter wouldn't have the authority

11  to dismiss that employee --

12         MR. KUBLANOVSKY:  Absolutely not.

13         THE COURT:  -- or at least send that employee home for

14  the day?  He could do nothing?

15         MR. KUBLANOVSKY:  He would be able to say, you know,

16  you're going to have to talk to my father, which is exactly

17  what he did, and that's an interesting example.

18         THE COURT:  What about a decision that had to be made

19  on the spot, where the father was not available?  You're not

20  saying that anybody else made those decisions other than Peter?

21         MR. KUBLANOVSKY:  I'm not saying that anyone else ever

22  made -- if any decision like that would have been made, yes,

23  Peter would have made it but I'm not saying Peter made them.

24  And that's what's important here.

25         THE COURT:  Well, what's important, though, is that

H13KFRIM

1   even if you say to me that the father, when he was around and

2   available, made 90 percent of the decisions, I'm trying to

3   figure out who made the 10 percent of the decisions when he

4   wasn't available and wasn't around.  If that's Peter, which it

5   appears to be, then Peter's father can be the owner and

6   proprietor and ultimately also the employer but that doesn't

7   disqualify Peter as being also an employer.

8           MR. KUBLANOVSKY:  I see the comparison you're making.

9   Let me put it in a different framework, your Honor, and I was

10  thinking about this on my way over.  I clerked for a judge a

11  long time ago, for a very brief spell, and it was certainly a

12  terrific experience but the person who had obviously the final

13  say in that relationship was the judge, something I don't have

14  to explain, your Honor.  Certainly I could carry out the

15  judge's will and give my impressions and try to assist but I

16  did not have final say.

17          THE COURT:  I know, but that's a different

18  relationship.  I was out a couple of days last week.  You're

19  absolutely right, that's the relationship I have with my

20  clerks:  They make no decisions.  I don't put that

21  responsibility on them, I don't let the lawyers try to put that

22  responsibility on them.  Even if I'm at home, sitting at home

23  eating Christmas dinner -- it probably wouldn't be on Christmas

24  that it would happen, but even if I'm not in the office, even

25  if I'm out of the state, they will email me or they'll pick up

H13KFRIM

1    the phone and say the lawyer would like X, should I say yes or

2    should I say no?  That's a different kind of authority.  They

3    don't have the authority to say, well, you know, the judge is

4    not around so I think it sounds good to me, why don't you go

5    ahead and do it.

6          And I assume you didn't have that authority either as

7    a law clerk.  But Peter did have that authority.  It appears

8    that if a decision had to be made on the spot, Peter would not

9    be in a position to say, okay, we're going to have to shut down

10   the restaurant for the rest of the day because I can't make

11   this decision because I can't get a hold of my father.

12          MR. KUBLANOVSKY:  Actually, your Honor, that --

13          THE COURT:  Maybe it is.

14          MR. KUBLANOVSKY:  That did in fact occur --

15          THE COURT:  Oh, I'm sure --

16          MR. KUBLANOVSKY:  -- because that was exactly the

17   relationship.  His first call, if for some reason his father

18   wasn't around -- and I would say it was probably 1 percent

19   where he wasn't around, but let's for the sake of this argument

20   say there was that 1 percent where he wasn't around -- Peter's

21   first call was to his father.  He would literally go to his

22   father if he could.

23          THE COURT:  And if his father wasn't available?

24          MR. KUBLANOVSKY:  I don't know if that was ever the

25   case.  So I'm --

1          THE COURT:  Well, you've got to give me that.  If you

2     can't --

3          MR. KUBLANOVSKY:  I am, your Honor.  That's why I'm

4     trying to --

5          THE COURT:  If you can't give me that scenario, that

6     the father was always available to make every single decision

7     on the spot, no matter where he was, what physical condition he

8     was in, and no matter what the issue, then the person who's at

9     the restaurant who has the authority in his absence to do that

10    is the employer.

11         MR. KUBLANOVSKY:  The authority, I'm trying to

12    explain, your Honor, is a divided one.  There's a difference

13    between having that supervisor being in control and determining

14    payroll.  Hiring, firing, making all those decisions, was never

15    within Peter's sphere of responsibility.  He did not execute

16    any of those responsibilities.  It wasn't just within the

17    sphere; he did not do that when his father was alive, he just

18    didn't.

19         THE COURT:  If the father wasn't available and the

20    waiter came to Peter and said, the couple at table six, they

21    want a glass of our most expensive wine, we haven't opened that

22    bottle, should I open the bottle and give them one glass or

23    should I not open the bottle and give them one glass?  I

24    assume -- and you can tell me differently -- that Peter would

25    have to make that decision and he wouldn't say, well, tell them

H13KFRIM

1    to come back tomorrow when the boss is here and we can let them

2    know whether they can have a glass of wine.  He's going to make

3    the decision and if something happens between the employers and

4    some managerial decision has to be made and the father is not

5    available to make that immediate decision, from your papers and

6    what I hear from you saying, it's that Peter would have to make

7    that decision or he would have to say that decision cannot be

8    made.  But I don't see anyplace here where it says where the

9    father wasn't available, that Peter didn't have the authority

10   to make that decision.  For example, you said to me -- and I

11   think the papers explain it too -- although the father died, I

12   think, on April 20th?

13            MR. KUBLANOVSKY:  Yes.

14            THE COURT:  The father died on April 20th, there was a

15   period of time where he was incapacitated, that he was not at

16   the restaurant running the restaurant.

17            MR. KUBLANOVSKY:  Right.

18            THE COURT:  And that may have been even a period of

19   months.

20            MR. ELLIS:  Years, your Honor.

21            MR. KUBLANOVSKY:  It was months, it was months.  But I

22   want to get back to that, your Honor.  I wanted to address that

23   because I don't have to -- we don't have to certainly work in

24   a -- for illustrative purposes, create a fiction.  There was in

25   fact, as your Honor just said, a time when Peter's father was

H13KFRIM

1   in the hospital.  Peter, every morning and each night, would go

2   to the hospital and get -- that's what I was talking about

3   before -- he would talk to his father, talk about who would be

4   paid what, and what are we ordering, what are we doing, and

5   what should I tell --

6           THE COURT:  But he would have to go to the restaurant

7   and execute all of that?

8           MR. KUBLANOVSKY:  He would.

9           THE COURT:  He would have to give orders to the

10   employees to execute all of that?

11           MR. KUBLANOVSKY:  Yes, he would have --

12           THE COURT:  And if the employee said, you know what, I

13   don't like your idea, I'm not going to do it, he has the

14   authority to say to them, well, if you don't do it, go find

15   yourself another job?

16           MR. KUBLANOVSKY:  No, he could not do that.

17           THE COURT:  I'm sure he didn't do that but --

18           MR. KUBLANOVSKY:  He could not do that.  And because

19   he knew, as long as his father was alive, his father called the

20   shots.  His father had complete control and he would have to go

21   back to his father to get a decision, especially as to those

22   crucial points.

23           THE COURT:  Are you saying that that's the

24   circumstance right until the day he died or that was the

25   circumstance before he died, when he was physically and/or

H13KFRIM

1   mentally incapacitated before he died?

2          MR. KUBLANOVSKY:  He was physically incapacitated and

3   he was in the hospital and up until the point he died, that is

4   exactly the procedure they followed.

5          THE COURT:  He was in the hospital for how long?

6          MR. KUBLANOVSKY:  I believe it was several months.  I

7   forget the exact period but several months.

8          THE COURT:  When you say several months, what do you

9   think that means?

10          MR. KUBLANOVSKY:  I think more than three.

11          THE COURT:  Three to six months?

12          MR. KUBLANOVSKY:  I think that's fair.  I think it's

13   closer to three but I just don't have the exact date when he

14   went into the hospital.

15          THE COURT:  He was hospitalized for at least three or

16   more months before he died, at which point he never returned to

17   the restaurant?

18          MR. KUBLANOVSKY:  That I don't know as a factual

19   matter.  I don't know if he was discharged at any point.  I

20   know for certain the last month before he died he was in the

21   hospital the entire time, I believe.

22          THE COURT:  Who was running the business while he was

23   in the hospital before he died?  Peter, I assume?

24          MR. KUBLANOVSKY:  When your Honor says running the

25   business, do you mean --

H13KFRIM

1          THE COURT:  I mean in any way you want to mean it.

2          MR. KUBLANOVSKY:  The way Peter -- in actuality, the

3    way it happened was that Peter would go to his father to see

4    who would get paid, what would be the wages, how would the day

5    run while his father was in the hospital.

6          THE COURT:  And he would do that on a daily basis?

7          MR. KUBLANOVSKY:  He would do that on a daily basis.

8    And he would be in contact with his father, and he would go and

9    he would execute the orders from his father.

10          THE COURT:  But that arrangement wouldn't necessarily

11    exclude him as the employer legally, simply because the father

12    gave ultimate directions as the proprietor.  That's not the

13    difference between employer and not an employer.  Supervisory

14    personnel can be employers; they don't have to be the one who

15    owns the restaurant.

16          MR. KUBLANOVSKY:  You're right, your Honor, but here

17    it was orders being communicated in the shape and form and they

18    were communicated for 20 years directly from Peter's father.

19          THE COURT:  How do I know that?  How do I determine

20    that on this record?  That's not what the other says.  The

21    others say the father wasn't around, Peter and others were

22    giving us directions, paying us, supervising us.  They dispute

23    the nature of the relationship that you claim that was going

24    on.  I'm not sure it's much in dispute because somebody had to

25    play that role.  I mean they weren't -- I assume it wasn't --

H13KFRIM

1  well, I don't know, I don't have any evidence that anybody

2  said, well, I want a raise and Peter said, I've got to go ask

3  my father.  Maybe that happened, but other than the ultimate

4  decisions of hiring and firing, I'm not sure what other

5  responsibilities, decisions, you're saying Peter didn't have

6  the authority to make while he was managing the restaurant,

7  because he was clearly managing the restaurant.

8         MR. KUBLANOVSKY:  I think he was at the restaurant --

9  if we're talking about the period when his father was ill --

10        THE COURT:  Right.

11        MR. KUBLANOVSKY:  -- he was helping take care, as a

12 custodian of the restaurant, making sure nothing fell apart.

13        THE COURT:  Well, he was more than a custodian, he was

14 running the restaurant.  I mean he is the one there making sure

15 you had waiters, making sure you had the right food, making

16 sure that the business was run appropriately, making sure the

17 customers were happy.  Everybody looked to him, from your

18 description, as the person who was now the person running the

19 restaurant because the father was no longer in a position to do

20 so.

21        MR. KUBLANOVSKY:  I think what's key, that we haven't

22 addressed here, your Honor, is that the other employees,

23 especially the employees in the kitchen, and a number of them,

24 had been working there for many, many years.  The cook, we

25 maintain, was an exempt employee, ran the kitchen, so Peter

H13KFRIM

1     didn't have to worry about certain parts of the kitchen because

2     that was taken care of.  He didn't have to worry about certain

3     parts of the waitstaff.  The waiter was there, like Peter was.

4            And the waiter, Mr. Ortiz, did submit an affidavit.

5     And there is, I believe, evidence in the record, based on his

6     affidavit, that supports the roles, that I have been trying to

7     describe, that Peter held versus his father and what authority

8     Peter's father had versus, I would say, the authority that

9     Peter had and that Mr. Ortiz says that in his 20 years at the

10    restaurant he worked very closely with all the plaintiffs, with

11    Peter and with Renato, and Renato was the one that gave all the

12    directions, Peter was not.

13           So we don't just have --

14           THE COURT:  But that's not what any of the plaintiffs

15    say.  I have to look at the papers again -- I read them a while

16    back -- but I don't have any statement by the plaintiffs that

17    they even had a conversation with Renato.  They say that the

18    other family members supervised them, that the other family

19    members gave them their check, that they had day-to-day contact

20    with other family members other than the patriarch of the

21    family, they say that they were disciplined by others, they say

22    they were supervised by others, including Peter, they say they

23    were paid by others, including Peter.  They don't ever say, for

24    any portion of the time that's at issue, that Renato was the

25    one who had that kind of contact.

H13KFRIM

1          Did I miss something?  What is the nature of what they

2     say the relationship was with Renato that you say would exclude

3     Peter as the employer?

4          MR. KUBLANOVSKY:  Well, I would cast doubt on some

5     parts of the affidavits, most notably, Mr. Pineda's affidavit.

6     He also says that Mr. Costanzo Migliorini -- it is not true

7     that he did not supervise or control --

8          THE COURT:  I'm sorry, say that again.

9          MR. KUBLANOVSKY:  That Costanzo Migliorini, the uncle

10    who they dismissed today, we have maintained had no role after

11    2005.  Mr. Pineda's own affidavit says, "From 2000 to 2014,

12    Renato and Mario Costanzo Migliorini were my bosses."  And they

13    submitted that Mr. Costanzo -- in fact, there's a discrepancy

14    between their own facts where they agreed with defendants'

15    statement of material fact in paragraphs, I believe, 8 and 9

16    that Mr. Costanzo Migliorini was not a boss.  So --

17         THE COURT:  The problem I have with Peter, the part

18    that's difficult for me to get past, is that the only time

19    period that I can look at on the record that you have given me,

20    based on the arguments that you've made, would demonstrate that

21    Peter was the employer as of the time that his father died.  I

22    don't know why you -- I can't put my hands around why you say

23    he morphed into being not the employer the day before and being

24    the employer the day after, simply because the father died.  He

25    must have had that kind of role that set him up to

1    automatically do that, unless you want to show me a piece of

2    paper that says when I die I designate Peter as my successor

3    and I leave the restaurant to Peter to run as he sees fit.  On

4    what basis does he morph into the employer the day after the

5    father died, when he is nowhere close to the employer the day

6    before the father dies?

7              MR. KUBLANOVSKY:  In part, your Honor, that was our

8    argument for why it took him so long after he decided to take

9    over the restaurant, for why he struggled so hard to understand

10   what his father did.  Literally, he had to find the books and

11   records of the company, he had to figure out how to run and

12   operate the company.  So from --

13             THE COURT:  But why did he have to figure that out?

14   What designated him the person to have to do that?  That's the

15   question.  I understand what you're saying, that he may have

16   not have been prepared for his father's death, to take over the

17   restaurant, full responsibility for the restaurant, at that

18   point in time, but I don't know who anointed him the employer

19   the day the father died, how that came about.

20             MR. KUBLANOVSKY:  I think, in all honesty, I think it

21   came about, your Honor, because Peter was in this family, in

22   this very traditional Italian family, he was looked upon as

23   someone who would carry out, hopefully, his father's legacy.

24             THE COURT:  But that was true while his father was

25   still alive.  When his father in the in the hospital, he was

1    looked at that person, and I'm sure the relationship was a

2    little different or maybe a lot different when his father was

3    there on a day-to-day basis, but what you just said to me about

4    people looking to him to play that role, that also applies to

5    the employees.  The employees looked to him -- there was the

6    nature of his responsibilities at the restaurant and the nature

7    of his relationships at the restaurant and his family

8    relationship; all parties looked to him as the person in charge

9    and the person to be the one who was going to obviously run the

10   business when his father was incapacitated, and take over the

11   business when his father wasn't around.

12        MR. KUBLANOVSKY:  I'm not saying -- that's not an

13   unfair characterization, but based on the record and what

14   happened and how, after Peter assumed control, as is evident by

15   what happened less than a year later, there was certainly

16   something that materialized or that soured the relationship

17   between employees, some of whom had been there before Peter and

18   been working at the restaurant for much longer in terms of day

19   to day, when Peter was younger, when he started at the

20   restaurant.

21        So I believe there was a souring of the relationship

22   between the employees and Peter that ultimately came to a head

23   on February 7th, when five out of the six employees left.  I

24   believe that there was something that happened that made that

25   relationship unequal.  And that's what's key.  After his father

H13KFRIM

passed away --

THE COURT:  But that relationship was never equal?
He's the son of the owner.

MR. KUBLANOVSKY:  I'm not going to say he wasn't
owner --

MR. ELLIS:  Mr. Kublanovsky, your Honor, is studiously
avoiding --

THE COURT:  Wait, don't interrupt him.  I'm going to
give you a full opportunity to address these issues.

MR. KUBLANOVSKY:  What I want to differentiate, your
Honor, is the fact that this was a family-run restaurant.

THE COURT:  Right, I understand.

MR. KUBLANOVSKY:  Certainly, Peter was family, that
was part of the family that was running it, the running it part
being solely attributable to his father's return to the
position that we're trying to take here.  However, the
employees, because in this fairly unusual situation, with a
restaurant we have so many employees that have been there for
so long and, as we have already inferred, because they were
treated well, when Peter's father passed away and Peter tried
to assume the mantle and run the restaurant, certainly there
was some resentment, we believe, there on the part of the
employees and which led to eventually some of them leaving.

I believe prior to that, everyone looked to Peter's
father because they knew he ran the show.  Peter helped with

H13KFRIM

1    certain responsibilities, as did the other employees.  The one

2    interesting example that your Honor used was what if the

3    customer came to the waiter and had a dispute.  That

4    relationship was between the customer and the waiter.

5           What we're talking about, for purposes of New York

6    Labor Law and the FLSA, is what are the hallmarks of being an

7    employer.

8           THE COURT:  Right.  So if I'm a customer in the

9    restaurant and I get into a dispute with the waiter and I say

10   to the waiter, I want to talk to the manager, Peter would be

11   the one to show up?

12          MR. KUBLANOVSKY:  I believe here's what would probably

13   likely have happened, is that the waiter would go to Peter and

14   say he wants to talk to the manager.  Peter would go to the

15   customer and say, you know --

16          THE COURT:  I can't talk to you because my father's in

17   the hospital?

18          MR. KUBLANOVSKY:  -- the manager, my father, isn't

19   here but tell me and maybe I can take it to my father.  That's,

20   practically speaking, likely what happened.

21          THE COURT:  Well, unless you had some evidence that

22   that's what happened, practically speaking, that's not likely

23   what happened.  Practically speaking, what happened is that he

24   walked over and if this is a customer that he wants to satisfy,

25   he tried to solve the problem right then and there, and he took

1    that responsibility and they looked to him to take on that

2    role.  And he wouldn't say, well, you know, I know you don't

3    like the service here and you think we ought to take 10 percent

4    off the bill or we should give you a free glass of wine, I'll

5    tell you what, why don't you come back tomorrow because I'm

6    going to see my father tomorrow and I will ask him.

7            I am not going to assume that that's the way this

8    restaurant was run, you can speculate as to that, but that

9    would be an unreasonable speculation, that the restaurant was

10   run that way.  If the waiter had a dispute with the customer,

11   the waiter would go to Peter, Peter would have to solve that

12   problem, that immediate problem, because he was the one who the

13   father put in charge to do the day-to-day operation of the

14   restaurant when he wasn't there.  At this point, there is no

15   evidence that -- that was clearly the case after the father

16   died because he himself took on that mantle.  It seems to be

17   fairly obvious that's the role he had while the father was in

18   the hospital.  I don't know how he ended up with that role.  He

19   obviously was the person that everyone assumed or knew was

20   taking on that role.  And there's no reason to assume that he

21   had a different relationship even when the father wasn't sick

22   in the hospital when the father wasn't there and Peter was

23   there.

24           You can correct me if I am wrong -- I don't know if

25   the record reflects any of this -- but I assume that even when

H13KFRIM

1    the father was fully engaged at the restaurant, on the rare

2    occasions that the father was not there, people looked to Peter

3    to fill in for the father.

4        MR. KUBLANOVSKY:  I believe people looked to Peter to

5    communicate to his father -- and this is important, given the

6    other positions that the employees occupied.  Again, they were

7    very long-serving employees there who worked independently and

8    knew what they had to do, so Peter didn't have to labor, as he

9    does now, entirely on his own in the kitchen.  He had a kitchen

10   staff that had been there for many, many years, that knew what

11   to do.  He didn't have to worry about that.  He had to worry

12   about his responsibilities as an employee, playing part-time

13   host, doing food prep, doing all the little things that he had

14   always done, all the little things when he was growing up in

15   the restaurant, as children help their parents in restaurants.

16       THE COURT:  But I'm not concerned about the little

17   things.  I'm concerned about the decisions that had to be

18   made --

19       MR. KUBLANOVSKY:  Yes.

20       THE COURT:  -- that affect the employees and affect

21   the overall running of the restaurant.  Those are not little

22   things.  I walk into the restaurant, I find a fly in my soup, I

23   want to know who I'm supposed to talk to about that, who can do

24   something about that.  By your relative relationship of the

25   family members, Peter seems to be the person who would be

H13KFRIM

1   taking care of those issues when the father wasn't there.

2   That's after the father passed away, obviously, that's when the

3   father was in the hospital incapacitated, that's, I assume,

4   also when the father was on vacation, which may be rare, if

5   ever happened, or he had to go someplace else and Peter was at

6   the restaurant alone.  Most of the time, I assume, by your

7   argument, that -- there's a hierarchy here; it goes from the

8   father to Peter, and then we can argue about the other family

9   members, but you seem to agree that Peter had a position that

10  was different vis-a-vis his father than his other siblings,

11  vis-a-vis the restaurant.

12          MR. KUBLANOVSKY:  It was different, and the

13  differentiation I'm trying to make is that it was different

14  from a family sense.

15          THE COURT:  No, it was different from a employee

16  sense, for the employees.  If there's a problem when Costanzo,

17  Maria and Peter are in the restaurant and I'm the waiter and

18  I've got a complaint, by your argument, I'm going to go to

19  Peter?  Your argument is that I wouldn't go to Costanzo and I

20  wouldn't go to Maria, I would go to Peter.

21          MR. KUBLANOVSKY:  Well, Costanzo wasn't there and

22  Maria didn't do anything, so by process of elimination, maybe

23  they would go to Peter with a complaint that something

24  happened, tell your father, if his father isn't there, because

25  they knew who called the shots, and it was Peter's father, they

1    didn't rely on Peter.  So your Honor's right --

2            THE COURT:  They knew who called the shots when Peter

3    wasn't there.  By your argument, you said that they would not

4    complain to Maria and tell Maria, go call your father, they

5    would complain to Peter and Peter would -- they wouldn't say,

6    well, I've got a decision to make, they wouldn't go to Maria or

7    they wouldn't say get Costanzo on the phone.  By your argument,

8    they would go to Peter, everybody knew to go to Peter, because

9    Peter was the voice and the stand-in for the employer when the

10   employer wasn't there.

11           Is it your argument that simply because the father

12   would have the ultimate say-so as to who would be fired, hired

13   and what their salaries would be, that because he had the final

14   say-so on that, that that eliminates anybody else from being

15   the employer?

16           MR. KUBLANOVSKY:  In this situation, your Honor, I

17   think that is the argument, because Renato had all of the

18   hallmarks, exactly those that you mentioned, Peter could not

19   fire, he did not hire, he did not fire, he did not set payroll,

20   he did not set working conditions.  He just did not do those

21   things that are, under the legal test, required for an

22   employer.  And that's the distinction that we're trying to

23   make.

24           So whether it's a good distinction or not, whether it

25   succeeds or fails, that is the distinction that we're --

H13KFRIM

| | |
|---|---|
| 1 | THE COURT:  What do you say Maria's role was? |
| 2 | MR. KUBLANOVSKY:  Maria at all times was sitting in |
| 3 | the hostess chair, sometimes she would help with waitressing. |
| 4 | Those were her only roles that she ever occupied in the |
| 5 | restaurant, from the first day she started to today. |
| 6 | THE COURT:  All right.  Did she have an official job |
| 7 | title? |
| 8 | MR. KUBLANOVSKY:  Maybe hostess, if that. |
| 9 | THE COURT:  Did Peter have an official job title? |
| 10 | MR. KUBLANOVSKY:  I don't think he did, actually.  I |
| 11 | don't recall there ever being any title designated to him in |
| 12 | terms of what he did because, like I said, he -- |
| 13 | THE COURT:  In my view, that would make your argument |
| 14 | stronger, not weaker, because if you had a job title that said, |
| 15 | you know, he's the assistant chef, then I can say, well, he's |
| 16 | the assistant chef.  You're saying, well, he didn't really -- |
| 17 | he was sort of like, you know, the father's right-hand man. |
| 18 | MR. KUBLANOVSKY:  I understand, your Honor, and I wish |
| 19 | I could say that, but because he did all these little things, |
| 20 | he didn't have any title because he was just picking up.  He |
| 21 | cleaned up after -- |
| 22 | THE COURT:  On what authority?  What was he being paid |
| 23 | for? |
| 24 | MR. KUBLANOVSKY:  He was being paid for these little |
| 25 | things, to help with food prep, that was one of his |

1    responsibilities, to help clean up after the restaurant closed,

2    and to help with occasional hostessing duties if his sister was

3    sick or occasional waiting duties if for some reason the

4    restaurant was very busy.  So he would play all these roles, to

5    help out in the kitchen, which is why he knew -- help out in

6    the restaurant, which is why he knew how the restaurant

7    functioned and why he had the greater range of experience, I

8    would say, in the restaurant.

9            And perhaps that's why everyone looked at him, because

10   he knew how all the other employee roles.

11           THE COURT:  Ultimately, other than the father, who had

12   supervisory or managerial responsibility at the restaurant?

13   Other than the father.

14           MR. KUBLANOVSKY:  No one.  It was the father.

15           THE COURT:  Well, that can't be, that can't be.

16           MR. KUBLANOVSKY:  The father was there almost every

17   single day, almost never took vacation.

18           THE COURT:  Okay, so when he wasn't there, and when he

19   did take vacation, there had to be a managerial or supervisory

20   employee on-site.  Who was it?  If you don't want to say --

21           MR. KUBLANOVSKY:  They closed for two weeks out of the

22   year.

23           THE COURT:  They didn't close when he was in the

24   hospital.

25           MR. KUBLANOVSKY:  You're right.  And that's why I was

H13KFRIM

1    saying, your Honor, I cannot deny that his son took instruction

2    from his father during that point because factually that's what

3    happened.

4             THE COURT:  That's why I keep separating Peter from

5    the others, because I know there's a different argument to be

6    made.  But you don't want to concede on this record that other

7    than the father, the only other person that you are arguing

8    that had any supervisory or managerial responsibilities was

9    Peter, but are you genuinely arguing that Peter had no

10   supervisory or managerial responsibilities?  That can't be the

11   case because even if he had to go to the father, the fact that

12   he's the one that goes to the father would give him some

13   supervisory or managerial responsibility, as opposed to Maria

14   or Costanzo.

15            MR. KUBLANOVSKY:  I understand the difficulty here,

16   and unfortunately --

17            THE COURT:  A difficulty?

18            MR. KUBLANOVSKY:  Well, we're trying to differentiate

19   Peter's role.

20            THE COURT:  Right.

21            MR. KUBLANOVSKY:  And what we are attempting to argue,

22   your Honor, and because it is in fact what happened, is that

23   his role, to the extent there was any in, let's say, managing

24   the restaurant, was to take orders from his father.

25            THE COURT:  No, I understand that, but that doesn't

H13KFRIM

1   preclude him from being an employer, simply because he

2   ultimately reports to the father.  If I'm suing Microsoft, you

3   can't just argue to me the only employer is Bill Gates or the

4   only person who has any supervisory responsibility, because if

5   an important decision has to be made, Bill Gates better go

6   along with it or it's not going to get done.

7           MR. KUBLANOVSKY:  I wouldn't make that argument, your

8   Honor, and I'm not really making that argument here.  It is a

9   fine point that I'm making, I will definitely concede, but it's

10  based on the record and on the affidavits that have been

11  submitted and what role Peter occupied at the restaurant.

12          THE COURT:  Well, other than Peter, what role are you

13  saying that others said that Peter occupied that takes him out

14  of the realm of employer?

15          MR. KUBLANOVSKY:  Well, Mr. Ortiz in his affidavit

16  says much the same, even Peter's sister.

17          MR. ELLIS:  There is no plaintiff Ortiz.  I think you

18  mean Pineda.

19          THE COURT:  Ortega Diaz.

20          MR. KUBLANOVSKY:  Mr. Fernando Ortiz, who was the

21  waiter for over 20 years at the restaurant, he --

22          THE COURT:  He says what?

23          MR. KUBLANOVSKY:  In his affidavit, in paragraphs 4

24  and 5 of his affidavit, he says Renato --

25          THE COURT:  Slow down.

H13KFRIM

1         MR. KUBLANOVSKY:  I'm sorry.

2         "Renato Migliorini controlled employee work schedules,

3    set compensation levels for employees, paid employees and

4    generally managed the overall business of the restaurant."

5         THE COURT:  We all concede that.

6         MR. KUBLANOVSKY:  And in paragraph 5, he says, "Prior

7    to Renato Migliorini's death in April 2014, neither his son,

8    Peter Migliorini, or his daughter, Maria Migliorini, ever held

9    any management responsibilities at the restaurant.  Neither I

10   nor any of the plaintiffs ever reported to or took direction

11   from either Peter Migliorini or Maria Migliorini Cintron."

12        THE COURT:  But I don't know what that means.  Then,

13   when the father wasn't there, you still say they go to Peter?

14   For any decision that the employees cannot make themselves,

15   they go to Peter?

16        MR. KUBLANOVSKY:  They go to Peter with a request

17   because he would go to his father, and they knew that.

18        THE COURT:  Under what authority do they go to Peter?

19   Why do they go to Peter, as opposed to his sister, his brother,

20   or the head chef?

21        MR. KUBLANOVSKY:  Because --

22        THE COURT:  Because Peter has been designated the

23   stand-in, the managerial employee's voice by Renato.

24        MR. KUBLANOVSKY:  I would go to the first part.  He

25   was definitely designated the stand-in.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H13KFRIM

1          THE COURT:  For who?

2          MR. KUBLANOVSKY:  For his father, the stand-in to

3     go -- he was the consiglieri, if you will.  He would go to his

4     father and everyone knew that's what he would do because that's

5     what he was doing.

6          THE COURT:  I know, but I cannot determine the motion

7     based on that argument.  Maybe you can convince a jury that

8     somehow Peter didn't have anything, didn't have a clue what was

9     going on, he was just an employee up until his father died,

10    when he tried to take over, and so they should limit his

11    exposure, individual exposure, to the period of time that he

12    was an employer, but I don't know how he got to be the

13    employer.

14         What you said to me on this record is that the father

15    ran the restaurant, then the father got ill, then the father

16    went to the hospital, then the father died, and after the

17    father died, Peter miraculously is the employer.  I mean that's

18    it.  He just walks in the next day and says, okay, I'm the

19    boss.  It doesn't happen that way, it can't happen that way.

20    Somebody has to give him that authority, and that authority has

21    to be either perceived or actual.

22         Now, I don't see here where on his deathbed the father

23    says, okay, of my three children, Peter, I'm designating you,

24    you now own the restaurant or you're now the employer, you have

25    to take care of things; everybody else, if you want to work for

 1   Peter, that's fine but Peter is now the boss.  I don't see that

 2   on the deathbed.  I just see that the father died, Peter walks

 3   in the next day and everybody pretty much acts the way they

 4   assumed that everybody was going to act, that once the father

 5   died, Peter was going to continue to play the role of stand-in

 6   for the father, just now he's standing in for the father

 7   permanently because the father is not going to make the

 8   decisions, Peter is going to make the decisions.  And he

 9   doesn't say, well, I have to go, we have to huddle with the

10   sister and the brother and we have to vote, you know, have a

11   unanimous vote.  It's a coup, Peter has taken over somehow.  I

12   don't know how he's now the employer and the day before, when

13   was he still the person everybody turned to when they couldn't

14   get a hold of Renato, that now Peter has, as I say, morphed

15   into the employer.

16        That's a harder argument to make and it's clearly not

17   an argument that can be made, that asks me to dismiss Peter

18   from this case because there's no evidence that Peter was an

19   employee, that he is being sued in his appropriate capacity as

20   employer.  He's obviously being sued in his appropriate

21   capacity as an employer because you concede he's an employer,

22   at least after the father died.  He's just trying to limit the

23   extent of his personal liability.

24        MR. KUBLANOVSKY:  I think that's right, your Honor.

25   As I said, to speak candidly, it's a much harder argument that

1    he was not the employer after his father died.  And certainly

2    there was that transitionary period while his father was in the

3    hospital, that for all intents and purposes, whoever was there

4    at the restaurant, it was Peter that was giving the orders from

5    his father.

6           So, to the extent that he was in any position of

7    authority, it would be by virtue of his being at the restaurant

8    when his father was not there, communicating with his --

9           THE COURT:  No, but that's not true.

10          MR. ELLIS:  Your Honor, could I --

11          THE COURT:  It's by virtue of something else because

12   you're telling me Maria is the hostess.  She's sitting right

13   there, she's in the restaurant every day, she's related to him.

14   What's the distinction you draw between Peter and Maria?

15          MR. KUBLANOVSKY:  I think, as I said before, it was

16   the breadth of Peter's experience at the restaurant, I think,

17   as an employee, that gave his father comfort to know that Peter

18   knew, from an employee's perspective, while he was handling all

19   these different responsibilities, at least up front, the front

20   part of the operations would be run, meaning the service to the

21   customers, the food prep, all these little things.

22          THE COURT:  So what managerial or supervisory

23   responsibility did the father give Peter that he didn't give

24   Maria?

25          MR. KUBLANOVSKY:  That he gave Peter?

H13KFRIM

1          THE COURT:  Right.

2          MR. KUBLANOVSKY:  He didn't give either of them those

3    responsibilities, and I think that's what we're trying to

4    communicate.  This was not a type of restaurant --

5          THE COURT:  Well, he give him that responsibility

6    while he was sick.

7          MR. KUBLANOVSKY:  Yes, your Honor.

8          THE COURT:  So what responsibilities did he give to

9    Peter when he was in the hospital and wasn't running the

10   restaurant day to day, that he didn't give to Maria?  What's

11   the evidence of that?

12         MR. KUBLANOVSKY:  He gave him the responsibilities to

13   communicate his orders, to run in his -- to communicate the

14   orders how the restaurant should be run, to the other

15   employees.

16         THE COURT:  So he had a higher responsibility than

17   Maria?  He gave him a higher responsibility --

18         MR. KUBLANOVSKY:  I would have to concede that, your

19   Honor, because factually that is what happened.  He was the one

20   that went to see his father, he got the orders for the day, he

21   would go back and he would tell people what to do.  So those

22   are the facts --

23         THE COURT:  Isn't going back and telling people what

24   to do really the crux of it?

25         MR. KUBLANOVSKY:  Yes, your Honor, I agree.

1          THE COURT:  It depends on what he went back and told

2     them to do.

3          MR. KUBLANOVSKY:  I agree.

4          THE COURT:  You want to say that every question that

5     the employees asked Peter, Peter's answer always started out

6     with, Renato says no, or Renato says yes, not that, yeah, you

7     should do this, no, you shouldn't do this?  I'm not sure that's

8     what you're trying to argue.

9          MR. KUBLANOVSKY:  No, I'm not, and I don't think that

10    would be a believable or credible argument that would have

11    happened, because I'm sure during Peter's experience in the

12    restaurant -- he's worked there for 20-some-odd years just like

13    some of the other employees -- I'm sure he had a feeling for

14    how things may have operated, so I don't think it would be a

15    credible argument to say that for every single issue that came

16    up.

17          However, it is the case that for every issue, under

18    the test that the Second Circuit uses to determine whether a

19    person, an individual, is an employer, that for those key

20    decisions, which I'm not sure he was asked but let's assume

21    that some employee came up to him and said, you know, I'm not

22    getting paid enough, I want to be paid more, he did not have

23    authority to, while his father was alive, to make those

24    decisions.

25          THE COURT:  How did he get that authority when his

H13KFRIM

1    father died?

2              MR. KUBLANOVSKY:  It's a good question, your Honor.

3              THE COURT:  I want a good answer.

4              MR. KUBLANOVSKY:  It's a good question.  He assumed

5    the role.  That's the best unsatisfactory answer I can probably

6    give to your Honor, is that he did assume the role with the

7    blessing of his --

8              THE COURT:  I know Mr. Ellis is anxious to be heard

9    but let me just ask you the last question.  First of all, how

10   many waiters were there, employees?

11             MR. KUBLANOVSKY:  There was one full-time waiter,

12   Mr. Ortiz, who's still there.  Peter helped out with the

13   waitstaff duties, as did Peter's sister, Maria, from time to

14   time.

15             THE COURT:  The plaintiffs are who?  The plaintiffs

16   are not waiters, they are kitchen staff?

17             MR. KUBLANOVSKY:  We have Mr. Pineda, who was the

18   busboy; Mr. Jaquez, who was the cook; Mr. Diaz was the

19   dishwasher; Mr. Arizmendi also did food prep; and

20   Mr. Guayllasac was the kitchen manager.

21             THE COURT:  How often would Peter talk to the father?

22             MR. KUBLANOVSKY:  Daily, when he was there.

23             THE COURT:  Meaning?

24             MR. KUBLANOVSKY:  Every day, because his father was

25   there every day.

H13KFRIM

1              THE COURT:  I mean when he was in the hospital.

2              MR. KUBLANOVSKY:  I believe he would see him almost

3       daily.

4              THE COURT:  Meaning what?  When would the restaurant

5       open?  When would he speak to the father?

6              MR. KUBLANOVSKY:  I think he would go in the mornings.

7       The restaurant didn't open until the afternoon, so he would go

8       in the mornings.  And I believe -- I can't guarantee that he

9       did it daily but I'm almost positive that he did because he

10      would have to go and speak with his father.  He also wanted to

11      check on his father and meet with his father, but in the course

12      of that meeting he would ask his father about the restaurant.

13      The restaurant was his father's life, and that was his father's

14      number one concern.

15             THE COURT:  So you're just relying on the one

16      communication that dealt with all of these issues in the

17      morning before the restaurant opened, when he went to see the

18      father?

19             MR. KUBLANOVSKY:  Right.  But that relationship wasn't

20      really that much different when his father was at the

21      restaurant because Peter would come in and his father would

22      say, this is what you have to do, this is what everyone's

23      doing.  So I don't want to say this is unique because it

24      wasn't.

25             THE COURT:  Okay, I accept that.

H13KFRIM

1          My final question was:  All right, he goes to the

2     hospital to see his father in the morning, they talk about

3     what's going to happen and any major decisions that have to be

4     made, then Peter goes to the restaurant, Peter gets to the

5     restaurant, one of these plaintiffs calls in sick.  I assume

6     Peter has the authority to make sure that that issue is dealt

7     with on the spot, as the employer --

8          MR. KUBLANOVSKY:  I think --

9          THE COURT:  -- as the managerial person, the

10    supervisory person, if the cook doesn't show up, I assume that

11    Peter has the authority -- or the busboy doesn't show up or

12    whatever these other employees, their roles were, if they

13    didn't show up and they were needed, that person was needed to

14    have the restaurant open that day -- that Peter would be the

15    person who was given the authority to make those kinds of

16    decisions to find somebody to replace them.

17         MR. KUBLANOVSKY:  To the extent that Peter had to do

18    that, I wouldn't argue that point.  I believe he either took

19    those responsibilities because he was in the one that was best

20    positioned because of his experience.

21         THE COURT:  Right.  But he didn't have to go back to

22    the father and say, well, you know what, the busboy didn't show

23    up, is it okay if I call in Charles, who we bring in sometimes

24    to fill in for him, because we need a busboy?  He would make

25    that decision.

H13KFRIM

1              MR. KUBLANOVSKY:  I would agree with your Honor, he

2    would likely make that decision, if not for anything more than

3    not bothering his father who was ill.  But to the extent that

4    he would be able to undertake those responsibilities, yes.

5    But --

6              THE COURT:  Even when his father wasn't ill?

7              MR. KUBLANOVSKY:  No, that's not --

8              THE COURT:  As you say, if the father was away, he

9    would have to get the father's permission to find somebody to

10   fill in.

11             MR. KUBLANOVSKY:  He would do much the same, he would

12   be the one filling in.

13             THE COURT:  I don't know what you mean, he would be

14   the one filling in.

15             MR. KUBLANOVSKY:  Because of his knowledge --

16             THE COURT:  He would make the decision as to how --

17             MR. KUBLANOVSKY:  He would make the decision, he would

18   do it himself.  So, yes, your Honor, if there was a decision to

19   be made, he would make that decision.

20             THE COURT:  He had the authority to go ahead and find

21   somebody to replace that employee for that day?

22             MR. KUBLANOVSKY:  Even if that was himself, which it

23   was.  But practically -- well, the reality of the situation

24   was, the father was there all the time.  I really believe --

25             THE COURT:  That would be a hard evidentiary issue,

H13KFRIM

1    for me to conclude that the father was there all the time.

2         MR. KUBLANOVSKY:  And that I understand.

3         THE COURT:  We know the father wasn't there all the

4    time, because he was sick in the hospital, lying up in the bed

5    for months.  We know he wasn't there all the time.

6         MR. KUBLANOVSKY:  Correct.  Other than that period --

7    and that's why on the record here, I will admit that.

8         THE COURT:  So let me hear from Mr. Ellis.  What is

9    it --

10        MR. ELLIS:  Thank you, your Honor.  I was going to

11   say, first of all, the point that -- and I commend him for

12   going that entire time without mentioning this fact, it's

13   basic, but from 2006, Maria and Peter were both shareholders in

14   the corporation and officers of the corporation.

15        THE COURT:  But that doesn't make them an employer.

16        MR. ELLIS:  That's correct, in and of itself.  But it

17   does explain, to your Godfather analogy, why Peter was in line

18   to take over the family business.

19        THE COURT:  Well, wasn't Costanzo also --

20        MR. ELLIS:  When the company was started, there are

21   two brothers, Costanzo and Renato, each 50 percent owners.  At

22   the end of 2005, Costanzo wants out of the business, I don't

23   know why, but he leaves the business, his 50 percent goes in

24   equal parts, 25 percent each, to Peter and Maria.  Peter and

25   Maria have worked at the restaurant the entire time since 1993,

H13KFRIM

1      when it opened.

2              THE COURT:  Okay.  So other than being the hostess,

3      what was Maria's job?

4              MR. ELLIS:  Well, Maria supervised the front of the

5      house.  And this --

6              THE COURT:  What does that mean?

7              MR. ELLIS:  -- is explained in Mr. Pineda's

8      declaration.

9              If we go to paragraphs 8 and 9 of Mr. Pineda's

10     declaration, he's speaking from 2000, when he started working

11     there, "Throughout that time, Peter and Maria Migliorini also

12     worked at the restaurant supervising waiters and hostesses and

13     generally helping to run the restaurant.  Peter or Maria would

14     pay me.  When Peter was working, he would pay the employees but

15     when Maria was working, she would pay the employees, and when

16     Renato was working, he would pay the cook employees."

17             THE COURT:  Okay.

18             MR. ELLIS:  "It always alternated depending on who was

19     working."

20             THE COURT:  So let me concentrate on what you just

21     said about Maria.  First of all, part of that is group

22     pleading.  It says "Maria and/or Peter."

23             MR. ELLIS:  Yes.  If you would allow me, the next

24     paragraph addresses Maria more directly.  "Because I was a

25     busboy" -- this is again quoting from Mr. Pineda's declaration

H13KFRIM

1     at paragraph 9 -- "because I was a busboy, Maria directly

2     supervised me throughout my employment and generally made my

3     life miserable.  Maria would badmouth and degrade me.  And I

4     believe that she regularly stole money from employees' tips.  I

5     was also -- I was never able to see how much I made in tips

6     total."

7                THE COURT:  Okay.  But what part of that activity is

8     employer activity?

9                MR. ELLIS:  "Maria supervised the tip pool.  Maria

10    would simply give me some amount of the tips but I never knew

11    how much the total was, so I was never able to see if I was

12    being paid fairly.  When I believed my tips were incorrect and

13    I was owed more money, she would make rude comments about my

14    legal status in this country or would say that I should be

15    content with the amount that I had been given, that it was good

16    money."

17               THE COURT:  So, wait a minute.  She is the one that --

18    what do you say her role was?

19               MR. ELLIS:  Maria supervised the front of the house.

20               THE COURT:  What does that mean?  That's a legal

21    conclusion.  What did she do?

22               MR. ELLIS:  She was in charge of supervising the

23    employees.

24               THE COURT:  What does that mean?  That doesn't mean

25    anything.  Was Peter in charge of supervising?

H13KFRIM

1          MR. ELLIS:  Yes, they both were.

2          THE COURT:  Well, what did she do to supervise them?

3          MR. ELLIS:  Well, what's laid out here is that she

4     determined the amount of tips that were paid --

5          THE COURT:  That doesn't say she determined the amount

6     of tips.  It says she gave them the tips and said that these

7     are the tips that you're supposed to have.  Where does it say

8     that she was the one who determined the tips?

9          MR. ELLIS:  It's unclear, but she was the one -- first

10    of all, they all, both Maria and Peter, paid the employees.

11         THE COURT:  That means they physically gave them cash

12    or check?

13         MR. ELLIS:  It depended on the employee, I believe.

14         THE COURT:  Okay.  What else did she do, other than to

15    hand them their wages?  We don't do this anymore -- we don't

16    have checks -- but if my law clerk hands my secretary her check

17    every week, that doesn't make my law clerk her employer.

18         MR. ELLIS:  Correct.

19         THE COURT:  What is it about Maria handing him his

20    wages -- of course there's some issue with other stuff that

21    maybe this might be an employer, but other than giving him the

22    check and giving him his portion sometimes of the tips -- what

23    page were you reading from?

24         MR. ELLIS:  From page 2, paragraphs 8 and 9 of

25    Mr. Pineda's declaration, Luis Pineda, document 52 in the

H13KFRIM

1    docket, your Honor.

2              THE COURT:  I know you quoted it in the brief.

3              MR. ELLIS:  I did.  It's quoted in my brief at page, I

4    believe, 9.

5              THE COURT:  Paragraphs 6 through 9?

6              MR. ELLIS:  Yes.  Paragraphs 8 and 9 particularly.

7              THE COURT:  Paragraph 8 and 9 on page 8.  All right,

8    okay.  And I'll get to Peter, but these are the factual

9    allegations that you say warrant holding Maria as an employer,

10   right?

11             MR. ELLIS:  That's right, your Honor.

12             THE COURT:  Is there any other, before I look at these

13   more carefully -- I haven't highlighted them so I am going to

14   go through them with you -- is there something else I should be

15   looking at?

16             MR. ELLIS:  No, that's it.  I'd also put this again in

17   conjunction with the fact that she was a corporate owner and an

18   officer of the company, because the law is clear on this -- and

19   there is the distinction that's properly made between

20   possession of this authority and exercise of it -- possession

21   alone is sufficient to make somebody an employer under the FLSA

22   and the New York Labor Law.

23             THE COURT:  So what authority do you say she

24   possessed?

25             MR. ELLIS:  We believe, and I believe, that these

H13KFRIM

1   facts establish -- and again we're at the summary judgment

2   stage, obviously -- these facts establish she had all the

3   requisite control indicia of control to make her an employer

4   under the FLSA and the New York Labor Law.  She supervised

5   employees --

6           THE COURT:  How?

7           MR. ELLIS:  She determined -- well, Mr. Pineda, I

8   believe, worked in the front of the house because he was a

9   busboy.

10          THE COURT:  Do you agree that she was the hostess?

11  That was her primary responsibility?  Or you don't agree?

12          MR. ELLIS:  It's our position that she was the manager

13  of the front of the house.

14          THE COURT:  Well, again, those are legal conclusory

15  terms.  I don't know what that means.

16          MR. ELLIS:  So is "hostess," with all due respect.

17          THE COURT:  Well, no, not unless you tell me that,

18  yes, she was the hostess and the job of the hostess is to greet

19  the customers at the front door when they come in and seat

20  them.  That's why I'm asking you:  What is her job function

21  that you say pushes her over the limit to become the employer?

22          First of all, you're not claiming that she hires

23  anyone?

24          MR. ELLIS:  None of the plaintiffs, no.

25          THE COURT:  And you're not contending that this is

H13KFRIM

1   evidence that she had the authority to fire anyone?

2            MR. ELLIS:  No.  They all quit.

3            THE COURT:  Okay.  But they could have still quit

4   and --

5            MR. ELLIS:  Yes, and somebody else, they could have --

6   right, no.

7            THE COURT:  So she didn't have the authority to hire

8   him?

9            MR. ELLIS:  Well, no, that's not true.  Again, this

10  gets possession or exercise.  Our argument is that she in fact

11  possessed all of those authorities.

12           THE COURT:  Well, what's the evidence that she had

13  authority to hire someone?

14           MR. ELLIS:  She owned 25 percent of the corporation

15  and she was a corporate officer and she was there on a

16  regular basis --

17           THE COURT:  That doesn't give her the authority --

18           MR. ELLIS:  -- supervising the function of the

19  corporation.

20           THE COURT:  But that's not true.  Those conclusions

21  don't lead there.  Because she has a significant ownership

22  interest and also works there -- and I assume she had a salary,

23  right?

24           MR. ELLIS:  I would assume so, yes.

25           THE COURT:  I don't know if you guys are disputing

H13KFRIM

1    that.

2              MR. ELLIS:  I don't dispute that.

3              THE COURT:  That's what I'm trying to figure out.

4    That's why I asked earlier what Peter's job description was.

5    Did she have a job description as hostess or some other job --

6              MR. ELLIS:  I think that may be in dispute.  I think

7    they would try and minimize her role by calling her a hostess,

8    saying that's all she ever did, was seat people.

9              THE COURT:  Did she ever have a job title, that your

10   clients were aware of?

11             MR. ELLIS:  No, not to my knowledge, no.

12             THE COURT:  What was her day-to-day function?  Was it

13   to play a traditional hostess role --

14             MR. ELLIS:  No, more so.  According to Mr. Pineda, it

15   was to directly supervise him on a daily basis.

16             THE COURT:  Mr. Pineda, what was his job?

17             MR. ELLIS:  A busboy.

18             THE COURT:  What did she do?  Give me an example of

19   what she did to supervise Mr. Pineda?

20             MR. ELLIS:  She would determine, based on this

21   testimony, she would determine his tips.

22             THE COURT:  Where does it say she determined the tips?

23             MR. ELLIS:  Paragraph 9.  "Maria would simply give me

24   some amount of the tips."

25             THE COURT:  I'm looking at 9, and I have a different

H13KFRIM

1   one.  I'm on page 8.  Oh, I see, you're on page 9.

2            MR. ELLIS:  Page 9.

3            I would also point out, your Honor -- and this is a

4   quote from Slamna versus API Restaurant Corp., 2012, U.S. Dist.

5   LEXIS 102043, Southern District July 20, 2012 -- "The

6   overwhelming weight of authority is that a corporate officer,"

7   which she was, "with operational control of a corporation's

8   covered enterprise," which she had" --

9            THE COURT:  Well, what's the operational control?

10   That's what I'm trying to get at.

11            MR. ELLIS:  She supervised Mr. Pineda --

12            THE COURT:  Give me an example of a supervisory

13   decision that you say the evidence indicates, which would

14   indicate taking supervisory action as to Mr. Pineda.

15            MR. ELLIS:  She had the authority to pay employees.

16            THE COURT:  What do you mean by "have the authority"?

17   She had the authority to do what?  To hand them their

18   paychecks?

19            MR. ELLIS:  Right, that wasn't given to anyone.  You

20   don't just trust any random employee or any person off the

21   street to pay your employees.  It's management that pays

22   employees.

23            THE COURT:  No, it's management that issues the check.

24   You can trust any employee to hand out the checks.

25            MR. ELLIS:  That's not how they functioned.

H13KFRIM

1            THE COURT:  Well, what makes you say that?  I don't

2       see anything here.  What makes me say that?

3            MR. ELLIS:  Both the plaintiffs who submitted

4       affidavits testified that they were paid by either Peter or

5       Maria on multiple occasions.

6            THE COURT:  Which means what, that she gave them --

7       were they paid in cash or check?

8            MR. ELLIS:  I believe combinations of both, your

9       Honor.

10           THE COURT:  All right.  So she gave them their wages?

11           MR. ELLIS:  Correct.

12           THE COURT:  She handed it to them?

13           MR. ELLIS:  Correct.

14           THE COURT:  Other than handing them their wages, what

15      other responsibility did she have over their wages?  Any?  Is

16      there any evidence that she set those wages, that she had the

17      authority to withhold the paycheck?  Is there anything else

18      other than handing the paycheck?

19           MR. ELLIS:  For Maria, there is evidence -- and,

20      again, this is Mr. Pineda's declaration at paragraph 9 -- that

21      Maria supervised the tip pool.

22           THE COURT:  Where does it say she supervised the tip

23      pool?  It doesn't say that.  It says he accused her of stealing

24      monies from the employees' tips.  That's not a managerial role,

25      one way or the other.

H13KFRIM

```
 1              MR. ELLIS:  She has to have access to even do that.
 2    Even if you're talking about, say, an owner, in a very classic
 3    owner-versus-manager scenario, which we don't have here, but if
 4    somebody has the capability of even stealing from the tip pool,
 5    it means that they're in a class separate and apart from the
 6    other employees.
 7              THE COURT:  That's not necessarily true.  I assume
 8    everybody has some access to the tip pool because they each
 9    individually get the tips.  If I'm sitting in a restaurant
10    eating and I give the waiter a $20 tip, he has access to the
11    tip pool because he has to take that $20 a put it in the tip
12    pool.
13              MR. ELLIS:  Right.
14              THE COURT:  That doesn't make him an employer.
15              MR. ELLIS:  No, but it does put him in a separate
16    category from, say, a busboy, who doesn't have such access.
17    And, again --
18              THE COURT:  We're not arguing about whether the busboy
19    is an employer.  Your argument is this --
20              MR. ELLIS:  Or the waiter.
21              THE COURT:  I'm trying to concentrate on the exact
22    facts that you're giving me.
23              MR. ELLIS:  Right.
24              THE COURT:  You gave me two facts that you say -- no,
25    I'll give you three facts and you can add to that, if you
```

H13KFRIM

 1   will -- that you say make her the employer, a combination of

 2   these factors.  You say, one, she's an owner/shareholder,

 3   that's the first factor; two, that she would hand them their

 4   pay --

 5             MR. ELLIS:  Right.

 6             THE COURT:  -- sometimes; and three, that she would

 7   hand them their portion of the tips and --

 8             MR. ELLIS:  No, I would disagree with that

 9   characterization.  And I would add another.  I would say

10   that -- again, this is Mr. Pineda's declaration at paragraph

11   9 -- "Maria directly supervised me throughout my employment."

12             THE COURT:  I know, but that's not a fact.  I need a

13   fact.  In what way did she supervise him?  Did she tell him

14   which tissues to pick up?  Is there some deposition testimony

15   that tells me that she had a relationship with these plaintiffs

16   and that, by the nature of that relationship, I can conclude

17   that that means she is their supervisor?

18             MR. ELLIS:  No.  I inherited this case from a previous

19   associate, so I won't.

20             THE COURT:  Not a good excuse.

21             MR. ELLIS:  Yes.  So I don't believe that there were

22   depositions taken of Mr. Pineda.

23             THE COURT:  Well, you take the case as you find it.

24             MR. ELLIS:  I stand to be corrected if I'm wrong on

25   that.

H13KFRIM

1          THE COURT:  I'm looking at paragraph 9.  It says, "She

2    supervised me."  And then when I read the rest of the

3    paragraph, it says that the only things that -- I'm sorry, show

4    me where it says that she gave them the paychecks.

5          MR. ELLIS:  Paragraph 8.

6          THE COURT:  Oh, 8.

7          MR. ELLIS:  "When Maria was working, she would pay the

8    employees."

9          THE COURT:  It says, "Peter or Maria would pay."

10   That's what you're relying on?

11         MR. ELLIS:  Right.

12         THE COURT:  Okay.

13         MR. ELLIS:  "When Maria was working."

14         THE COURT:  She would pay the employees?  Okay.

15         So at this point, I guess what we're saying is -- tell

16   me if I'm interpreting this paragraph correctly -- if Peter was

17   the only one there, he paid employees; if Maria was the only

18   one there, she paid employees; if Renato was the only one

19   there, he paid employees?  That's basically what I read this to

20   say.

21         MR. ELLIS:  Right.

22         THE COURT:  So if Renato was there, who pays the

23   employees?

24         MR. ELLIS:  Unclear.

25         THE COURT:  Okay.

H13KFRIM

1          MR. ELLIS:  It also says cook employees, for Renato,

2    as opposed to all employees.

3          THE COURT:  Oh, I see, okay.

4          So if Peter and Maria are there, who pays the

5    employee?

6          MR. ELLIS:  Unclear.

7          THE COURT:  Okay.

8          MR. ELLIS:  I would think it would be Peter.

9          THE COURT:  If Maria and Renato are there, who pays

10   the employee?

11         MR. ELLIS:  Based on this, it seems that Renato paid

12   the cooks and that Maria would pay the others.

13         THE COURT:  Well, what's the distinction?

14         MR. ELLIS:  I don't think there really is one.

15         THE COURT:  You agree that Renato is the owner and the

16   proprietor and he ultimately hired all of these people, right?

17         MR. ELLIS:  Hired them, yes; owner and proprietor, no.

18   At that time, undisputedly, Maria and Peter were also owners

19   and proprietors who worked there on a daily basis.  So all

20   three of them owned shares in the corporation and worked there

21   on a daily basis and were officers of the corporation and paid

22   employees and supervised them and determined the tip pool, did

23   all the things that employers do, all three of them.

24         THE COURT:  Well, again, you've only given me, other

25   than wanting to rely on your legal conclusory statement that

H13KFRIM

1   she supervised employees, I don't have any affidavit,

2   depositions or anything that tells me what she did that would

3   make me conclude that she was a particular plaintiff's

4   supervisor or manager.

5           MR. ELLIS:  That's not so, your Honor.  Mr. Pineda,

6   his declaration specifically addresses this.

7           THE COURT:  Okay.

8           MR. ELLIS:  It's not our position that Maria

9   supervised all of the employees.

10          THE COURT:  So who did Maria supervise?

11          MR. ELLIS:  The front-of-the-house employees.

12          THE COURT:  Which of the plaintiffs did Maria

13  supervise?

14          MR. ELLIS:  Mr. Pineda.

15          THE COURT:  Just Mr. Pineda?

16          MR. ELLIS:  At least Mr. Pineda.

17          THE COURT:  Well, just Mr. Pineda?  Is there any

18  evidence in this record that she supervised any other type of

19  employee other than Pineda?

20          MR. ELLIS:  I believe that Mr. Guayllasac also

21  testified that she was a boss at the restaurant and supervised

22  employees.

23          THE COURT:  What was Pineda's job?

24          MR. ELLIS:  He states, in fact, at paragraph 7 -- this

25  is on page 8, this is from Mr. Guayllasac's declaration -- he

H13KFRIM

1    testifies that, yes, that Peter and Maria worked at the

2    restaurant, supervised waiters and hostesses, and generally

3    helped run the restaurant, that on occasion Peter or Maria

4    would pay me.

5              THE COURT:  Okay.  But that doesn't tell me which one

6    of them supervised the waiters and which one of them supervised

7    the hostesses.

8              MR. ELLIS:  That's true.  He goes on at paragraph 9

9    and says that Peter and -- this is following Renato's death --

10   that they were both, Peter and Maria, equally in charge of

11   monitoring and disciplining employees.

12             THE COURT:  All right.  So give me a fact that would

13   establish that.  Tell me what she did that would make this a

14   correct statement, make this a factual statement.

15             MR. ELLIS:  I would again --

16             THE COURT:  What is he basing that conclusion on?

17             MR. ELLIS:  This is his testimony.

18             THE COURT:  Well --

19             MR. ELLIS:  As to specific --

20             THE COURT:  Was he ever deposed?  I assume no.

21             MR. ELLIS:  I assume no.

22             THE COURT:  Because I assume if you had deposed this

23   guy, then you would have said -- well, you said in your

24   affidavit that Peter and Maria were both equally in charge of

25   monitoring and disciplining employees.  Give me an example of

H13KFRIM

1    when and how Maria monitored an employee, and give me an

2    example of how Maria disciplined and when Maria disciplined an

3    employee and then he would have said, well, yeah, I remember

4    when Jose was working and Jose wasn't moving fast enough, Maria

5    went in there and said, Jose, get your stuff together or you're

6    fired, I want you out there and I want you out there now, that

7    I specifically remember when she disciplined and she said I'm

8    docking your pay five dollars because you're just not working

9    hard enough today.  She would have given a factual scenario.

10             MR. ELLIS:  Right.

11             THE COURT:  I'm looking for some facts.  This is

12   summary judgment.  I'm looking for some facts that support

13   whether or not at this stage of the proceeding, what evidence

14   that you're going to present to a trier of fact on which the

15   jury can conclude, yes, she did monitor and -- what was the

16   word?

17             MR. ELLIS:  Supervise.

18             THE COURT:  -- and discipline, supervise, monitor and

19   discipline.  I don't see any example of supervision, I don't

20   see any example of monitoring, I don't see any example of

21   discipline on behalf of Maria.

22             MR. ELLIS:  I disagree.  First of all, we have the

23   pay.

24             THE COURT:  Well, what do you consider that to be --

25   monitoring, supervision or discipline -- giving them the

H13KFRIM

1     paycheck?

2               MR. ELLIS:  If I had to pick any of those verbs, I

3     would pick monitoring.

4               THE COURT:  How is handing them the paycheck

5     monitoring the employee?

6               MR. ELLIS:  You're making sure that they're paid.

7     This is one of the basic terms of an employer --

8               THE COURT:  It doesn't say she made sure they were

9     paid.  It says she handed them the paycheck, gave them the

10    paycheck.

11              MR. ELLIS:  Right.  That is making sure that your

12    employees --

13              THE COURT:  If I gave it to the busboy and I said give

14    this to the waiter, that doesn't make the busboy a supervisory

15    employer and that doesn't give him some authority over the

16    paycheck.  He's the delivery person.

17              MR. ELLIS:  Right.

18              THE COURT:  She's the delivery person.  Somebody gave

19    her -- you don't claim she wrote those checks?

20              MR. ELLIS:  No.

21              THE COURT:  You don't claim she issued those checks?

22              MR. ELLIS:  No.

23              THE COURT:  You don't claim that she set those wages?

24              MR. ELLIS:  It also appears from the record -- and

25    this is not quoted in here but this is Mr. Pineda's

H13KFRIM

1    declaration, paragraph 12:  "It was Peter's idea to start

2    paying the cook employees in checks around September 2014 but

3    they were empty checks since employees were paid in cash.  The

4    check was only for the record.  I was also paid in cash and was

5    never given an empty paper check."

6            THE COURT:  So that says that it was Peter's decision,

7    it wasn't Maria's decision.

8            MR. ELLIS:  It also implies that the employees were

9    paid in cash prior to that.

10           THE COURT:  Okay.  Well, that's fine, but for another

11   purpose, it says -- he's saying Peter made that decision.

12   That's a good example, when I say tell me an example of how one

13   supervises, monitors or disciplines, what is the factual

14   evidence of that.  If I asked you that about Peter, you would

15   say the factual evidence of that is that the employer said that

16   he knew or I guess it's still somewhat conclusory but at least

17   he's saying that Peter made the decision as to whether to pay

18   the person in check or cash.  Now, Peter can either deny or

19   admit that, but you don't make that kind of allegation against

20   Maria.

21           What decision do you say Maria made?  What managerial

22   decision did she make?

23           MR. ELLIS:  At paragraph 9, Mr. Pineda states again,

24   first, that he was supervised by Maria --

25           THE COURT:  What was the supervisory decision that she

H13KFRIM

1    made?

2              MR. ELLIS:  He goes on to state that she determined

3    his tips.

4              THE COURT:  No, it doesn't say that.

5              MR. ELLIS:  "Maria would simply give me some amount of

6    the tips but I never knew how much was the total, so I was

7    never able to see."  And he would complain to her, so she is

8    the person that he would then complain to about this.  And she

9    would tell him to go pound sand, basically.

10             THE COURT:  It doesn't say she determined the amount

11   of tips.  She handed him his portion of the tips.  He said that

12   he questioned her --

13             MR. ELLIS:  His testimony is that he was paid by three

14   people -- Peter, Maria and Renato -- and his testimony is that

15   the tips were controlled only by Maria.

16             THE COURT:  Where does it say that?

17             MR. ELLIS:  In paragraph 9.

18             THE COURT:  It doesn't say it was controlled only by

19   Maria.

20             MR. ELLIS:  He never said it was controlled by anyone

21   other --

22             THE COURT:  No, it doesn't say she controlled the tips

23   at all.  It says she would simply give me some amount of the

24   tips.  He doesn't say how she got them, it doesn't say whether

25   or not she was the one that divided up the money, it doesn't

1    say she determined the tips.  It says that she handed him what

2    was supposed to be handed to him as his portion of the tip.

3            When he asked her about it, he doesn't say, well,

4    look, I calculated it, I know it's right, you've got nothing to

5    complain about because I did it myself personally and I take

6    responsibility for it, it's my job to determine the tips.  She

7    doesn't say any of that.  He doesn't even say she has that

8    role.  He says she shows up with a portion of the tips.  By

9    this scenario, I have a day in time when she shows up with his

10   pay and she gives him an amount of money and that amount of

11   money may be $80 for his wages and $20 for his portion of the

12   tips.  And she hands that to him and he looks at it and he says

13   you know what, I'm not sure this is right.  And she says to

14   him, well, look, I don't know what you're complaining about

15   now.  Whether or not this was the right thing to say, she says

16   you shouldn't even work here, so if I were you, I wouldn't

17   complain so much about whether or not you think the tips are

18   right, I would just take your money and be happy you got a job.

19           Okay, that's what I read from this.  That doesn't tell

20   me that she's the boss.  Anybody could have made that

21   statement.  Another busboy could have made that statement.

22           MR. ELLIS:  The busboy is not giving her the tips.

23           THE COURT:  A busboy could have given her the tips.

24           MR. ELLIS:  And if that was the case, that it's

25   another busboy who's giving him his tips and telling him you

H13KFRIM

1    should be happy with this amount, then that other busboy is an

2    employer.

3            THE COURT:  But you would agree that if he thought

4    that he wasn't getting paid the right amount of pay, that the

5    logical and appropriate thing for them to do would be to go to

6    Renato?

7            MR. ELLIS:  No.  It would be to go to the person who

8    he believed is determining that amount of pay.

9            THE COURT:  But he didn't do that, he didn't do.

10           MR. ELLIS:  He says that Maria was my direct

11   supervisor, she determined my tips; when I had a problem with

12   the amount of tips I made, I would go talk to Maria.  That's

13   what he's saying.

14           THE COURT:  No, it doesn't say when I had a problem.

15           MR. ELLIS:  Maria directly supervised me.

16           THE COURT:  Right.

17           MR. ELLIS:  Maria would simply give me some amount of

18   the tips but I never knew what the total was; when I would tell

19   her about that, I believed my tips were incorrect, she would

20   tell me to be content with what I had been given.

21           THE COURT:  Okay, so what about that --

22           MR. ELLIS:  That's exactly what an employee does when

23   they have a relationship with an employer who's their

24   supervisor.  If I have a problem with my pay, I go to Michael

25   Faillace and I tell him to give me a raise.

H13KFRIM

1          THE COURT:  It doesn't say he went to her.  It says

2     she went to him.

3          MR. ELLIS:  No, it says he --

4          THE COURT:  No, it says she goes to him and gives him

5     the tips.  And when she gives him the tips, he says, well, I

6     don't think this is right, and she says, look, not my problem.

7     That's basically the way I read this.

8          MR. ELLIS:  I don't think you read it incorrectly.

9     That's exactly what -- and the fact that coupled with her being

10    an owner of the corporation, an officer of the corporation, and

11    that is her operational control of the corporation's covered

12    enterprise.

13         THE COURT:  Well, let me ask you -- because we're

14    going to end this soon -- let me ask you these questions, which

15    would be the most powerful arguments if you had this evidence:

16    So tell me, when I read this evidence, there's no evidence in

17    this record that Maria ever hired a single employee; is that

18    correct?

19         MR. ELLIS:  That's correct.

20         THE COURT:  There's no evidence in this record that

21    Maria ever fired a single employee.

22         MR. ELLIS:  That's correct.

23         THE COURT:  There's no evidence in this record that

24    Maria set the salary level for any of these employees.

25         MR. ELLIS:  That's correct.

H13KFRIM

1          THE COURT:  What else is the most powerful indication

2     of -- and there's no evidence in this record that Maria was

3     engaged in certain kinds of functions that would make me

4     conclude that she was supervising Pineda when it seems that she

5     is mostly in the role of a hostess, and I'm not sure what it

6     is --

7          MR. ELLIS:  She was not just a hostess -- we can

8     establish that -- she was an owner of the corporation and an

9     officer of it.  So this idea that she is just a hostess is

10    hogwash.

11         THE COURT:  Look, this is not the determination, but

12    it's clear, as being the daughter of the owner of the

13    establishment and having a corporate ownership herself, that

14    people are going to be hesitant to make her unhappy, okay?  I

15    understand that.

16         MR. ELLIS:  We're well beyond that, your Honor.

17         THE COURT:  No, we're not well beyond that.  If we're

18    well beyond that, you'd give me some facts.

19         MR. ELLIS:  She's not just some person who happens to

20    be related to the owner, who owns an ownership stake and comes

21    in every Saturday and you've got to make her happy.  She's

22    there every day supervising people.

23         THE COURT:  No, she's there every day doing work.  And

24    without using the word "supervise," tell me what she's there

25    doing.

H13KFRIM

1          MR. ELLIS:  Telling employees what to do, go bus that

2     table, go bus this table.

3          THE COURT:  Where is that in this record?  Where does

4     it say this?

5          MR. ELLIS:  Mr. Pineda's testimony.

6          THE COURT:  Where does it say that he told her to go

7     do this table, go do that table?  Where is there any evidence

8     of those kinds of specifics?  I assume there isn't.

9          MR. ELLIS:  If Mr. Pineda were here --

10          THE COURT:  How would you know that?

11          MR. ELLIS:  He was never deposed.

12          THE COURT:  Well, then that's not evidence that you

13     can argue from.  I can't assume he would say that.  You don't

14     know that he would say that.  He never said that to you.

15          MR. ELLIS:  Her role, though, as an employer is in

16     dispute, and there's clearly not enough evidence on this record

17     to say that she was not an employer within the meaning of the

18     FLSA, especially given the fact, again, that she's an owner of

19     the corporation who's there on a daily basis.  If --

20          THE COURT:  So you want me to say that because she is

21     an owner, a corporate owner, and is working there -- she's not

22     there on a daily basis in her capacity as a corporate owner,

23     she's there on a daily basis in her capacity as a paid

24     employee, right?

25          MR. ELLIS:  Both.

H13KFRIM

1          THE COURT:  Well, no, not both.  She's being paid to

2     do the job that she's doing.

3          MR. ELLIS:  Right.

4          THE COURT:  She's not doing it for free and she's

5     not --

6          MR. ELLIS:  She's also not made an owner for free.

7          THE COURT:  I know, but being an owner doesn't

8     determine whether you're going to be there on a daily basis.

9          MR. ELLIS:  Correct.

10         THE COURT:  And in this case, you would have a

11    stronger argument if she was an owner, didn't have a job there,

12    was there on a daily basis to make sure that the restaurant was

13    making money so she could profit from it.  She's there in a

14    paid capacity.

15         MR. ELLIS:  Yes.  But giving her a paycheck, a salary,

16    doesn't somehow absolve her role as an employer.

17         THE COURT:  It doesn't, it doesn't, if you can tell me

18    what role she has as an employee.

19         MR. ELLIS:  Whether or not she's paid say a salary is

20    completely irrelevant to the analyses of whether she is an FLSA

21    employer.  She could be paid a salary, she could not be paid a

22    salary, the salary could be one dollar, a thousand dollars a

23    week.  That has no bearing on whether or not she's an employer.

24         THE COURT:  So let me ask you, the same way I asked

25    you about hiring, firing, setting the wages --

H13KFRIM

1              MR. ELLIS:  Operational control, if you will.

2              THE COURT:  All right.  So tell me what -- well, no,

3    let me take it back.  I'm going to say it more firmly.  Isn't

4    it true that there's no evidence in this record that she made

5    any particular decision over an employee that you can cite to

6    me as evidence of her alleged supervisory role?

7              MR. ELLIS:  No, there is evidence of that.

8              THE COURT:  Okay.  Give me the evidence of what it is

9    that she did that would support her supervisory role.

10             MR. ELLIS:  She was given the authority to pay

11   employees and, according to Mr. Pineda --

12             THE COURT:  Wait a minute, wait a minute.  Where does

13   it say that?

14             MR. ELLIS:  She paid employees.

15             THE COURT:  She was given the authority -- so, okay,

16   that's what I anti --

17             MR. ELLIS:  Only three people can do this in the

18   corporation.  Only three people, according to all the

19   testimony, only three people ever paid employees, and all three

20   of them happened to be corporate owners and officers.

21             THE COURT:  Okay.  So you're saying that the fact that

22   she handed them their pay is what makes her an employer?

23             MR. ELLIS:  It's one of many indicia of her being an

24   employer.

25             THE COURT:  And you think that --

H13KFRIM

1          MR. ELLIS:  Under Irizarry, the question is, does this

2     person have operational control.

3          THE COURT:  Right.  So what operational control, what

4     is the evidence of her operational control?  Give me the fact.

5     What did she do?

6          MR. ELLIS:  Before that, let me read the definition

7     from Irizarry of operational control.  This would be if his or

8     her role within the company and the decisions it entails

9     directly affect the nature or conditions of the employee's

10    employment.

11         THE COURT:  Okay.  So tell me, what evidence in this

12    case is there that she made a decision that directly affected

13    the employer?

14         MR. ELLIS:  So some degree of individual involvement

15    in the company in a manner that affects employee-related

16    factors, such as workplace conditions and operations, personnel

17    or compensation.

18         THE COURT:  Okay.  So as to which one of those did she

19    make the decision?

20         MR. ELLIS:  Compensation --

21         THE COURT:  She made the decision about what the

22    compensation was going to be?  There's evidence in this record?

23         MR. ELLIS:  No.  It says some degree of individual

24    involvement -- it's not the final decision -- some degree --

25         THE COURT:  No, no.

H13KFRIM

1          MR. ELLIS:  -- of individual involvement in a company

2     in a manner that affects --

3          THE COURT:  No.

4          MR. ELLIS:  -- employment-related factors such as

5     workplace conditions.

6          THE COURT:  No.  You just read part of the sentence.

7     The sentence started out with "decisions."

8          MR. ELLIS:  No, it doesn't.

9          THE COURT:  Read it again.

10         MR. ELLIS:  Page 5 from my brief.

11         THE COURT:  Read what you just read to me.  What you

12    read to me, the word you read to me was "decisions."

13         MR. ELLIS:  Okay.  So the issue is operational

14    control.

15         THE COURT:  Right.

16         MR. ELLIS:  A defendant exercises such operational

17    control, quote, if his or her role within the company and the

18    decisions it entails --

19         THE COURT:  And the decisions it entails.

20         MR. ELLIS:  -- directly affect the nature or

21    conditions of the employees employment or if he possesses,

22    quote, some degree of individual involvement in a company in a

23    manner that affects employment-related factors such as

24    workplace conditions and operations, personnel or compensation.

25         THE COURT:  Okay.  So which one of those factors are

H13KFRIM

1    you relying upon?

2              MR. ELLIS:  Multiple.  First, I would state workplace

3    conditions.  She was a supervisor of the front of the house.

4              THE COURT:  Give me an example of the workplace

5    condition that she changed.

6              MR. ELLIS:  That she changed?

7              THE COURT:  Yes.  That she made some decision on.

8              MR. ELLIS:  Again, we're getting back to this issue of

9    whether or not somebody possesses or exercises these

10   controls --

11             THE COURT:  Right, because --

12             MR. ELLIS:  -- because possession is enough to get me

13   status as an employer.

14             THE COURT:  But you can't argue that she has this if

15   she's not -- if there's no evidence she's exercising this,

16   what's the evidence that she has this control?

17             MR. ELLIS:  Oh, no, that is absolutely the way that

18   this area of law functions, your Honor.

19             THE COURT:  No, it doesn't, no.  This area functions

20   that you have to give me some fact that will establish these

21   factors.  I'm asking you which one of these factors you're

22   relying upon, and I'm asking you what facts you're relying upon

23   to argue these factors.

24             MR. ELLIS:  I would point to two.  First, workplace

25   conditions and operations because --

H13KFRIM

1              THE COURT:  Wait a minute, because I want to write it

2      down.  Okay, workplace --

3              MR. ELLIS:  Workplace conditions and operations.

4              THE COURT:  Conditions?  Wait a minute, that's two

5      different things.  Workplace conditions?

6              MR. ELLIS:  And operations.

7              THE COURT:  And workplace operations.

8              MR. ELLIS:  Right.

9              THE COURT:  Okay.

10             MR. ELLIS:  And compensation would be the other

11     factor.

12             THE COURT:  Compensation?

13             MR. ELLIS:  Right.

14             THE COURT:  And you say --

15             MR. ELLIS:  Just back to this distinction between

16     exercise of control and possession of control, because I think

17     this is really key, this is from page 6 of my brief:  Fermin

18     versus Las Delicias Peruanas Restaurant, Inc., Eastern District

19     2015, 93 F.Supp.3d 19.  "A district court may consider an

20     individual defendant's potential power at a company, i.e., if

21     an individual defendant's lack of operational control is due to

22     the individual defendant choosing not to exercise power he or

23     she possesses."

24             THE COURT:  Okay, so --

25             MR. ELLIS:  That may also weigh in favor of the

H13KFRIM

 1   employer status.

 2         THE COURT:  So tell me what power you say the record

 3   indicates that she had that she did not exercise.  What

 4   potential powers are you trying to urge upon me to conclude?

 5         MR. ELLIS:  I think all of the powers that -- to hire

 6   and fire employees.

 7         THE COURT:  Wait a minute.  Is there a shred of

 8   evidence that she had any authority, potential power --

 9         MR. ELLIS:  Yes.

10         THE COURT:  -- to hire and fire employees?

11         MR. ELLIS:  Absolutely.

12         THE COURT:  What is that evidence?

13         MR. ELLIS:  She is an officer of the company.

14         THE COURT:  That does not give her the right to hire

15   and fire employees.

16         MR. ELLIS:  She is there on a daily basis.

17         THE COURT:  That does not give her the right to hire

18   and fire employees.

19         MR. ELLIS:  I believe it does.

20         THE COURT:  The fact that she's a corporate officer?

21         MR. ELLIS:  And --

22         THE COURT:  You think the case law is that a corporate

23   officer, you can rely on that --

24         MR. ELLIS:  Not alone.

25         THE COURT:  -- as evidence of that you have the

H13KFRIM

1    authority to hire and fire employees?

2         MR. ELLIS:  No, not alone, but in total, I believe

3    that the evidence is very clear that she possessed all of

4    these -- all of this power.

5         THE COURT:  Okay.  You're lumping them together.

6    You're making your argument weaker not stronger.  I'm asking

7    you specifics and you're having difficulty me giving me those

8    specifics.

9         You said she had some sort of involvement in workplace

10   conditions.

11        MR. ELLIS:  Right.  She was the supervisor --

12        THE COURT:  What are the workplace conditions that she

13   affected?

14        MR. ELLIS:  She controlled, managed, supervised the

15   front of the house.

16        THE COURT:  Tell me what workplace condition that your

17   client was working under that she affected.  Give me one

18   example.

19        MR. ELLIS:  Again, going back to Mr. Pineda's

20   declaration, I would point to the fact that he was paid

21   regularly by Maria and that she apparently determined his tips.

22        THE COURT:  How does giving him his paycheck affect

23   his workplace conditions or the operation?

24        MR. ELLIS:  It's a basic part of the employer/employee

25   relation, that one is paid for their work.  And how that occurs

H13KFRIM

1    is critical.  That's the basic function of an employer/employee

2    relationship, and if this is the person who, on behalf of the

3    company, is paying me --

4           THE COURT:  That's compensation.  You also said you're

5    relying on compensation.  Is that your same argument or a

6    different argument?

7           MR. ELLIS:  No, I would also point to the tip

8    testimony about the tip pool.

9           THE COURT:  Where is the evidence that she determined

10   what percentage of the tip he's supposed to get?

11          MR. ELLIS:  Sorry, say that again.

12          THE COURT:  What's the evidence that she determined

13   what percentage of the tip pool he was supposed to get?

14          MR. ELLIS:  She hasn't been deposed, let alone on

15   this --

16          THE COURT:  So there's no evidence that she affected,

17   that she set his compensation, either as to salary or as to

18   tips.

19          MR. ELLIS:  That's not correct.  This testimony --

20          THE COURT:  What is the evidence --

21          MR. ELLIS:  That she set the amount of tips that he

22   received.

23          THE COURT:  It doesn't say that.  It doesn't say she

24   determined the amount -- what does that mean, she determined

25   the amount of tips?  She determined what percentage he was

H13KFRIM

1    going to get?

2            MR. ELLIS:  That's what his testimony is.

3            THE COURT:  That's not his testimony.

4            MR. ELLIS:  She would give me some amounts of the

5    tips.

6            THE COURT:  Where is that testimony?  Quote it to me.

7            MR. ELLIS:  Again, paragraph 9.

8            THE COURT:  Quote me that testimony that stands for

9    that proposition.

10           MR. ELLIS:  "Maria would simply give me some amounts

11   of the tips but I never knew how much the total was, so I was

12   never able to see if I was being paid fairly."

13           THE COURT:  So what does it say she did, other than

14   give him some amount of money?

15           MR. ELLIS:  Exactly.  Though --

16           THE COURT:  Handing him --

17           MR. ELLIS:  As opposed to what?  She's determining the

18   percent of tips that he receives.  She's determining his

19   compensation.

20           THE COURT:  So one last question:  What is the

21   evidence, consistent with the argument you make as to Peter,

22   what is the comparable evidence as to Maria with regard to what

23   role she played when Renato was in charge and what role she

24   played after Renato passed away or went to the hospital?

25           MR. ELLIS:  Okay, if you take a step back and look at

H13KFRIM

1    the undisputed facts in this, the undisputed facts for both of

2    the defendants, Renato and Peter, are remarkably similar, the

3    same, in fact, aside from their different titles as corporate

4    officers.  They both began working at the restaurant in 1993;

5    they were both, at the exact same time, given equal shares,

6    ownership shares, of 25 percent each; and they were both made

7    corporate officers at the exact time, in 2006.

8              THE COURT:  By their father?

9              MR. ELLIS:  Right.

10             THE COURT:  And I assume there are no other children?

11             MR. ELLIS:  I assume so too, but --

12             THE COURT:  He gave children his interest in the

13   restaurant?

14             MR. ELLIS:  Right, right, which came from the uncle

15   who was leaving the restaurant.

16             THE COURT:  It had been the uncle's share?

17             MR. ELLIS:  Right.

18             So if we wanted to look at this and say, well, Peter

19   is more in charge than Maria --

20             THE COURT:  You don't agree that Peter is more in

21   charge than Maria?

22             MR. ELLIS:  I think that's clear.

23             THE COURT:  I would you could think make a credible

24   argument on these facts.

25             MR. ELLIS:  No, I think that's true.  Again, in terms

H13KFRIM

1   of hard facts that we can point to, the only other one that I

2   would point to is that their titles -- he was given the title

3   of vice president and she was given the title of secretary in

4   the corporation.

5           THE COURT:  But those are corporate titles, not job

6   titles.

7           MR. ELLIS:  Exactly.

8           THE COURT:  Did either one of them have a job title?

9           MR. ELLIS:  Not to my knowledge, no.  They just had

10  roles.  You know, basically, Maria was in charge of the front

11  of the house and Peter was the manager.

12          THE COURT:  The only thing you told me is that she

13  supervised your plaintiff who was a busboy?

14          MR. ELLIS:  Right.

15          THE COURT:  Is there any evidence she supervised

16  anyone else?

17          MR. ELLIS:  No, because the rest worked in the back of

18  the house.

19          THE COURT:  Okay.  So how many busboys were there?

20          MR. ELLIS:  Unclear from the record.

21          THE COURT:  More than one that worked at a time?

22          MR. ELLIS:  I believe so, perhaps two, I don't know,

23  and waiters.

24          THE COURT:  Is there any evidence that she supervised

25  some other individual other than Pineda?

H13KFRIM

1          MR. ELLIS:  Yes.  Mr. Pineda testified that she

2     supervised waiters and hostesses.

3          THE COURT:  Okay.  What does that mean?  Is there some

4     waiter who said that he was supervised by her?

5          MR. ELLIS:  No.  This is Mr. Pineda testifying as to

6     the operations --

7          THE COURT:  No, I understand that.  I'm saying, who

8     did she supervise?  There's no other plaintiff who claimed that

9     she was their supervisor.

10          MR. ELLIS:  That's correct, because the other

11     plaintiffs worked in the back of the house.

12          THE COURT:  So why would she qualify as their

13     employer?

14          MR. ELLIS:  Again, as a corporate owner, who is a

15     corporate officer, who is working at the restaurant every day,

16     she was --

17          THE COURT:  Yes, but she isn't like any employer --

18     no, her function has to be with regard to these plaintiffs,

19     right?

20          MR. ELLIS:  No.  If she is --

21          THE COURT:  Well, Diaz can't just sue her and sue her

22     as his employer, can he?

23          MR. ELLIS:  If he was only suing her and not the

24     corporation?

25          THE COURT:  Right.  If you're suing her and the

H13KFRIM

1    corporation.  He doesn't claim that she's his supervisor, even

2    by your argument.

3              MR. ELLIS:  Correct.

4              THE COURT:  None of these other plaintiffs, other than

5    Pineda -- that's why I asked -- none of these other plaintiffs

6    have standing to sue her as their employer, whether they sue

7    the restaurant or other people or not.

8              MR. ELLIS:  Yes, I think that's correct.

9              THE COURT:  The only person you're alleging who would

10   have any standing to sue her as their employer is Pineda.

11             MR. ELLIS:  Right, fair enough.  She still ends up on

12   the hook jointly and severally, though, as an employer --

13             THE COURT:  No, not as to the other employees.  She's

14   not their employer.  She doesn't owe them money.

15             MR. ELLIS:  If she is a corporate officer and she is

16   on a daily basis --

17             THE COURT:  Supervising only the busboys.  If she is

18   only the employer as to the busboys, how can the waiter sue her

19   if she has no supervisory responsibility over waiters?

20             MR. ELLIS:  Well, according to this, she supervised

21   waiters and hostesses and busboys, the people who worked in the

22   front of the house --

23             THE COURT:  Does Diaz claim that she supervised him?

24             MR. ELLIS:  Not to my knowledge.

25             THE COURT:  None of the other three, none of those

H13KFRIM

1   three, other than Pineda, claim that she supervised them,

2   right?

3              MR. ELLIS:  I believe Mr. Guayllasac states that she

4   supervised him.

5              THE COURT:  Do you think she's his employer also?

6   What is his job?

7              MR. ELLIS:  He was a cook.  No, he doesn't he states

8   that -- well --

9              THE COURT:  You said she supervised the people in the

10  front.  The cook is in the kitchen.

11             MR. ELLIS:  Right, yeah.  He testifies that she

12  supervised waitresses -- waiters and hostesses and generally --

13             THE COURT:  What waiter did she supervise?

14             MR. ELLIS:  Oh, he also testified that she would pay

15  him occasionally.

16             THE COURT:  Are you arguing that she's his supervisor

17  because she paid him?

18             MR. ELLIS:  No.  My argument is that she had

19  operational control over the business --

20             THE COURT:  Over him?

21             MR. ELLIS:  And that -- yes, over all the plaintiffs

22  because of the powers that were vested in her, and that she

23  only occasionally exercised these powers, some of the indicia

24  of this being when she would pay employees, when she would --

25             THE COURT:  What is the evidence she was given these

H13KFRIM

1    powers, other than that she was a corporate owner?  What's the

2    evidence that she was given managerial powers over employees,

3    other than Mr. Pineda's vague statement that she supervised?

4            MR. ELLIS:  The payment of employees, I would say, is

5    the only hard evidence we have.  And, again, this gets to the

6    only people going around paying employees at Piccolo Angolo are

7    actual corporate owners.

8            THE COURT:  You wouldn't argue that would make them

9    employers in and of itself?

10           MR. ELLIS:  In and of itself, no, but it's this

11   analysis in toto.

12           THE COURT:  Is it your position that Peter had the

13   authority to hire and fire people?

14           MR. ELLIS:  Yes, absolutely.

15           THE COURT:  But it's not your position that Maria had

16   that authority?

17           MR. ELLIS:  No.

18           And with respect to Peter, I would state also that

19   both plaintiffs who submitted declarations testified they were

20   both fired by Peter.

21           THE COURT:  Both fired by Peter?

22           MR. ELLIS:  Yes.

23           THE COURT:  That was after the father died?

24           MR. ELLIS:  Yes.

25           THE COURT:  What do you say the status was of Peter

H13KFRIM

1   and Maria after the father died?

2           MR. ELLIS:  As to their corporate ownership or --

3           THE COURT:  As to their status as employers.

4           MR. ELLIS:  It's our argument that they were employers

5   for the entire time, both of them, that they were FLSA

6   employers for the entire --

7           THE COURT:  I know, but Peter's role did change to

8   some extent.

9           MR. ELLIS:  Yes.

10          THE COURT:  When the father died?

11          MR. ELLIS:  Right.

12          THE COURT:  You don't claim that Maria's role got

13  significantly different after the father died?

14          MR. ELLIS:  No.

15          THE COURT:  You don't say it got any different at all?

16          MR. ELLIS:  No, for either.  And I think --

17          THE COURT:  No, no, no, you can't say that.  You just

18  said the opposite.  You just said Peter's role was

19  significantly different after the father died because the

20  father was no longer around to consult on those decisions, he

21  was making those decisions, right?

22          MR. ELLIS:  On this theory of Peter running back and

23  forth to his father's bedside --

24          THE COURT:  On any theory.

25          MR. ELLIS:  Well, that would have changed, even under

H13KFRIM

1    that theory.

2              THE COURT:  Right.

3              MR. ELLIS:  No, I think in --

4              THE COURT:  Peter was clearly the person in charge.

5    He took over the responsibilities as employer once the father

6    died.

7              MR. ELLIS:  Right, I think that's --

8              THE COURT:  His role went from whatever you want to

9    characterize it as -- whether you had a hierarchy and the

10   father was at the top --

11             MR. ELLIS:  Yes.

12             THE COURT:  -- that hierarchy didn't exist anymore,

13   Peter was now at the top.

14             MR. ELLIS:  Yes, but I think in terms of day to day,

15   the day to day did not change, and that the only thing that

16   changed was his paper hierarchy, with the father at the top.

17   And both plaintiffs testified that the father actually started

18   getting sick in 2011 and that the roles started changing at

19   that point.

20             THE COURT:  I know, but there was at least a

21   significant change.  There was a change in the fact that Peter,

22   before the father died, whether Peter was making decisions in

23   the father's absence, Peter had the father available to

24   consult.

25             MR. ELLIS:  Sure.  So did Maria, though.

H13KFRIM

1      THE COURT:  It is not your position that if the father

2  wanted to do it one way and Peter wanted to do it a different

3  way, that Peter could tell the father, we're going to do it my

4  way?  That's not your case before the father died?

5      MR. ELLIS:  Correct, yes.

6      THE COURT:  As I say, a Godfather analogy, you've got

7  Michael and Vito.  He decides, Michael, you're in charge now,

8  you do what you want, that's your theory, and then he dies and

9  then Michael goes out and he does the assassination.

10      MR. ELLIS:  Right.

11      THE COURT:  That's his decision.  I said, I promise,

12  on the lives of my children, that I wouldn't do anything to

13  force him to break the peace.

14      MR. ELLIS:  Right, right, right.

15      THE COURT:  That's what Vito says.  And he wasn't the

16  person to break the peace because he didn't make those

17  decisions when he was in authority to make to make those

18  decisions, and when he transferred power to his son, that

19  decision was ultimately made by his son.

20      MR. ELLIS:  I agree.  But to go Godfather analogy, I

21  think what you're really talking about is the time when Sonny

22  and Michael -- when Sonny is still alive.  And Sonny is Peter

23  and Maria is Michael.

24      THE COURT:  Sonny is Peter and Maria is Michael?  You

25  know, that's not a bad analogy because you know at that point

H13KFRIM

1    in time Michael was in Italy.

2              MR. ELLIS:  Right.

3              THE COURT:  Michael wasn't in charge.

4              MR. ELLIS:  Very much involved in the family business.

5              THE COURT:  No, he was not involved in the family

6    business.

7              MR. ELLIS:  He had to go to Italy to hire because he

8    had just done the family a great service and he was --

9              THE COURT:  Exactly, not as an employer.  He decided

10   that he would assassinate --

11             MR. ELLIS:  A cop.

12             THE COURT:  The cop and whatever his name was.

13             They could have gotten -- I forget all the names now,

14   but if Lugo was still alive, they could have gotten him to kill

15   him, right?  That's not an employer task, that's an employee's

16   task, of killing the police officer and killing the -- whoever

17   will going to get the job done, Tessio could have done it,

18   Clemenza could have done it, but the reason Michael did it was

19   not because he was their boss.  They were trying to keep him

20   out of this.  Michael did it because he was the person who had

21   access to the person to be assassinated.

22             MR. ELLIS:  Right.  But it was critical family

23   business that needed to be done.

24             THE COURT:  That's right.  But you wouldn't argue that

25   Michael was everybody's employer at that time when they asked

H13KFRIM

1    him to do the hit, you wouldn't be arguing that?

2              MR. ELLIS:  Even in the movie, right, that's when

3    Michael crosses the Rubicon and gets involved.  And I think

4    that the analogy --

5              THE COURT:  No, not running the business.  That's the

6    whole --

7              MR. ELLIS:  Involved in the business, not running it

8    as the Godfather but being involved.  That's when he crosses

9    that Rubicon.

10             THE COURT:  No.  The only involvement he had was

11   killing these two guys in the restaurant.

12             MR. ELLIS:  Exactly.

13             THE COURT:  Then he jumped on a boat and went to Italy

14   for a year.  He wasn't involved in the business.  He was making

15   no decisions.

16             MR. ELLIS:  No, he's --

17             THE COURT:  Sonny was making all the decisions.  He

18   wasn't involved in the business, this is not the appropriate

19   analogy, but he wasn't involved in the business, if you want to

20   throw that analogy at me.  If he's Maria, I can't use his

21   activities prior to his father transferring those

22   responsibilities.  Sure, at the point when Michael, what's his

23   name, Robert Duvall --

24             MR. ELLIS:  The consiglieri?

25             THE COURT:  Yes.  Whatever his name was in the movie.

H13KFRIM

1              -- at the point when he says to the other guys, look,

2    no, I'm not going to talk to the Godfather, Michael's running

3    things, you talk to Michael.

4              MR. ELLIS:  That's after he comes back from Italy,

5    right.

6              THE COURT:  At that point, yes, he's the employer.

7    But you don't have that status as to Maria; you argue you have

8    that status as Peter.

9              MR. ELLIS:  This is, I guess, where the analogies

10   break down.  In the Godfather analogy, we have a very

11   hierarchical system where there's no ambiguity, there's one guy

12   in charge, everyone else works for him.

13             THE COURT:  There was a hierarchical system.  Renato

14   was in charge.  You don't argue that anybody had greater

15   authority than Renato?

16             MR. ELLIS:  Absolutely.

17             THE COURT:  Or had as much authority as Renato?

18             MR. ELLIS:  Correct.  But where the analogy breaks

19   down is the FLSA and the definition of employer under the FLSA

20   and the fact that it's so broad purposefully.

21             And then, again, back to the Godfather analogy,

22   Michael is involved at the point when he leaves for Italy.  His

23   wife is assassinated in Italy by Americans acting --

24             THE COURT:  Right, he's involved but he's not involved

25   as an employer.

H13KFRIM

1          MR. ELLIS:  Yes, he's involved --

2          THE COURT:  No, he's not involved as an employer.

3          MR. ELLIS:  In the analogy with the FLSA --

4          THE COURT:  If you look at all the factors you gave

5     me, there's not a single factor, piece of evidence, that you

6     can point to, even in that analogy, that would show that he set

7     people's compensation.  He isn't even delivering checks.  Maria

8     is delivering the checks.  He's not supervising anybody.  He

9     has none of those indicia of being the employer or that you

10    cited under the case law.  Your argument betrays you there.  If

11    you're going to say that that's --

12         MR. ELLIS:  My argument is that he is involved in the

13    family business, is the point where he crosses that Rubicon and

14    assassinates Sollozzo and the cop.  And the indicia in the

15    analogy that he is still involved, even in Italy, is that his

16    wife gets assassinated and he comes back and takes over.

17         THE COURT:  When he goes back and takes over, then

18    he's involved?

19         MR. ELLIS:  Then he's in charge.  But he's always

20    involved from the moment he crosses that Rubicon and kills the

21    cop.  He's --

22         THE COURT:  That's why I asked you specifically in

23    this case, give me the facts that you say the evidence

24    indicates that Maria was involved.  You're making that argument

25    as to Michael, and my question would be exactly the same thing:

H13KFRIM

1    What evidence is there that Michael was involved in running the

2    family business from Italy?  There's absolutely none, none.

3    You can't say because they blew up his wife that's evidence

4    that he is an employer of the people who were working for the

5    Godfather.  He's not making those decisions.  He's not even

6    talking to these people.  They haven't seen him for a year.

7    They're hiding him out somewhere so somebody doesn't kill him.

8           There's no factual evidence that you can give me that

9    I can say, yes, Michael did X so that shows that he was helping

10   to run the family business.  There's no such evidence.  Until

11   Michael comes back, his father gets out of the hospital, and

12   he's sitting down with his father, his father is passing on

13   those responsibilities to him.  There's no such evidence before

14   that.

15          So here I understand your argument about Peter, I

16   understand, although it's very vague and I think it's an

17   evidentiary issue as to how involved Peter was, when he got so

18   involved that he at some point became an employer or wasn't the

19   employer, was he the employer all along, was he the employer

20   only when his father got sick, only after his father died.

21   Those are all factual issues that I think on this record I

22   don't have a basis to resolve.  Those have to be resolved on

23   credibility issues and testimony of witnesses.

24          With regard to Maria, I don't see such a transition.

25   You're saying to me that you've got one plaintiff, who's the

H13KFRIM

1    busboy, who simply says, Maria used to supervise me, she gave

2    me my check, she gave me the pay and the pay included my wages

3    and my tips, and I complained to her when she gave me the tips,

4    that I thought I wasn't getting my whole tips, and she told me

5    to just take it, she wasn't do anything about it.

6             MR. ELLIS:  You also have a cook testifying he was

7    paid by Maria.

8             THE COURT:  Okay.  But you're not arguing that she's

9    his supervisor.  You told me she wasn't his supervisor.

10            MR. ELLIS:  On a daily basis.

11            THE COURT:  On any basis.

12            MR. ELLIS:  Well, aside from paying.

13            THE COURT:  I know, but you're not arguing from that

14   that she's the cook's employer, are you?

15            MR. ELLIS:  Yes, because I'm saying that the act of

16   paying is a supervisory act.  The act of distributing paychecks

17   is the act of an employer.

18            THE COURT:  So even though she had, as you said to me,

19   conceded to me, that she only, even on your theory, that she

20   only supervised the people in the front of the restaurant, you

21   said to me she didn't supervise the cooks, in essence?

22            MR. ELLIS:  Right.

23            THE COURT:  She doesn't have any decision-making over

24   what goes on in the kitchen.  Is that about right?

25            MR. ELLIS:  I think so, yes, based on the record, yes.

H13KFRIM

1          THE COURT:  So you're saying to me that I should

2    determine that she is the cook's employer because she also gave

3    the cook his paycheck?  That's your argument?

4          MR. ELLIS:  That is an act of operational control

5    under Irizarry that the Second Circuit has laid out, and that

6    that test is very broad.  It doesn't have to be supervision

7    like on a daily basis.

8          THE COURT:  You said two different things to me.

9    You're now arguing that she is the employer of the cook.

10          MR. ELLIS:  Yes.

11          THE COURT:  But you conceded before that she wasn't

12    the cook's employer?

13          MR. ELLIS:  No.  I conceded she didn't supervise him.

14          THE COURT:  She didn't supervise him, she didn't set

15    his wages, she didn't have the authority to hire and fire

16    him --

17          MR. ELLIS:  I won't concede any of that.

18          THE COURT:  Well, you concede there's no evidence in

19    this record.

20          MR. ELLIS:  Yes, and I concede she did not directly

21    supervise the cook.  He doesn't testify to that.

22          THE COURT:  The only evidence in this record on which

23    you want me to determine that she is the cook's employer is the

24    fact that there's some evidence that she gave the cook his

25    paycheck.

H13KFRIM

1            MR. ELLIS:  Right.  And that in conjunction with the

2       fact that she is a corporate owner, officer, on a daily basis

3       there supervising work conditions, including how, when, how

4       much people are paid, that all --

5            THE COURT:  But not of the cook?

6            MR. ELLIS:  Yes, how, at least how and when he is

7       paid, she determines that.

8            THE COURT:  Where does it say that?  Where does it say

9       how and when he's paid?

10           MR. ELLIS:  She's the one giving the paycheck.

11           THE COURT:  But that --

12           MR. ELLIS:  That's definitely a "when."

13           THE COURT:  My secretary hands me my paycheck.  That

14      doesn't make her my employer.

15           MR. ELLIS:  But your secretary is not an owner of your

16      enterprise.

17           THE COURT:  The President of The United States can

18      hand me my check but that doesn't make him my employer.

19           MR. ELLIS:  Right.

20           THE COURT:  That theory I don't understand.  I don't

21      understand how you can make a credible argument that even

22      though she has no supervisory responsibilities whatsoever over

23      the cook, that simply because she gives him his paycheck, that

24      makes her --

25           MR. ELLIS:  I don't think it does.  I think we're too

H13KFRIM

1    much in the weeds.

2            THE COURT:  Well, those are the weeds.  You're saying

3    to me that she's his employer.

4            MR. ELLIS:  Yes, those are the weeds but the bigger

5    picture is whether or not she even possesses this power in the

6    first place.

7            THE COURT:  But what is the evidence --

8            MR. ELLIS:  As to if she exercises it --

9            THE COURT:  Which power?

10           MR. ELLIS:  All of the powers --

11           THE COURT:  Which power over the cooks?

12           MR. ELLIS:  The powers to hire and fire --

13           THE COURT:  What evidence is there that she possesses

14   the power to hire and fire the cook?  What is the evidence?

15           MR. ELLIS:  She is the owner of the corporation, who

16   is an officer, who is there on a daily basis supervising --

17           THE COURT:  That doesn't give her authority,

18   circumstantially or directly, give her that authority, right?

19           MR. ELLIS:  True, but on this record, circumstantially

20   and indirectly, what is established is that she has the power

21   to hire and fire people who work in the front of the house.

22           THE COURT:  What is the evidence she has the authority

23   it hire and fire somebody in the front office when she has

24   never done that?

25           MR. ELLIS:  Just because she never exercises control

H13KFRIM

1    doesn't mean she doesn't possess that authority.

2            THE COURT:  So that would be clear evidence that she

3    has such evidence.

4            MR. ELLIS:  Right.

5            THE COURT:  What is the evidence that she has such

6    authority?  Simply because she's a corporate owner and works

7    there?

8            MR. ELLIS:  And Mr. Pineda's testimony that she

9    supervised him throughout his employment and that she

10   determined his tips.

11           THE COURT:  So, there are two periods of time, up

12   until the father died and after the father died.  Who do you

13   say -- and then we'll be done -- who do you say had the

14   authority to hire and fire?

15           MR. ELLIS:  I believe that all three -- Maria, Peter

16   and Renato -- had the authority to hire and fire people

17   throughout the statute of limitations period.

18           THE COURT:  And you have no evidence that at any point

19   in time during this period that anyone hired or fired an

20   employee other than Renato until Renato died, right?  And then,

21   when Renato died, the plaintiffs contend that they got into an

22   argument or fight with Peter and Peter subsequently fired some

23   individuals after Renato died?

24           MR. ELLIS:  Right, that's correct.

25           THE COURT:  But while Renato was alive, he was the

H13KFRIM

1    only person that ever hired or fired an individual, right?

2            MR. ELLIS:  To my knowledge, yes.

3            THE COURT:  On this record?

4            MR. ELLIS:  Yes.

5            THE COURT:  And after Renato died, Peter was the only

6    person who hired or fired employees after Renato died?

7            MR. ELLIS:  Yes, I believe that's the case.

8            THE COURT:  Okay.

9            MR. ELLIS:  But -- again, this is not my motion --

10   they're asking to you conclude, based on this record, that

11   Maria didn't even possess any of these powers, that she --

12           THE COURT:  And she doesn't possess them unless you

13   can show me someplace in the record that you're going to offer

14   some evidence that she does possess them.  And your argument

15   that she's simply a corporate owner, that she works there and

16   she hands them their checks is not enough to make her the

17   employer.

18           MR. ELLIS:  Absence of evidence is not evidence of

19   absence.  The fact that she didn't do these things doesn't mean

20   that she couldn't do these things.

21           THE COURT:  Well, that's like saying, well, she had

22   the authority to tear down the building.  I'm not going to

23   assume she had that authority unless there's some evidence that

24   she had that authority.  There's no evidence that she had the

25   authority.  You can't rely on the fact that she's the employer

H13KFRIM

1   because she had the power to hire and fire people unless

2   there's evidence in the record that she has the power to hire

3   and fire.  How are you going to prove that?

4          MR. ELLIS:  Well, first of all, again, this is not my

5   motion --

6          THE COURT:  No.  How are you going to prove that to a

7   jury?  How are you going to prove that to a trier of fact, that

8   she is the employer based on the power that she possessed?

9   When did she obtain this power?  If she never exercised it,

10  when do you claim she obtained it?

11         MR. ELLIS:  Probably at the point when she became an

12  owner, a 25 percent owner, in the corporation.

13         THE COURT:  And you don't claim that anybody discussed

14  this with her, you don't claim that anybody gave her that

15  power.

16         MR. ELLIS:  I have no idea what those discussions

17  were.  This would be something that we would need -- and this

18  gets exactly at why their summary judgment motion should fail.

19  We need to establish all of this based on testimony.

20         THE COURT:  But aren't we finished with discovery?

21         MR. ELLIS:  Yes.

22         THE COURT:  So whatever you're going to present on

23  this issue should be in this record.  I'm asking you where in

24  the record it is.  We're not going to start all over again and

25  try to figure out if we can make her the employer.  Either the

H13KFRIM

```
1    evidence demonstrates she is or she isn't.  And if your

2    argument is that she's the employer because even though she's

3    never exercised any of these powers at any point in time, you

4    say that she does have them, I want to know how they arose,

5    when she got them, and what's the evidence that I can conclude

6    that she had these powers.

7              MR. ELLIS:  I think that evidence is clear.  She was a

8    corporate officer, who was an owner, who works there on a daily

9    basis supervising employees.  It doesn't get more clear.

10             THE COURT:  It does get more clear.  It could be

11   clearer if somebody gave her that authority.  It could be

12   clearer if she had ever exercised that authority.  And the

13   scenario you just gave me, that person might have such

14   authority or that person might not have such authority.  It

15   doesn't tell me whether they have such a authority.  It doesn't

16   give you a basis to argue that the facts indicate that she had

17   such authority.  That's what you're saying to me, that simply

18   because she's a corporate owner and she works there and she

19   hands them their checks and somehow, quote, supervises a

20   busboy, that's it.

21             MR. ELLIS:  And determines his pay --

22             THE COURT:  No, it doesn't say --

23             MR. ELLIS:  -- by way of his tips.

24             THE COURT:  It does not say she determines the pay.

25   That is not an accurate characterization of this evidence.
```

H13KFRIM

1   Nowhere in this record have you pointed me to that says that

2   she calculated or determined the amount of his pay.

3        MR. ELLIS:  With all due respect, sir, "Maria would

4   simply give me some amount of the tips but I never knew how

5   much the total was so I was never able to see if I was being

6   paid" --

7        THE COURT:  Where does that say that she determined

8   what amount to give him?

9        MR. ELLIS:  "Maria would simply give me some amount of

10   the tips."

11        THE COURT:  Right.  She gave him $20 and said, this is

12   your portion of the tips?

13        MR. ELLIS:  Right.

14        THE COURT:  Where does that say that she was the one

15   that calculated that or set the formula or could guarantee that

16   that was right because she personally did it?  It says she gave

17   him the money.

18        MR. ELLIS:  That is absolutely implied because he goes

19   and complains to her and she tells him --

20        THE COURT:  No, he doesn't go anywhere.  It doesn't

21   say he goes anywhere.  It says she gave him the money and he

22   complained.

23        MR. ELLIS:  Right.

24        THE COURT:  It doesn't say he went anywhere.  He

25   didn't go to Peter, he didn't go to Renato.

H13KFRIM

1          MR. ELLIS:  He goes to her.

2          THE COURT:  She's standing right there giving him the

3     money, and he says, well, I don't think this is enough.

4          MR. ELLIS:  And she says, deal with it because she has

5     the authority to say deal with it.

6          THE COURT:  Even if she was another busboy, she would

7     have the authority to deal with it.

8          MR. ELLIS:  If that's the case, then that other busboy

9     is an employer.

10          THE COURT:  Because they said, look, this is the

11     amount of money they told me to give you, that's the amount of

12     money I gave you, that's it, deal with it?

13          MR. ELLIS:  But that's not what she's saying.  She's

14     saying, "this is what you get," not "this is what was given to

15     me to give you"; "this is what you get, deal with it."

16          THE COURT:  That still doesn't tell me that she is the

17     one that calculated that amount of money.  You don't have any

18     deposition testimony anything that supports that statement.

19     That's a speculation.  That's an inference you want from this.

20     But come on.  As you say, you find yourself in a situation

21     where you haven't deposed any of these people.  I've got no

22     facts from which I'm supposed to infer that somehow she's the

23     one sitting down calculating the tips.  You want me to say this

24     record indicates that she's the person who calculates the tips

25     for all employees?  Or for just the busboy?

H13KFRIM

1          MR. ELLIS:  At least just for the busboy.  The record

2     does indicate that she determines his tips.

3          THE COURT:  All right, okay.

4          Did you have anything further?

5          MR. KUBLANOVSKY:  Your Honor, just one minute, just to

6     clarify some things on the record.

7          In Peter's affidavit as well as Maria's, it states

8     pretty clearly they did not work there daily; they worked there

9     for eight hours a day, five days a week, before their father

10    died.  I just want to be clear especially as to Maria because

11    she was not there and she was only there for a limited period.

12    She continues to work there only eight hours per day.  It's

13    important because she wasn't there to set up or to pay people

14    or afterwards to clean up except for a couple minutes.  She

15    wasn't are there to pay people.

16          The other point I want to make is, there is one

17    affidavit from the only waiter and the only other person that

18    worked in front of the house, and that's Mr. Ortiz, who says in

19    his affidavit that neither her in any of the plaintiffs ever

20    reported to -- "neither I nor any of the plaintiffs ever

21    reported to, or took direction from, either Peter Migliorini or

22    Maria Migliorini Cintron."  And he continues to say that,

23    "Renato Migliorini was our one and only boss after

24    February 2005 and until he died in April 2015.

25          He concludes by stating that -- and this is one of the

H13KFRIM

1    other factual points I wanted to correct in the record -- that

2    contrary to the statement in plaintiffs' declarations, Renato

3    Migliorini did not fall ill in 2011; in fact, he did not become

4    ill until in or around March 2014.  So it was only about a

5    month before he passed away that he was in the hospital, but

6    that notwithstanding the illness, Renato Migliorini continued

7    to manage all aspects of the restaurant, "including supervising

8    me and all the other employees, including plaintiffs, Peter

9    Migliorini and Maria Migliorini Cintron at the restaurant and

10   was responsible for, among other things, paying us our wages."

11           That's all, your Honor.

12           THE COURT:  All right.  This is what I'm going to do:

13   With regard to Costanzo, I think the plaintiff has

14   appropriately withdrawn and conceded Costanzo is not an

15   employer under the standard here.  I don't think there's any

16   allegations that would put Costanzo in that category.

17           Peter, Maria are the ones that basically worked at the

18   restaurant.  Clearly, Peter is an employer for some period of

19   time and he's an employer appropriate to be sued by the

20   plaintiffs.  There's a real argument, a credible argument, that

21   if Peter was not the employer after the father died -- whether

22   or not the evidence will establish exactly whether he was the

23   employer for the entire period of time or was just an employer

24   for just some portion of that time, I think that's not an issue

25   for summary judgment, that's an evidentiary issue, and that's

H13KFRIM

an issue that should be determined by the extent of the

evidence of his activities and the nature of his activities pre

and post his father's illness and death.

So I am going to deny the motion to dismiss Peter from

this case as an employer because it clearly indicates that he

is appropriately sued in some capacity for at least some period

of time, if not the total period of time, as an employer of the

plaintiffs.

With regard to Maria, there is obviously at least an

argument to be made over the argument made on Costanzo, that

Maria is somehow, because she's an owner and because at least

one or certain individuals claimed she somehow supervised them.

I find, with the other factors that were argued, that it does

not rise to the level of a determination on this record that

Maria was in such a role as being the employer of any of these

plaintiffs to be sued as the employer.

As you've indicated, I'm not sure there's any role

that she played that would qualify her as an employer of any --

an argument to be made with regard to any plaintiff other than

Mr. Pineda, who was a busboy, but there's no evidence in this

record that she played any particular roles or facts that

indicate that would support a conclusion that she was an

employer because besides the fact that she was an owner and

worked at the restaurant and was paid to work at the

restaurant, that somehow she had the authority to fire and

H13KFRIM

1    hire, set wages, that she ever did this activity, was ever

2    given any of that authority or ever implicitly had that

3    authority.  None of the plaintiffs even argue or testify or

4    assert in their affidavits that she had such authority or what

5    the basis would be to conclude that she had such authority.

6            I think it is not a sufficient argument to make, that

7    simply because she was a corporate owner and worked at the

8    restaurant and somehow, in some unspecified way, supervised a

9    busboy and maybe one or two others, and that she handed out the

10   checks, that that somehow makes her the employer of -- it

11   doesn't make her an employer of the cooks or other kitchen

12   people who, the evidence is, the record seems to be undisputed,

13   that she exercised such authority over them.  The only argument

14   is that the front of the restaurant people -- I'm not even sure

15   it includes waiters but I'll assume that even if it includes

16   waiters and busboys, there's no evidence in here in this record

17   whatsoever from which one could conclude that she had the

18   status of employer in the conduct of her control over these

19   employees, not setting any wages, there's no evidence she set

20   their wages, no evidence she hired them, there's no evidence

21   that she fired them, there's no evidence that she set their

22   hours, which is all the classic indicia of who is the employer,

23   there's no evidence that she disciplined any employees, there's

24   just no factual basis on which argument could be made at this

25   stage of the proceedings, after close of discovery, that would

H13KFRIM

1    warrant a reasonable conclusion that somehow she either

2    exercised this kind of employer authority or that she had such

3    employer authority somehow given to her or somehow obtained,

4    that the evidence indicates that she had but she just declined

5    to use it.  I don't think that those are compelling arguments

6    in this case.

7                I think that as to Peter as an individual, obviously,

8    after their father's death, he took over the role as the

9    employer, which is indicated by the fact that he fired people

10   after that, and there's some evidence that a reasonable jury

11   could conclude that he had enough responsibility and managerial

12   supervisory control over the employees, even when his father

13   was alive, ill or not ill, that might make him liable

14   personally as the employer even during this period of time but

15   that's an issue to be resolved.  I'm happy to resolve on

16   summary judgment matters that are appropriate for summary

17   judgment.  If the summary judgment motion is to dismiss him as

18   an employer being sued by the plaintiffs as their employer --

19   he was clearly their employer at some portion of the relevant

20   time period.

21               So he stays in the case, but as to Maria, the record

22   is void of any evidence on which one could conclude that she

23   was an employer.  And, in fact, any evidence that is in the

24   record is evidence of lack of employer status or, as I say, you

25   look at the classic indicia of employers, the type of authority

H13KFRIM

1    they would exercise, and when you contrast obviously Maria to

2    Peter to Renato, it is clear that Renato clearly had all of

3    that authority, Peter had at least some of that authority or

4    all of that authority for a portion of the time, if not the

5    total time, and when you look at Maria, there's no indication

6    that her role in that regard was a significant indication of

7    being an employer, nor any indication that her role at any

8    point in time changed or she exercised greater authority either

9    when her father got sick, as it's clear that Peter exercised

10   greater authority when his father was sick, or exercised any

11   greater authority when her father died, as a contrast to Peter

12   who exercised greater authority and total authority.

13           The evidence is very clear that Peter, after his

14   father's death, is pretty much exercising the entire authority

15   as the employer.  There's no evidence that Maria is taking a

16   greater role, a different role, during any period of time, and

17   there's no indication that she took an active role in taking on

18   the responsibilities or decision-making of the employer during

19   the period of time that her father was clearly alive and in

20   charge and during the period of time that her brother was

21   substituted for the father, working with the father, or took

22   over full responsibility after the father's death.

23           So, for those reasons, I'm going to issue the order to

24   dismiss Costanzo from the case as a defendant personally; I'm

25   going to deny the motion to dismiss Peter as a defendant in

H13KFRIM

1    this case being sued by the plaintiffs; and I will issue an

2    order dismissing Maria as a defendant, as there's no evidence

3    to conclude that Maria was the employer of any of these

4    plaintiffs.  That's the order of the Court.

5              Where are we going from here?

6              MR. KUBLANOVSKY:  I believe, your Honor, we're

7    probably going to need a pretrial conference at this point.

8              THE COURT:  I need a pretrial conference, joint

9    pretrial order, and then a trial date.  So let's work

10   backwards.

11             What month would you like to try this?

12             MR. ELLIS:  March, your Honor.

13             THE COURT:  Okay.  So can we do March 13th?

14   March 13th is the trial date.  Let's say February 28th as a

15   conference, pretrial conference.  If you're going to have any

16   motions in limine, why don't you give them to me by the 3rd of

17   February so they can be responded to within two weeks and I can

18   look at them before the 28th and resolve as many issues as

19   possible.

20             Let's have a joint pretrial order, just give it to me

21   by the 23rd so I can at least take a quick look at it before we

22   have the conference, and we'll be ready for trial on the 13th

23   if we're going to trial.

24             If you want the assistance of the magistrate or

25   mediation for settlement discussions before, just let me know,

H13KFRIM

1    but otherwise we'll set it on that schedule so we can move

2    forward with trial on March 13th.

3              I'll see you on the 28th, let's say, at 10:00 o'clock.

4              MR. ELLIS:  Very good.  Thank you, your Honor.

5              MR. KUBLANOVSKY:  Thank you, your Honor.

6              THE COURT:  Thank you.

7                                    * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25