H3h6pin11

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LUIS PINEDA, et al.,

4              Plaintiffs,

5          v.                              15 CV 3774(GBD)

6   FRISOLING, INC., et al.,

7              Defendants.

8   ------------------------------x
                                    New York, N.Y.
9                                   March 17, 2017
                                    9:45 a.m.
10
    Before:
11
                    HON. GEORGE B. DANIELS,
12
                                    District Judge
13
                        APPEARANCES
14
    MICHAEL FAILLACE & ASSOCIATES, P.C.
15       Attorneys for Plaintiffs
    BY:  GERRALD ELLIS
16       JOSHUA S. ANDROPHY

17  KUBLANOVSKY LAW, LLC
         Attorneys for Plaintiffs
18  BY:  EUGENE D. KUBLANOVSKY
         ALLISON MATTERA CHARLES
19

20

21

22

23

24

25

H3h6pin11

H3h6pin11

         (In open court)

         THE COURT:  Are we ready to proceed with the next witness?

         MR. KUBLANOVSKY:  Yes, your Honor.  Just some housekeeping matters.

         THE COURT:  Yes.

         MR. KUBLANOVSKY:  I wanted to address an exhibit that was introduced by defendants during Mr. Pineda's testimony and this was his declaration in support of plaintiffs' opposition to summary judgment.

         THE COURT:  What exhibit?

         MR. KUBLANOVSKY:  This was the declaration of Luis Pineda in opposition to defendants' motion for summary judgment.

         THE COURT:  Exhibit number?

         MR. KUBLANOVSKY:  D, as in David.

         THE COURT:  Is that the one that is already in the book?

         MR. KUBLANOVSKY:  Yes, sir.

         THE COURT:  So you are moving the Exhibit D into evidence?

         MR. KUBLANOVSKY:  Yes.

         THE COURT:  Any objection?

         MR. ELLIS:  No, your Honor.

1           THE COURT:  Admitted.

2           (Defendants' Exhibit D received in evidence)

3           THE COURT:  Are we ready to proceed?

4           MR. KUBLANOVSKY:  Yes.

5           THE COURT:  Why don't you call the next witness.

6           MR. KUBLANOVSKY:  Defendants call Peter Migliorini to

7    the stand.

8     PETER MIGLIORINI,

9          called as a witness by the Defendants,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. KUBLANOVSKY:

13    Q.  Mr. Migliorini, can you please state your name and address

14    for the record?

15    A.  Peter Migliorini.  455 Hudson Street, apartment 27, New

16    York, New York 10014.

17    Q.  Sir, where were you born and raised?

18    A.  I was born 455 Hudson Street, apartment 27, New York, New

19    York, and I was raised there.

20    Q.  Where do you currently live?

21    A.  The same apartment.

22    Q.  Have you always lived there?

23    A.  Yes.

24    Q.  Can you please tell us your educational background and job

25    history beginning with college?

1    A.  I attended two years of college at Iona College in New

2    Rochelle.  And I didn't hear the --

3    Q.  Then you work history after college.

4    A.  I started a job at my high school -- my old high school

5    Xavier High School in the alumni relations department.

6              THE COURT:  Can you just tap that mic.  Is it on?

7              THE WITNESS:  I don't think so.  There is no light.

8              THE COURT:  You may continue.

9    Q.  You were describing your work history.

10   A.  I worked at my old high school, Xavier High School, in the

11   alumni relations department.  And after that I started to work

12   at my dad's restaurant.

13   Q.  Your dad's restaurant is pick low Anglo?

14   A.  Yes, it is.

15   Q.  When did you start working at Piccolo Angolo?

16   A.  Approximately 1993.  Late 1993, early 1994.

17   Q.  What was your job at that time at Piccolo Angolo?

18   A.  I was a waiter.

19   Q.  How many days per week did you work when you started

20   working there?

21   A.  Three days.

22             THE COURT:  When did you say you started working

23   there?

24             THE WITNESS:  Approximately 1993.  Late 1993, early

25   1994.

1          THE COURT:  Thank you.

2   Q.  What kind of restaurant is Piccolo Angolo?

3   A.  It's a family-owned Italian restaurant.

4   Q.  Where is it located?

5   A.  On the corner of Hudson and Jane.  The exact address is 621

6   Hudson Street.

7   Q.  Relatively to the size of the courtroom, how big is it?

8   A.  The entire restaurant, including the kitchen, is probably

9   from beginning of the jury box back to the behind the judge's

10  desk.

11  Q.  How many tables does it have to seat customers?

12  A.  23.

13  Q.  I would like to show you a document at this time.

14          MR. KUBLANOVSKY:  May I approach, your Honor?

15          THE COURT:  Yes.

16  Q.  If you can take a moment to flip through this document.

17          MR. ELLIS:  Your Honor, I object to this document at

18  least as far as it contains photographs of these New York Labor

19  Law posters.  This is the first we are seeing it.

20          THE COURT:  Which?

21          MR. KUBLANOVSKY:  I don't recall any objection being

22  made to the production or nonproduction of these documents.

23          THE COURT:  Production or nonproduction.

24          MR. KUBLANOVSKY:  Well, yeah.  This is the first time

25  I am hearing about it and --

1          THE COURT:  Were these produced?

2          MR. KUBLANOVSKY:  These photographs were not produced.

3          THE COURT:  When you say "the production," what is it

4    that you say you produced?

5          MR. KUBLANOVSKY:  We produced documents.  I don't

6    recall, one, a request made.  They may very well have made that

7    request, but I don't recall standing here because I don't have

8    the document request before me.  I also don't recall because

9    there wasn't an objection to our nonproduction of anything in

10   this case.

11         MR. ELLIS:  How am I to know what to object to if I

12   don't know what it is?

13         THE COURT:  The first question the answer to that is

14   it depends on what you asked for.

15         MR. ELLIS:  Sure.  I don't have my copy of my document

16   production request here; but I can assure you that we and my

17   firm use the same standard document demand, and they do include

18   request for production of any posters such as this --

19   photographs.

20         MR. KUBLANOVSKY:  To the extent that it does contain a

21   picture of the photo, it goes to solely the testimony earlier

22   in the case regarding the walk-in closet and what was posted

23   there.

24         THE COURT:  I remember the testimony.  I already have

25   the testimony.

1              MR. KUBLANOVSKY:  Right.

2              THE COURT:  Quite frankly, Mr. Ellis, I am not sure

3    why you are objecting.  You have to have two things to object:

4    A ground to object and a reason.

5              MR. ELLIS:  Well, if it is being presented for the

6    truth of the matter asserted that these in fact existed at

7    whatever time -- I mean, there is no timestamp.

8              THE COURT:  What difference does that make to you?  As

9    a matter of fact why does it hurt you?

10             MR. ELLIS:  Insofar as they are notices, your Honor.

11             THE COURT:  Insofar as both the employees and the

12   employer were aware of the obligations under the --

13             MR. ELLIS:  Right.  Yes.

14             THE COURT:  What difference does that make?  Way do

15   you say you would be prejudiced by that rather than --

16             MR. ELLIS:  Because we demanded production of this and

17   it wasn't produced.

18             THE COURT:  Well, that is not prejudice.  I am not

19   sure why you are objecting.

20             MR. ELLIS:  Fine, your Honor.

21             THE COURT:  If you want to press your objection, fine.

22   Quite frankly I don't have any evidence in this case that the

23   plaintiffs were not aware that they had minimum-wage rights.

24             MR. ELLIS:  Fair.

25             THE COURT:  Quite frankly at this point for my

1    purposes, its only relevance at this point seems to be whether

2    the employer was aware of their obligations.

3              MR. ELLIS:  Fair enough.

4              THE COURT:  I already resolved that the plaintiffs are

5    not saying he didn't tell us what our rights were or didn't

6    post our rights.  We already had that testimony.  We had your

7    testimony from witnesses they were posted with regard to the

8    rights of the employees.

9              MR. ELLIS:  I will withdraw the objection.

10             THE COURT:  If you want to articulate what you are

11   fighting about, I will hear you.

12             MR. ELLIS:  I will withdraw the objection.

13             THE COURT:  I am going to put to rest whether or not

14   the employees knew what their rights were, the employer knew

15   what his obligations were, and the rights of the employees were

16   clearly posted by the employer and fully aware by all.  That is

17   what I take it for.

18             MR. ELLIS:  Understood.  My objection is withdrawn.

19             MR. KUBLANOVSKY:  Thank you, your Honor.

20   BY MR. KUBLANOVSKY:

21   Q.  Mr. Migliorini, have you seen these photographs before?

22   A.  Yes, I have.

23   Q.  Did you take these photographs?

24   A.  Yes, I did.

25   Q.  What do these photographs show?

1   A.   The first three are the views from the different kitchen

2   stations and the kitchen itself -- the entirety of the kitchen

3   prep table and refrigerators and salad prep tables.

4           The one after that was the basement area where the

5   employees would go downstairs to change and our storage area as

6   well.

7           The following one is the labor law posters that we had

8   on our walk-in box door and the disability notice door.

9           The following one is the cellar stairs going up to the

10  street.

11          The one after that is the cellar stairs going down to

12  the street.

13          The one after that is the dishwasher's room with the

14  dishwashing machine.

15          The one after that is also the dishwasher's room at a

16  difference angle with the dishwashing machine.

17          The one after that is a view into the dining room from

18  a window where the salad prep area was and of the storage area

19  for all of the kitchen spices and various other sundry that

20  they needed in the kitchen.  That is the salad prep area, the

21  refrigerator where all the salad ingredients are kept.

22          The next one is the view into the kitchen from the

23  same window from the dining room.

24          The following one is the box where any cash tips were

25  placed at any given time.

1          The next one is the cash register, credit card machine

2     area.  Also, to the left is the bread-cutting table and coffee

3     machine area all combined.

4          The next one is service bar where we kept the wine and

5     beer and ice.

6          The next one is the service window where food would be

7     placed when it was ready, viewing from the dining room into the

8     kitchen.

9          The second one is also another picture just -- it was

10    difficult to get the whole window.  That is the bottom part.

11    It was a three-leveled -- three-tiered shelfing system.  That

12    is our printer for our tickets that go into the kitchen.  That

13    is the sink used to wash the pots and pans throughout the

14    evening.

15         That is another view of the window from the salad prep

16    area out into the dining room to the cash register area.  You

17    can partially see the computer screen there.  That is where the

18    cash register is and the service bar.

19         This is another view out into the dining room again

20    from the salad service area -- salad prep area.

21         That is a picture of the main dining room -- the right

22    side of the main dining room.

23         That is a view from the cash register area of the

24    dining room -- the entire dining room.

25         That is a view from the front door to the right side

1    of the dining room.

2              That is just another view of the right side of the

3    dining room from the middle of the dining room.

4              That is the view into the restaurant from our front

5    door where we hang our open and closed sign.

6              That is a sticker that we have on the door posting our

7    hours of operation.

8    Q.  Thank you, sir.

9    A.  You are welcome.

10   Q.  Sir, when you started working at Piccolo Angolo, who owned

11   the restaurant?

12   A.  My dad and my uncle Costanzo.

13   Q.  What year did your father and your uncle open the

14   restaurant?

15   A.  November 14th, 1992.

16   Q.  With respect to your father, had he previously worked in

17   the restaurant business?

18   A.  Yes, he did.  He came from a family of restaurateurs in

19   Italy.  He went to Mendoza, Argentina and worked for a family

20   restaurant in Mendoza, Argentina before coming to New York as

21   an immigrant and worked in various Italian restaurants around

22   the city.

23             And then he and his brother opened a restaurant on

24   Cedar and West, and they were there for almost 20 to 25 years.

25   I am not sure of the exact date because I was not born when

1    they opened that restaurant.  Then they closed that restaurant

2    and they proceeded to open Piccolo Angolo.

3    Q.  Where was your father born?

4    A.  Liguria, Italy.

5    Q.  Does your father speak Spanish?

6    A.  Yes.  He did from his time in Mendoza, Argentina.

7    Q.  Do you know what positions your father worked in the

8    restaurant industry?

9    A.  From hearing stories from him, he did various jobs in

10   various restaurants.  He was a busboy.  He was a waiter.  He

11   was a maître d'.  He was a cook.  He did anything when he came

12   to America to have a job.  He would take any position in a

13   restaurant.

14   Q.  What year did he come to the United States?

15   A.  I am not exactly sure on that.  It was in the early '60s.

16   Q.  What were the operating hours for restaurant when you

17   started working?

18   A.  The restaurant was open on Tuesday through Thursday from

19   5:00 p.m. to 11:00 p.m.  Friday and Saturday from 5:00 p.m. to

20   11:30 and Sunday 4:00 p.m. to 10:00 p.m.  We were closed on

21   Monday.

22   Q.  Were those the same hours --

23             THE COURT:  Sorry.  Give me those hours again.

24             THE WITNESS:  Yes, your Honor.

25             Tuesday through Thursday 5:00 p.m. to 11:00 p.m.

1   Friday and Saturday 5:00 p.m. to 11:30 and Sunday 4:00 to 10:00

2   p.m.  We were closed on Mondays.

3            THE COURT:  Tuesday through Thursday until 10:30.

4   Friday and Saturday to 11:30?

5            THE WITNESS:  11:00 p.m. Tuesday through Thursday.

6            THE COURT:  Tuesday through Thursday 11:00 p.m.?

7            THE WITNESS:  Yes.

8            THE COURT:  Friday and Saturday 11:30?

9            THE WITNESS:  Correct.

10            THE COURT:  Sunday 10:00?

11            THE WITNESS:  Correct.

12   BY MR. KUBLANOVSKY:

13   Q.  Did those hours ever change?

14   A.  Only recently I did change Sunday to 5:00 p.m. opening.

15   Q.  Did your father ever change those hours during the time he

16   worked there?

17   A.  No.

18   Q.  Did your father ever change those hours during the time

19   plaintiffs worked there?

20   A.  No.

21   Q.  So you changed the hour on Sunday recently?

22   A.  Yes.

23   Q.  Did you change the hours after plaintiffs left the

24   restaurant?

25   A.  Yes.

1    Q.  So the hours that you just testified to were the same hours

2    that the restaurant was opened when plaintiffs worked there

3    during the entire period of their tenure?

4    A.  Yes.

5    Q.  Sir, when did your father pass away?

6    A.  April 19th, 2014.

7    Q.  Did the restaurant ever close early?

8    A.  We were closed on Thanksgiving Day, Christmas Day, New

9    Year's Day, and the last two weeks leading up to Labor Day.  It

10   was always surrounding opening the day after Labor Day.  So it

11   wasn't always the last two weeks of August and it wasn't

12   always -- it was set around Labor Day itself.  So to reopen the

13   Tuesday following Labor Day.

14   Q.  Those are the days the restaurant was closed.  Did it also

15   ever close early in the day?

16   A.  Oh, yes.

17   Q.  How frequently?

18   A.  We closed early more often than not.

19   Q.  Who would make the decision to close early?

20   A.  When my dad was alive, he would.  And after he passed, I

21   did.

22   Q.  What went into that decision as to whether to close early

23   or not?

24   A.  My dad's belief was that it was better to close early on a

25   day where there was no business in order to allow the employees

1    to get home earlier so that when business was better or busier,

2    it would be easier for them to stay a little bit longer.

3    Q.  When the restaurant closed earlier were the employees then

4    permitted to leave earlier during those days?

5    A.  Yes, they were.

6    Q.  When the restaurant was closed during the days you

7    indicated, no employee obviously -- excuse me -- did any

8    employee work at the restaurant?

9    A.  No.

10   Q.  Were employees still paid during the days that they were

11   either permitted to leave early or when the restaurant was

12   closed?

13   A.  Yes.

14   Q.  What were your responsibilities when you first started in

15   the restaurant when you started as a waiter?

16   A.  Taking customers' orders, placing the orders, and serving

17   them their food, occasionally assisting in busing tables and

18   resetting the tables.

19   Q.  Prior to the date your father died, did your

20   responsibilities ever change?

21   A.  No.

22   Q.  Were any of the plaintiffs named in this action already

23   working at the restaurant when you first started there?

24   A.  Yes.

25   Q.  Which ones?

1    A.   Angel Guayllasac.

2    Q.   Do you know when Mr. Guayllasac started at the restaurant?

3    A.   Sometime in 1993.

4    Q.   Over the years did you work at the restaurant alongside the

5    employees in this action?

6    A.   Yes, I did.

7    Q.   Does that include Robinson Diaz?

8    A.   No.

9    Q.   Why is that?

10   A.   My father had passed and I had assumed control of the

11   business at that time.

12   Q.   Did you hire Mr. Diaz?

13   A.   Yes, I did.

14   Q.   Did your sister also work at the restaurant?

15   A.   Yes, she did.

16   Q.   What was her job at the restaurant?

17   A.   She was a hostess, slash, waitress.

18   Q.   When did she start working there?

19   A.   Again, around the time that I started working there, late

20   1993, early 1994.

21   Q.   Did her position ever change at the restaurant?

22   A.   No.

23   Q.   Does your sister still work at the restaurant?

24   A.   Yes, she does.

25   Q.   Does she hold the same position?

1    A.  Yes, she does.

2    Q.  As the hostess and waitress, what was your sister

3    responsible for?

4    A.  She was responsible for sitting customers, serving

5    customers, taking their orders, and also bringing food and

6    assisting in busing the tables and resetting the tables.

7    Q.  Would you and your sister provide food orders to the

8    kitchen?

9    A.  In so much as we would place customers -- we would take

10   their order for what they wanted to eat.  And we would

11   initially handwrite the orders and we would place them into the

12   kitchen on -- I don't know the exact name for it, but it is a

13   rail that you can keeps the ticket up on.  And then we moved to

14   a POS system that was a touchscreen that would print the

15   tickets.

16   Q.  Can you explain what POS is?

17   A.  Point of sale.

18   Q.  Would the point of sale system print out a ticket in the

19   kitchen when you entered the order?

20   A.  Yes.

21   Q.  The printer that you referenced earlier in one of the

22   photographs in the document before you, that was the printer

23   that printed out that ticket?

24   A.  Yes.

25   Q.  That printer was located in the kitchen?

1    A.   Yes.

2    Q.   Where was it located specifically?

3    A.   It was just to the right of what would be the portion of

4    the service window, which was the pasta, slash, fish station.

5    In all essence that is what was prepared in this station.

6              Sorry, just to the left.  I am getting my left and

7    rights -- it was to left of that.

8    Q.   Which of the plaintiffs worked at that station?

9    A.   Angel Guayllasac.

10   Q.   Do you know if Mr. Guayllasac would take those tickets?

11   A.   Yes, he would.

12   Q.   Do you know what he did with those tickets after he took

13   them?

14   A.   He would review them and place them into the same holder

15   that we placed the written tickets and then proceed to either

16   tell Israel if any salads needed to be prepped as appetizers or

17   cold appetizers, which was his station area; or tell Eddie if

18   any hot appetizers needed to be prepared, because that was part

19   of his station.  Then if they didn't need any of that, he would

20   tell Eddie if any meats needed to be prepared or anything in

21   the boiler because that was his station.  Or he would have his

22   pasta and fish station and know what he needed to prepare for

23   the ticket.

24   Q.   When you say "Eddie," that is Mr. Jaquez?

25   A.   Yes.

1    Q.  What position did he hold at the restaurant?

2    A.  He was a cook.

3    Q.  When you mentioned Israel, that is Mr. Arizmendi?

4    A.  Yes.

5    Q.  What position did he hold at the restaurant?

6    A.  He was the salad prep person and he washed the pots and

7    pans.

8    Q.  Prior to your father's death and during the time that you

9    worked at the restaurant, who was the boss at the restaurant?

10   A.  My dad.

11   Q.  Who did the employees report to?

12   A.  My dad.

13   Q.  Did that include you and Maria?

14   A.  Yes.

15   Q.  Is that because you also are employees?

16   A.  Yes.

17   Q.  You mentioned that you had an uncle who worked at the

18   restaurant.  This is your uncle Costanzo Migliorini?

19   A.  Yes.

20   Q.  Did your uncle also go by Mario Migliorini?

21   A.  As far as I know, I always knew him as Costanzo.

22   Q.  Did you ever call your uncle Mario?

23   A.  Never.

24   Q.  Did he work at the restaurant?

25   A.  He did in the mornings doing prep work but never in the

H3h6pin11                        Migliorini - direct

1   evenings.

2   Q.  Did he ever stop working at the restaurant?

3   A.  Yes, he did.

4   Q.  When was that?

5   A.  In 2005.

6   Q.  Was he a shareholder in the restaurant?

7   A.  Yes.

8   Q.  Did he ever stop being a shareholder in the restaurant?

9   A.  Yes, he did.

10  Q.  When was that?

11  A.  In 2005.

12  Q.  After he stoped being a stockholder in the restaurant in

13  2005, did he do any work whatsoever for the restaurant in any

14  capacity whatsoever?

15  A.  He was my dad's brother and business partner for almost 60

16  years.  So he would come in to see my dad.  They lived -- well,

17  they lived -- my uncle still lives in the same apartment, which

18  was two blocks away.  They were together every day.  They left

19  Italy together to Argentina and they came from Argentina to New

20  York and they always lived in the Village when they came to New

21  York.  They were always together.  So he would come and visit

22  my dad and stop in at the restaurant.  And occasionally he --

23  my dad would ask him for some help and he would help him.  They

24  were brothers.

25  Q.  But did he hold any official title or official role or

1    capacity with the restaurant?

2    A.  No.

3    Q.  Or with the company Frisoling?

4    A.  No.

5    Q.  Did he have any authority to act on behalf of the

6    restaurant in any capacity?

7    A.  No.

8    Q.  Just so it is clear going forward, all my questions from

9    this point are concerning the time period before your father

10   passed away in April 2014.

11           So prior to your father's death, did you or Maria have

12   the power to hire or fire employees?

13   A.  No.

14   Q.  Who set employee compensation at the restaurant?

15   A.  My dad.

16   Q.  What about employee work schedules, who set those?

17   A.  My dad.

18   Q.  Who set your work schedule and compensation?

19   A.  My dad.

20   Q.  Who set Maria's work schedule and compensation?

21   A.  My dad.

22   Q.  Did you have the power to discipline employees?

23   A.  No.

24   Q.  Who had that power?

25   A.  My dad.

1   Q.  Did your sister have that power?

2   A.  No.

3   Q.  Do you know if your uncle ever had that power during the

4   time he worked at the restaurant?

5   A.  I mean as far as being an owner, he would have had that

6   power, but he never yielded that power.  He had no interest in

7   that.

8   Q.  Who exercised that power?

9   A.  My dad.

10  Q.  Did he exercise that power at all times prior to his death?

11  A.  Yes.

12  Q.  Did you ever review the company's financials or company tax

13  returns?

14  A.  No, I did not.

15  Q.  Who did that?

16  A.  My dad.

17  Q.  Did you ever speak with the company's accountant about the

18  company's tax returns?

19  A.  No.

20          THE COURT:  What time period?

21          MR. KUBLANOVSKY:  This is all before April 20th, 2014.

22          THE COURT:  Those questions are applying to before

23  April 2014?

24          MR. KUBLANOVSKY:  Correct.

25          THE COURT:  When you are asking has he ever done it.

H3h6pin11                           Migliorini - direct

1          MR. KUBLANOVSKY:  That is why I prefaced all my

2    statements with the time period that all these question apply

3    to so it is clear.

4    BY MR. KUBLANOVSKY:

5    Q.  Mr. Migliorini, does the restaurant lease its space?

6    A.  Yes, it does.

7    Q.  Again, prior to your father passing away, did you ever deal

8    with the landlord in negotiating or signing the lease for the

9    restaurant?

10   A.  No.

11   Q.  Who did?

12   A.  My dad.

13   Q.  Was there a company credit card or bank card during that

14   time?

15   A.  I believe so, yes.

16   Q.  Did you have it?

17   A.  No.

18   Q.  Did any other employee have one?

19   A.  No.

20   Q.  Who had one?

21   A.  My dad.

22   Q.  Did you ever review W-2s for any of the other employees?

23   A.  No.

24   Q.  On that first point, what is the first time you ever saw a

25   W-2 for any of the plaintiffs, for any employee in this action?

1  A.  It would have been 2015.  The year 2015 when those W-2s

2  came in.

3  Q.  If any of the employees at the restaurant had a question

4  about their jobs, who would they go to?

5  A.  My dad.

6  Q.  Did they ever go to you?

7  A.  They would try to but I would tell them, I cannot help you

8  there.  You have to go to my dad.

9  Q.  If they had questions about their compensation, who would

10  they go to?

11  A.  My dad.

12  Q.  Did that also apply to you and Maria, would you go to your

13  dad?

14  A.  Yes.

15  Q.  Who paid the employees their wages?

16  A.  My dad paid them.  Occasionally we would hand them their

17  money if my dad was unavailable to pay them.

18  Q.  So did your father ever ask you to hand the other employees

19  their wages?

20  A.  Yes.

21  Q.  Do you know if he ever asked Maria to hand the employees

22  their wages?

23  A.  Yes, I believe so.

24  Q.  Were you responsible for calculating any of those wages?

25  A.  No.

1    Q.  Do you know if Maria was responsible for calculating any of

2    those wages?

3    A.  No.

4    Q.  Were you ever free to change the amount of the wages paid

5    to any of the employees?

6    A.  No.

7    Q.  Did you know how much the employees were being paid?

8    A.  I did because my dad would prepare the payroll on Mondays

9    and he would do it in his apartment.  And Mondays being our day

10   off -- I lived in the same building as him and I would go down

11   sometimes to his apartment.  He was one floor below me.  I

12   would see him counting money and putting different rubber bands

13   around different amounts of money.  And I asked what that was

14   for and he told me it was for the payroll for the employees.

15   Occasionally he would ask me to recount a pile that he had and

16   I would see him put -- write a slip and put a name with a

17   rubber band.  To that essence, yes, I did.

18   Q.  You were not involved in the process of calculating the

19   wages or setting compensation?

20   A.  No.

21   Q.  How often was your father at the restaurant during the

22   week?

23   A.  Seven days.

24   Q.  When you say "seven days," you testified that the

25   restaurant was only open six days?

1    A.  You have to understand my father's attitude towards

2    especially Piccolo Angolo but business in general.  Piccolo

3    Angolo -- he had two children.  He had me and my sister.

4    Piccolo Angolo was his baby.  He spent his days off there.  He

5    went to check that nothing was wrong, everything was in its

6    proper place to start the week on Mondays.  He liked being

7    there.  He loved being there.

8    Q.  What time would he usually be at the restaurant?

9    A.  He would normally stay until closing until he got a little

10   bit older and then would leave around 9:00, 9:30 if I was there

11   in the evening.  If I was not there in the evening, he would

12   still stay until closing.

13   Q.  You may have mentioned this but just to clarify, what time

14   would you normally arrive at the restaurant?

15   A.  Between 11:00 and 11:30 a.m.  Sometimes earlier.

16   Q.  Would he sometimes be the first to arrive at the

17   restaurant?

18   A.  More often than not he was the first to arrive.

19   Q.  Did anyone else ever arrive earlier than he did to the

20   restaurant?

21   A.  Yes.  Sometimes Angel Guayllasac would get there earlier

22   than him.

23   Q.  Why was that the case?

24   A.  My dad would want to be the first one there, but

25   occasionally he would have to schedule things regarding his

1    personal life -- doctor's appointments, appointments with

2    various other things to do with the business -- and he would

3    tend to schedule them for the morning, a.m.; but these things

4    could tend to run over and he couldn't get there before Angel

5    would.

6    Q.   Would it be Angel and not you or Maria to open the

7    restaurant?

8    A.   I didn't come in in the mornings.  That is not what he

9    wanted me to do.

10   Q.   Do you know if Angel had a key to open the restaurant?

11   A.   Yes, he did.

12   Q.   Did any of the other employees have keys to open the

13   restaurant?

14   A.   No, they did not.

15   Q.   In the time that you worked at the restaurant and aside

16   from your father's illness and before he passed away, did your

17   father ever take any vacation from the restaurant and leave the

18   running of the restaurant to someone else?

19   A.   Never.

20   Q.   Generally speaking did your father ever take a day off from

21   the restaurant?

22   A.   Outside of the days that we were closed, the holidays that

23   we were closed and the vacation that was scheduled for

24   everyone, no.

25   Q.   Just to be clear your father would close the restaurant

1   during those two weeks in the summer rather than someone else

2   be in charge of the restaurant?

3   A.   Correct.

4   Q.   Why would that be the case?

5   A.   He didn't want to leave the restaurant to be run by anybody

6   other than himself.

7   Q.   Did your father ever leave early on days that he worked at

8   the restaurant?

9   A.   Yes.  As I stated before, only on evenings when I was

10  there.

11  Q.   So how did the employees know what to do or who to go to

12  when they had a problem?

13  A.   They all had his home phone number.  And later he got a

14  cell phone and they all had access to his cell phone number.

15  He would constantly check in when he went home early.  If he

16  went home at 9:30, his first phone call would be at 10:30 and

17  proceed from there depending on how the business was.  He

18  normally checked in between 10:00 and 10:30.

19  Q.   Who would he call to check in?

20  A.   He would call the restaurant line.

21  Q.   Who would he speak with?

22  A.   Occasionally it could be anybody that answered the phone.

23  Normally it was Fernando, myself or -- Fernando or myself.

24  Q.   Did he speak with Angel?

25  A.   He would ask for Angel.

1    Q.   Why would he ask for Angel?

2    A.   He wanted to know what was going to -- needed to be done

3    the following day, prep work and orders.

4    Q.   What if a customer saw a fly in her soup and was incensed

5    with the kitchen staff or wait staff, what would the staff do?

6    A.   I mean, we were -- the wait staff were allowed to handle a

7    certain extent of situations, smaller.  If somebody had to wait

8    for a table to -- my dad would always -- we would see how he

9    would handle situations when he was there and we understood to

10   handle it the same way he would handle.  Give them a free house

11   wine or dessert.  If it got to the point where that wasn't

12   satisfactory enough, we would contact him to ask him how should

13   we proceed with this.

14   Q.   Do you know if any employees actually ever did contact him?

15   A.   As far as I know we never had any issues of the type that

16   went to that extent that a free bottle of wine or dessert

17   wouldn't handle any situations in the dining room.

18   Q.   What about questions concerning food preparation or any

19   issues in the kitchen, who was in charge of those questions

20   when your father was not there?

21   A.   Angel.

22   Q.   Why was that the case?

23   A.   Because he was the kitchen manager.

24   Q.   Who hired Mr. Guayllasac?

25   A.   My dad.

1   Q.  How long did Mr. Guayllasac work at Piccolo Angolo?

2   A.  He started before me in 1993.

3   Q.  What was his position when he started at the restaurant to

4   the time before your father's death?

5   A.  He was hired as a dishwasher and a couple of years later my

6   dad promoted him to the salad prep area and then after that I

7   was already at the restaurant and my dad kind of took him under

8   his wing and hired him to be the cook, slash, kitchen manager.

9   He trained him to do all the prep work in the afternoon with

10  him and how to prepare the foods that we served.

11  Q.  Was his position different from the other employees?

12  A.  Yes, it was.

13  Q.  In what way?

14  A.  He essentially was my dad's right-hand man.

15  Q.  What do you mean by that?

16  A.  He was there with my dad all afternoon.  He learned all of

17  the recipes for my dad.  My dad essentially taught him how to

18  cook.  He assisted him in everything -- inventory, orders,

19  sometimes placing orders with vendors.

20  Q.  So Mr. Guayllasac would place orders with the vendors

21  directly?

22  A.  Yes.

23  Q.  Would he tell your father what orders also needed to be

24  placed with vendors?

25  A.  Occasionally, yes.  He would because there were certain

1   vendors that needed to be called or vendors that needed to be

2   called in the morning.  Specifically the meat and the fish

3   needed to be called early in the morning and he didn't want to

4   burden him with having to get up at 6:00 a.m. to call them.

5   And he had a relationship with his vendors, specifically the

6   meat and fish.  He knew the owners of the company.

7   Q.  When you say "he," who are you referring to?

8   A.  My dad.  So he would take those orders from Angel.  He had

9   direct lines to the owners.  He had the direct lines to

10  whatever stores or businesses they had and later cell phone

11  numbers that he called them directly to place the orders.  My

12  dad liked to handle it that way.

13  Q.  Do you know which vendors Mr. Guayllasac dealt with?

14  A.  Directly he dealt with DiCarlo Foods and he would sit down

15  with them on Tuesdays.  It was a weekly order and he would sit

16  with the salesperson on Tuesday and place the order directly

17  with them.

18  Q.  Do you know how much in terms of cost Mr. Guayllasac would

19  order on a weekly basis?

20  A.  I didn't until my dad's passing when I started to see the

21  invoices and it was a substantial order.  They are large orders

22  because it only comes once a week.  It is most of the dry

23  goods, paper products, cleaning supplies, some food products,

24  imported food products and such.  It was our largest order of

25  the week.

1   Q.  So you didn't know what he was ordering until after you

2   took charge of the restaurant?

3   A.  Correct.

4   Q.  So how much after he took charge of the restaurant on a

5   weekly basis was he ordering?

6   A.  On a weekly basis our invoices with DiCarlo were anywhere

7   between two and $3,000 a week.

8   Q.  What other responsibilities did he have?

9           Just to be clear, I am talking about the period prior

10  to your father's death.

11  A.  He was in charge of organizing the inventory in the

12  basement and managing the basement area, storage area of the

13  basement area.

14  Q.  When you say in charge of inventory, what did that

15  encompass?

16  A.  All of the food stored downstairs -- fish, meat,

17  vegetables, knowing what we had and what we were going it need.

18  My dad didn't like to place a lot of bulk orders when it came

19  to food in the way of fish and meat and vegetables.  So it was

20  always ordered daily.  He always needed to know what was --

21  what we had and what we needed.  That was his job.

22  Q.  Who would he relate all that information to?

23  A.  He would normally just contact my dad directly and give him

24  the orders.  Occasionally if he was in a hurry to leave, he

25  would write it on a list and give it to myself to bring to my

1   dad.  Because I lived in the same building, he would just ask

2   me to bring it to my dad.  If he was in a hurry, sometimes he

3   would leave the restaurant but he would text me from his cell

4   phone with orders to give -- if I wasn't at the restaurant to

5   give it to my dad, I lived in the same building so I could

6   relay that information to him.

7   Q.  Based on your testimony, Mr. Guayllasac did that in the

8   evenings before he left?

9   A.  Yes.  It was one of his duties.

10   Q.  Did your father vest authority to Mr. Guayllasac to manage

11   the restaurant?

12   A.  Yes, insofar as inventory and food products and the kitchen

13   itself during the evening.

14   Q.  Do you know if your father vested this kind of authority in

15   any other employee?

16   A.  No.  He did not vest that.

17   Q.  Not even in you or Maria?

18   A.  No.

19   Q.  Why not?

20   A.  It's -- specifically to my sister, it was -- my dad being

21   an Italian gentleman that ran the business the women in the

22   family tended to stay separate from the business.  It was just

23   the way he felt about it.  He was willing to give her a job as

24   a waitress and hostess and have her working there in the

25   capacity; but he didn't feel she needed to have that

1    responsibility.  It wasn't her place to have that

2    responsibility.

3            In regards to me, I believe he didn't want me to go

4    down the life path that he took.  He knew how hard the

5    restaurant business was and he wanted me to do something better

6    for myself.

7    Q.  When you say that, do you know if your father ever

8    envisioned your taking over the restaurant?

9    A.  We never had conversations about that.  He never broached

10   that subject with me.  It was not something we really

11   discussed.

12   Q.  Did you feel that he wanted you to take over the restaurant

13   based on what you just testified to?

14   A.  No.  I really don't.  I think he wanted me to do something

15   different, something on my own.

16   Q.  Earlier you testified that you had worked at the restaurant

17   for three days.  Did your schedule ever change at the

18   restaurant?

19   A.  It did a little later on in that we would switch the days

20   that we worked -- the evenings that we worked.

21   Q.  When you say "we," who do you mean?

22   A.  Me and Maria.  We worked alternate evenings and we switched

23   them just for -- for personal reasons.  We were working -- she

24   was working Tuesday, Wednesday and Sunday evenings and I was

25   working Thursday, Friday, Saturday.  It was difficult to -- it

1    is hard to work those hours -- those evenings.  And I just

2    started a new relationship and Friday, Saturdays -- it was a

3    long-distance relationship and I wanted to have a couple of

4    weekend evenings off.  So we kind of worked around that and we

5    kind of didn't have it set in stone so much on the evenings.

6    We would be flexible.

7              Where I would say, Dad, I need Saturday night off.

8              Okay, come in Wednesday.  Maria will come in Saturday

9    for you.

10   Q.  So you sought permission from your father to change your

11   schedule?

12   A.  Yes.

13   Q.  Did you ever call in sick to the restaurant?

14   A.  No.  I lived in the same building as my dad so he knew when

15   I was ill.

16   Q.  Do you know if any of the other employees ever called in

17   sick?

18   A.  Yes, they did.

19   Q.  Who would they call?

20   A.  My dad.

21   Q.  They would ask permission to not come to work that day?

22   A.  Yes.

23   Q.  Would they call anybody else and ask permission?

24   A.  No.

25   Q.  Who is Fernando Ortiz?

1    A.   Fernando Ortiz is our waiter.

2    Q.   When did he start working at the restaurant?

3    A.   I believe it was in January of 1993.  I only know that

4    because he just celebrated a milestones anniversary of

5    20-something years.

6    Q.   He still works for the restaurant?

7    A.   Yes, he does.

8    Q.   Prior to your father's death, did he have a key to the

9    restaurant?

10   A.   No, he did not.

11   Q.   Up until your father passed away, I believe you just

12   testified that he started -- Mr. Ortiz started in 1993.  Prior

13   your father passing away, did he work at the restaurant almost

14   as long as you and Angel?

15   A.   It was less.  He was there before I was but after Angel.

16   Q.   Do you know what Mr. Guayllasac's compensation was at the

17   restaurant prior to your father passing away?

18   A.   I did.

19   Q.   How do you know that?

20   A.   Because I had seen my dad counting the money on Mondays and

21   he would occasionally ask me to just recount -- can you recount

22   that stack for me, and I would see him putting his name on that

23   rubber band stack of money.

24   Q.   Aside from that did you have any other reason to know what

25   he was paid?

1    A.  No.

2    Q.  Do you know if what he was paid was higher than any other

3    employee at the restaurant?

4    A.  Yes, it was.

5    Q.  What was he paid?

6    A.  He was paid 1,050 a week.

7    Q.  Was he paid more than you?

8    A.  Yes, he was.

9    Q.  Was he paid more than Maria?

10   A.  Yes, he was.

11   Q.  Why was he paid so much do you think?

12   A.  Because he worked hard and my dad wanted to make sure he

13   was properly compensated for the hours and the overtime hours

14   he put in and he wanted to make sure he had extra added to that

15   because he was a hard worker.

16   Q.  Why was he paid so much more than any of the other

17   employees if you know?

18   A.  He was the kitchen manager and he was in charge of a lot of

19   things.

20   Q.  When you took over the restaurant, did he continue to be

21   paid the same amount?

22   A.  Yes, he did.

23   Q.  Were you here for Mr. Guayllasac's testimony at this trial?

24   A.  Yes, I was.

25   Q.  Mr. Guayllasac testified that he was only paid $420 a week;

1    is this correct?

2    A.  No, it is not.

3    Q.  Do you know where he is getting that number from?

4    A.  I believe from his W-2s and/or any pay stubs that he

5    received.

6    Q.  You testified that that is not the amount he was paid?

7    A.  Correct.

8    Q.  So why was he paid more than the amounts reflected on his

9    W-2s?

10   A.  Until my dad was alive, I didn't know what was on his W-2s

11   or his pay stubs.  After my dad passed, I had hired a payroll

12   company to run the payroll for us as per our new accounting

13   firm asking me to do.  In that process, they needed to fill out

14   W-4s for the payroll company.  So as I had them fill out the

15   W-4s before I turned them into the payroll company, I informed

16   them, Angel specifically, this is what you are going to go on

17   the books for.  I don't know what your pay will be after taxes

18   until I speak to the payroll company with your deductions.  And

19   he told me, No, I don't go on the books for that, that is not

20   the deal I had with your dad.  The deal I had with your dad was

21   to go on the book for $400 a week.

22   Q.  What did you want to put him on the books for?

23   A.  For the $1,050 a week.

24   Q.  Why didn't you wind up putting him on the books for $1,050

25   a week?

1   A.  Because he told me if I put him on books for $1,050 a week,

2   he would quit.

3   Q.  Did you have that conversation with any of the other

4   employees?

5   A.  Yes.  Eddie Jaquez.

6   Q.  What was that conversation?

7   A.  Same conversation with the W-4s, filling them out.  I told

8   him your pay is 725 a week and I don't know what you will get

9   after taxes because I have to see.  The payroll company had

10  told me that we were paying -- we were probably paying more in

11  payroll taxes than we should have been anyway.  So the lady

12  told me you have to get the W-4s and we'll know exactly what

13  their take-home pay will be.  I told them you will go on for

14  $725.  He told me, No, the deal I had with your dad was to go

15  on the books for $400.

16  Q.  Were you here during Mr. Jaquez's testimony?

17  A.  Yes, I was.

18  Q.  Do you recall his testifying that he had agreement with

19  your father, a verbal agreement as far as wages?

20  A.  Yes, I do.

21  Q.  Do you believe that was the agreement he was referring to

22  when he was testifying?

23  A.  Yes, I do.

24  Q.  Going back to Mr. Guayllasac, did you consider him to be

25  part of the restaurant's management team?

1    A.  Yes, I did.

2    Q.  Again, just to be clear I am referencing the time prior to

3    your father passing away.

4    A.  Right.

5    Q.  So I will restate my question.  In that context did you

6    consider Mr. Guayllasac to be part of the restaurant's

7    management team?

8    A.  Yes.

9    Q.  Did you consider yourself to be a part of the restaurant's

10   management team?

11   A.  No.

12   Q.  Did your father consider you a part of the restaurant's

13   management team?

14   A.  No.

15   Q.  Did your father consider your sister a part of the

16   restaurant's management team?

17   A.  No.

18   Q.  Did your father consider Mr. Guayllasac to be a part of the

19   restaurant's management team?

20   A.  Yes.

21   Q.  Did Mr. Guayllasac arrive at the restaurant each day prior

22   to the other employees?

23   A.  Yes, he did.

24   Q.  I believe you testified earlier that he arrived between

25   11:00 and 11:30?

1    A.  No.  When my dad would arrive, he would arrive 11:30 to

2    12:00 p.m.

3    Q.  What time would he usually leave?

4    A.  He would leave after he -- he cleaned his station and

5    checked what he needed downstairs.  He would clean his station

6    area, cover any food, and go downstairs and change and come

7    back up with his list or talk to my dad about the orders, and

8    then he would leave.  He was free to leave.

9    Q.  Do you remember what time he usually left?

10   A.  It varied because it was after the kitchen closed.

11   Q.  So on each night -- and you can take us through each

12   night -- when did the kitchen close during the days the

13   restaurant was open?

14   A.  The kitchen was -- our hours were from 5:00 to 11:00, but

15   we normally closed the kitchen after the last customer placed

16   their order.  We didn't stay open 0if the last customer was at

17   and 10:00 and they had their food by 10:30, we weren't -- my

18   dad especially didn't want to wait for a table of two to come

19   in to order two pastas for minimal effort and minimal revenue

20   to annoy the employees.  He rather avoid that and save that for

21   a night where we had customers that were -- it was going to be

22   a little bit longer for them.  He would term them, Close the

23   kitchen.  It's not worth it.  Let's just let everybody go home.

24   Q.  So you said the restaurant was open for 5:00 to 11:00.

25   That was during the week?

1    A.   Yes.

2    Q.   What about the weekends?  Do you know when Mr. Guayllasac

3    would normally leave on the weekends?

4    A.   The weekends were obviously our busiest day -- Friday and

5    Saturday.  We never sat anyone after -- our last reservation

6    was 10:30 and we never sat anyone after 11:00.  So normally the

7    kitchen would be done by 11:30.  And after his cleanup and

8    changing, and specifically on Fridays, there were still some

9    orders to be placed so he needed to do that on Fridays.

10   Saturdays there were no orders to be placed.  No one delivered

11   on Sundays.  When he was done cleaning his station, he was free

12   to go home.

13   Q.   If I could go back quickly to the document that I gave you

14   of the photographs, can you turn to the last page of that

15   document, please.  This document appears to reflect the

16   business hours for the restaurant.

17        When were these hours put in place?

18   A.   I don't remember.  Honestly it's -- I mean, it was before

19   they -- the employees left, the plaintiffs left, but I don't

20   know the exact date that that was put up.

21   Q.   Actually while we're here so we don't have to come back,

22   can you go to the second to last page?

23   A.   Yes.

24   Q.   This page appears to show a closed sign hanging from the

25   door.

1    A.  Correct.

2    Q.  Who would be in charge of turning that sign to show whether

3    the restaurant was open or closed?

4    A.  It could be anyone on the wait staff.  My dad if he was

5    there would say, Turn the sign; we're going to close.  Even if

6    there were customers that were still in the dining room,

7    sometimes he would say, Turn the sign; we're going to close.

8    He didn't want people trying to come in even if there were

9    people still eating.  When he wanted to close the restaurant,

10   that was how he did it and how we continue to do it and just

11   not to have anybody come in after we decided to close.

12   Q.  When the restaurant opened for business, was that sign

13   turned to open?

14   A.  Yes.

15   Q.  When would that take place?

16   A.  5:00.

17   Q.  Ever any earlier than 5:00?

18   A.  Only on Sundays at 4:00.

19   Q.  Ever any earlier on Sundays than 4:00?

20   A.  No, never.

21   Q.  Mr. Guayllasac ever leave any of the other employees when

22   you finished your shift?

23   A.  I didn't hear you.

24   Q.  Did Mr. Guayllasac ever leave work with any of the other

25   employees when he finished his shift?

1    A.   Not that I know of.  He lived in Queens and the employees

2    that would have finished around the same that he finished did

3    not live in Queens.  So they took different trains.  He would

4    leave before them.  Sometimes there would be people still

5    sitting and they would exit the same time, but they didn't

6    leave together.  There were times when they would come up to

7    the dining room.  They may want to sit and have a beer or glass

8    of wine and they didn't necessarily leave right away.  He may

9    have exited with somebody, but he wouldn't leave with them per

10   se.

11   Q.   So the employees were free to stay after they finished work

12   at the restaurant?

13   A.   Yes.

14   Q.   Why?

15   A.   Because we didn't have a -- we didn't have a policy where

16   you were not allowed to have beers or glass of wine or soda.

17   Sometimes they would prepare something to eat and they thought

18   they would take it home or they wanted to sit down and eat and

19   they would sit down and eat.  They would want to change before

20   they ate so they felt more comfortable not in their work

21   clothes while they were eating.  They would eat the meal that

22   they prepared and sometimes there were sporting events on that

23   they wanted to see the end of on our TV.  We welcomed them

24   staying.

25   Q.   Your father was okay with that?

1    A.  Yeah.

2    Q.  Did you also stay with them?

3    A.  Yeah.

4    Q.  Did the employees get along?

5    A.  Yeah.

6    Q.  Would you describe the employees that worked at the

7    restaurant as a tight group?

8    A.  Yeah.  We were -- we were friends.  We did a couple group

9    outings, Yankee games together, me, Fernando, Eddie, Angel,

10   Luis, Israel.  I don't believe Robinson was part of that

11   because he wasn't hired at that point, but we would go to

12   Yankee games on Mondays together.  We very -- it was more like

13   family than it was employees.  We were constantly -- before

14   their shifts started when the weather was nice they were

15   constantly outside.  My dad had a tendency after he was done

16   prepping to sit outside on his lawn chair and everyone in the

17   neighborhood knew him and the employees would come out and joke

18   around with him and joke around.  Always joking around with

19   each other.  There was a lot of just -- we had a good

20   relationship.

21   Q.  They were never told to finish their shifts and leave at

22   the end of each night?

23   A.  No.  They were told the kitchen is closed and they could

24   close up and either go home or come back up and talk to myself,

25   Fernando, my dad if he was still there.

1    Q.  When did the kitchen open each day to start serving

2    customers?

3    A.  5:00.  Except for Sundays at 4:00.

4    Q.  Approximately how long before the restaurant closed did the

5    kitchen close?

6    A.  I mean, I would say normally the restaurant closing

7    depended on -- like, locking the door closed?  Is that what --

8    Q.  Yes.

9    A.  It could be anywhere from half an hour, 45 minutes

10   depending on who was still there.  If something was -- again,

11   we had a TV -- on, the World series was on, we were all sitting

12   there watching it especially if the Yankees happened to be

13   involved.  Most of us are Yankees fans and still are.  No one

14   was in a hurry and if they wanted to watch the end of the game

15   and my dad would say okay and we would sit and watch the game.

16   He would sometimes get involved especially if it was the

17   Yankees because it was New York.  So it could vary when they

18   could leave and closing.

19   Q.  When the kitchen closed, did it stop taking food orders?

20   A.  Yes.

21   Q.  After the kitchen closed, what was Mr. Guayllasac's

22   responsibilities?

23   A.  He needed to cover the food in his section, which was the

24   fish and pasta.  There were two small tall boy refrigerators.

25   Scrub his stove, which was a four-burner stove.  Scrub the

1    countertop of his two tall boy refrigerators and go downstairs.

2    I don't know what he was -- what he did so much downstairs

3    because that was pretty much unsupervised, but I assume it was

4    checking the inventory one last time because he would come up

5    with orders and then change and be free to go home.

6    Q.  How long would it normally take him to fulfill those

7    responsibilities in the kitchen?

8    A.  In the kitchen itself, 15 minutes.  In the basement that

9    was contingent on how quickly he changed.  He was unsupervised

10   down there.  So sometimes there were other guys down there

11   changing.  They could get into a conversation.  So I didn't --

12   you know, I was attending to other things in the dining room so

13   when they came back up is when he came back up.

14   Q.  Who is Mr. Pineda?

15   A.  Luis was our busboy.

16   Q.  When did Mr. Pineda start working at the restaurant?

17   A.  I believe it was in -- it was in 2000.  It was in 2000

18   because it was before 9-11 that I remember.

19   Q.  Who hired Mr. Pineda?

20   A.  My dad.

21   Q.  What responsibilities did he have as a busboy?

22   A.  He needed to set up the bar -- service bar area.  It means

23   opening the house wine and putting -- we use carafes because we

24   have liter and a half bottles and we put them into liter

25   bottles.  Prepping beers, make sure we had beers on ice,

1    bringing up a bucket of ice to start the shift.  Folding

2    napkins, which Fernando, myself, and my sister would assist him

3    in folding the napkins and bringing up some table clothes to

4    have for the shift.  Generally making sure the dining room was

5    set up to start running.

6    Q.  Do you know what Mr. Pineda's compensation was at the

7    restaurant?

8    A.  He was paid $75 a day plus 15 percent of the daily tips.

9    Q.  How do you know how much he was paid?

10   A.  Because at the end of the night either myself or Maria

11   would pull the $75 out of the cash to pay him by my dad's

12   instructions.  Then as part of the splitting of the tips with

13   Fernando, we were instructed by my dad to give him 15 percent

14   of the total gratuities for the night.

15   Q.  You, Maria and Fernando were the other wait staff?

16   A.  Yes.

17   Q.  How were you paid?

18   A.  Myself, I was paid by tips.  My share of the tips.

19   Q.  Do you know how Maria was paid?

20   A.  The same.

21   Q.  As tipped employees?

22   A.  Yes.

23   Q.  Did Mr. Pineda ever complain to you about the pay that he

24   received?

25   A.  No.

1    Q.   Do you know if he complained to your sister about the pay

2    he received?

3    A.   No.

4    Q.   Do you know if he ever complained to your father about the

5    pay that he received?

6    A.   No.

7    Q.   After your father passed away, did he continue to be paid

8    the same amount?

9    A.   Yes.

10   Q.   Did he ever complain to you about what he was paid?

11   A.   No.

12   Q.   Did he ever complain to you that anyone was stealing tips?

13   A.   No.

14   Q.   Did he ever complain to you that your sister was stealing

15   tips from him?

16   A.   No.

17   Q.   Did he ever complain to you about his hours or schedule?

18   A.   No.

19   Q.   What about during the time your father was alive, did he

20   ever complain about his schedule to you?

21   A.   No.

22   Q.   To your sister?

23   A.   No.

24   Q.   To your father?

25   A.   Not complain.  Just ask for a change.

1    Q.   Can you describe that?

2    A.   I only know that he asked instead of coming in at 3:00 -- I

3    don't know when that was -- to come in at 4:00.  My father

4    said, Fine.

5    Q.   Do you know if Mr. Pineda ever received tips directly from

6    any of the restaurant's customers?

7    A.   Yes, he did.

8    Q.   Did those tips ever go into the tip box for the tip pool?

9    A.   No, they didn't.  He wasn't required to.

10   Q.   So he was allowed to keep those tips?

11   A.   Yes.

12   Q.   And your father was okay with that?

13   A.   Yeah.  To an extent he would -- there was a certain

14   customer, a regular, still is a regular, he tended to tip

15   everyone in the restaurant, all of the employees.  Outside of

16   myself, Fernando and Maria, he tipped everyone in cash

17   including the back, the kitchen staff and the dishwasher.

18   Outside of my dad, myself and Maria and Fernando.  Because he

19   tipped -- he was living a tip knowing that was for Luis.  My

20   dad encouraged him to tip Luis that amount that he was giving

21   to the kitchen as well.  He would tell him, Take care of Luis

22   too.

23   Q.   Were there only cash tips at the restaurant?

24   A.   No.  There was very rarely cash tips at the restaurant.

25   Q.   The box that stored the cash for the tip pool, was that the

1   entirety of the tip pool?

2   A.  No, it was not.

3   Q.  What percentage of the tip pool do you think that was on

4   any given night?

5   A.  On a given night, 20 percent.

6   Q.  Where did all the other tips come from?

7   A.  Credit card sales.

8   Q.  How were those distributed to the tipped employees?

9   A.  At the end of the night the batch needed to be sent on the

10  credit card machine and the receipt would be printed with the

11  total sales and the -- well, let me go back.

12          At the end of the night the tips needed to be entered

13  because customers were allowed to write them in and do their

14  mathematics.  So those needed to be entered manually into the

15  machine and then the batch needed to be sent.  Then a receipt

16  would be printed with the sales amounts and the tip amount and

17  then total.  So tip amounts would be withdrawn from the cash

18  register in cash and then taken wherever we did the splitting.

19  Normally it was right by the cash register because it was the

20  easiest area to do that.  Put the cash in the tip box and put

21  it together with the credit card tips that were now in the cash

22  box and distribute them that way.

23  Q.  Did Mr. Pineda remain at the restaurant after the

24  restaurant closed and while the tips were being calculated?

25  A.  He normally would.  Some nights he would be in a hurry and

1    need to do something either in the morning or wanted to get

2    home early -- earlier.  So he wouldn't remain because we had to

3    wait for the last customer to physically -- even though they

4    were done eating, table is cleaned, they may not necessarily

5    have paid the tab, which means the check could have been at the

6    table but they didn't put the tab in and we would encourage

7    them to kind of -- can we move this along.  Do you mind paying,

8    we want to close out the receipts.  So sometimes he wouldn't be

9    inclined to wait for the credit card receipts to be run.  So if

10   that was the case, his $75 would be paid to him for his nightly

11   wages and then whatever his percentage of tips were given to

12   Fernando to give to him the next day.

13   Q.  To deliver it to him the next day?

14   A.  Yes.  To deliver it to him the next day.

15          THE COURT:  We'll take a 10-minute break.

16          (Recess)

17          THE COURT:  Please be seated.

18          You may continue.

19          MR. KUBLANOVSKY:  Thank you, your Honor.

20   BY MR. KUBLANOVSKY:

21   Q.  Mr. Migliorini, were you here during Mr. Pineda's

22   testimony?

23   A.  Yes, I was.

24   Q.  Mr. Pineda testified that he was paid $400 per week.  Does

25   that sound right to you?

1   A.  No.  He was paid $75 daily.  So six days a week by $75

2   daily plus the 15 percent of the tip pool.

3   Q.  The $75 daily six days a week is $450?

4   A.  Correct.

5   Q.  Plus 15 percent tips?

6   A.  Yes.

7   Q.  I apologize if you said this earlier, but what time did

8   Mr. Pineda usually start working each day at the restaurant?

9   A.  4:00 p.m.

10  Q.  What time did he usually leave?

11  A.  Normally after the last table was set and cleared.

12  Depending on what time that table was served and cleared -- not

13  set and cleared, served and cleared.  Normally between 10:30

14  and 11:00 Tuesday through Thursday and 11:00 to 12:00 on Friday

15  and Saturday and 10:00 to 10:30 on Sunday.

16  Q.  How long would it normally take Mr. Pineda to clean up each

17  night?

18  A.  10 minutes.

19  Q.  Did he typically leave with any of the other plaintiffs?

20  A.  Not that I know of.

21  Q.  Did you oversee Mr. Pineda?

22  A.  No, I did not.

23  Q.  Did your sister oversee Mr. Pin?

24  A.  No, she did not.

25          THE COURT:  Are you talking about a certain period of

1    time?

2                MR. KUBLANOVSKY:  I am, sir.

3    Q.  My questions relate to when your father was still alive.

4    A.  Okay.

5    Q.  So in that context did you ever see Mr. Pineda?

6    A.  No, I did not.

7    Q.  Did your sister oversee Mr. Pineda?

8    A.  No, she did not.

9    Q.  Who did Mr. Pineda report to?

10   A.  My dad.

11   Q.  By the way can you please turn to Exhibit 4 in the

12   plaintiffs' book.  I believe it is in the binder.

13               Sir, prior to this action had you ever seen these

14   documents before?

15   A.  No, I have not.

16   Q.  Now, Mr. Pineda testified that you gave him these

17   documents; is that true?

18   A.  No, it's not.

19   Q.  Mr. Pineda also testified that you signed the second page

20   of this document on behalf of your uncle; is that true?

21   A.  No, it is not.

22   Q.  Do you know what these documents are used for?

23   A.  I have no idea.

24   Q.  Do you believe these are official documents from the

25   company Frisoling?

1   A.  No, I do not.

2   Q.  I would like to show you another document.

3           MR. KUBLANOVSKY:  May I approach, your Honor?

4           THE COURT:  Yes.

5   Q.  Sir, are you familiar with your uncle's signature?

6   A.  Yes, I am.

7   Q.  Have you ever seen this document before?

8   A.  Yes, I have.

9   Q.  Can you turn to the second page of this document.

10          Do you recognize your uncle's signature on this page?

11          MR. ELLIS:  Objection, your Honor.  The witness is not

12  a handwriting expert.

13          THE COURT:  He doesn't have to be a handwriting expert

14  to lay a foundation.  He can be familiar with other people's

15  signature or competent to testify as to whether or not that is

16  in fact their signature that they are familiar with.  I am

17  going to overrule that objection.

18  Q.  Sir, as of September 28th, 2013, was your uncle affiliated

19  with the restaurant or Frisoling in any way?

20  A.  No, he was not.

21  Q.  I believe you may have mentioned this before, but did you

22  ever refer to your uncle as Mario Migliorini?

23  A.  No, I did not.

24  Q.  Do you know if your uncle ever signed his name as Mario

25  Migliorini?

1   A.  No, he did not.

2   Q.  What was your uncle's legal name?

3   A.  Costanzo Migliorini.

4   Q.  Would you ever sign on behalf of your uncle using Mario

5   Migliorini?

6   A.  No, I did not.

7   Q.  Would you turn to the first page of Plaintiff's Tab 4.  It

8   is a letter signed by your father Renato Migliorini.

9           Do you know where Mr. Pineda would have gotten this

10  letter from?

11  A.  No, I do not.

12  Q.  Do you believe that these two letters are authentic?

13  A.  No, I do not.

14          MR. ELLIS:  Calls for speculation.

15          THE COURT:  Overruled.

16          You can answer.

17  Q.  Why not?

18  A.  Because that is not my dad's signature and that is not my

19  uncle's signature.

20          MR. KUBLANOVSKY:  Your Honor, at this point I would

21  like to renew any previous objection as to the authenticity of

22  these documents.  We don't believe that they were

23  authenticated.  The witness testified as a representative of

24  the business that these are not business records.

25          THE COURT:  No.  I am going to overrule that.  I will

1  admit those into evidence at this time.  The witness identified

2  them and said they are authentic.  This witness said they are

3  not.  So that is a factual dispute that I have to resolve.  It

4  doesn't go to its admissibility.  It goes to my determination

5  as to which one in my review and my evaluation of the testimony

6  and credibility of the witnesses as to what weight I will give

7  this.  I will admit them into evidence.

8            Is that 4?

9            MR. ELLIS:  Plaintiffs' Exhibit 4.

10           (Plaintiffs' Exhibit 4 received in evidence)

11  BY MR. KUBLANOVSKY:

12  Q.  Sir, when did Mr. Jaquez start working at the restaurant?

13  A.  I believe it was in 2011.

14  Q.  Do you know who hired Mr. Jaquez?

15  A.  My dad.

16  Q.  What was his position at the restaurant?

17  A.  He was a cook.

18  Q.  Did he start off as a cook?

19  A.  Yes, he did.

20  Q.  What responsibilities did he have?

21  A.  He was responsible for cooking the meats, manning the

22  Salamander or broiler grill, preparing hot appetizers, and

23  side -- vegetable side dishes, hot vegetable side dishes.

24  Q.  Would anyone tell him what to prepare in the kitchen?

25  A.  Yes.

1    Q.   Who?

2    A.   Angel.

3    Q.   Do you know what Mr. Jaquez's compensation was at the

4    restaurant?

5    A.   He was paid $725 a week.

6    Q.   Why do you know that?

7    A.   Again, in the course of my dad prepping the payroll on

8    Mondays, I would occasionally recount piles for him to make

9    sure -- he would ask me to double-check his work and I would

10   see Eddie's name on a slip of paper with the bundle of money.

11              THE COURT:  Didn't we go through this earlier?

12              MR. KUBLANOVSKY:  I am not going to spend a lot of

13   time --

14              THE COURT:  I have that written in my notes.

15   Q.   Was Mr. Jaquez paid weekly?

16   A.   Yes, he was.

17   Q.   What time did Mr. Jaquez start working every day at the

18   restaurant?

19   A.   3:00 p.m.

20   Q.   What time did he usually leave?

21   A.   Normally after we closed the kitchen.  It took him about

22   15, 20 minutes to close his station and change and then he was

23   allowed to go home.  So that could be anywhere between 10:30

24   and 11:30 on the weekdays and 11:00 and 12:00 on the weekends

25   and 10:00 to 10:30 on Sundays.

1   Q.  If you take a look at the documents that I gave you at the

2   beginning of the day, the photographs of the restaurant --

3   A.  Yes.

4   Q.  -- can you show us where the stations were for

5   Mr. Guayllasac, Mr. Jaquez, and Mr. Arizmendi referencing this

6   document?

7   A.  The best picture would probably be on the third -- fourth

8   page.

9   Q.  So the record is clear this is a picture of the kitchen and

10  a table with the stack of dishes in the center?

11  A.  Correct.

12  Q.  So where would the three of them work in relation to this

13  picture?

14  A.  Eddie would be to the left of the stack of the plates.

15  Angel's station was two refrigerators to the right of the stack

16  of the plates.  And then Israel's station is not easily seen

17  here, but you can see the beginnings of it to the right of the

18  slicing machine with the dish towels on top.

19  Q.  Is that the salad prep area?

20  A.  Yes.  There is a better pictures of it later on.

21  Q.  How long would it take Mr. Arizmendi to clean up his

22  station at the end of each night?

23  A.  Cleaning his station was very quick.  He only had to cover

24  the salad -- salads, salad ingredients, and food items in the

25  bottom part of the fridge.  That small table is less than the

1   front of this witness stand.  It is a very small prep area.  He

2   had to scrub that down with a Brillo pad.  He then needed to

3   mop the kitchen floor after that.

4           Cleaning his station took him 10 minutes and mopping

5   the floor took him another 15 minutes.

6   Q.  So 25 minutes to half an hour?

7   A.  Yes.

8   Q.  I believe you said it took Mr. Jaquez 15 to 20 minutes to

9   clean his station.  Did he have any other responsibilities?

10  A.  No, he did not.

11  Q.  So after Mr. Jaquez finished cleaning his station, what

12  would he do next?

13  A.  He would go downstairs to change.

14  Q.  What would he do after that?

15  A.  Prior to Robinson being hired, he would either go home or

16  sit down upstairs like I said earlier watching if there was a

17  game on.  If he wanted to have a beer, wanted to eat something,

18  he would do that.  Or he was free to go home after.

19  Q.  I am sorry.

20  A.  After Robinson was hired, he would wait for Robinson to go

21  home together because they lived on the same block and they

22  took the same train home.

23  Q.  What about Mr. Arizmendi, what would he do after he

24  finished cleaning up his station and mopping the floor?

25  A.  He went downstairs to change.

H3h6pin11                        Migliorini - direct

1    Q.  After that?

2    A.  He was free to go home.

3    Q.  Prior to your father passing away, did you oversee

4    Mr. Jaquez?

5    A.  No, I did not.

6    Q.  Did you oversee Mr. Arizmendi?

7    A.  No, I did not.

8    Q.  Did Mr. Guayllasac ever call in sick?

9    A.  Yes, he did.

10   Q.  When he called in sick, who would help prepare the meals?

11   A.  I would.

12   Q.  Before your father passed away?

13   A.  I would.

14   Q.  Would your father ever help prepare the meals?

15   A.  In the way of prep work, my father was always doing the

16   prep work at the restaurant.  In regards to his job at night as

17   a cook and kitchen manager, I would do that when he called in

18   sick.

19   Q.  You would help cook the meals?

20   A.  Yes.  The orders from the customers, yes.

21   Q.  Would the other employees report to you or to your father?

22   The other kitchen employees, would they report to you or to

23   your father during that time?

24   A.  To my dad.

25   Q.  When did Mr. Arizmendi start working at the restaurant?

1   A.  I believe he started working for us in either 2009 or the

2   early part of the 2010.

3   Q.  How long total did he work for the restaurant?

4   A.  The latter part of -- the latter part of 2010 to 2011 and

5   then he was back working for us at 2012.

6   Q.  Who hired Mr. Arizmendi during both of those times?

7   A.  My dad.

8   Q.  Do you know how much Mr. Arizmendi was paid?

9   A.  He was paid $500 a week.

10  Q.  How do you know that?

11  A.  The same as before, counting.

12  Q.  Was he paid weekly?

13  A.  Yes, he was.

14  Q.  What time did Mr. Arizmendi start working at the

15  restaurant?

16  A.  5:00 p.m.   Except on Sunday, 4:00 p.m.

17  Q.  Did he ever arrive early?

18  A.  No.

19  Q.  Why are you so sure?

20  A.  Because he had another job that did not allow him to arrive

21  before 5:00 p.m.

22  Q.  Did your father know he had another job?

23  A.  Yes, he did.

24  Q.  Was your father okay with that?

25  A.  He was so long as he was ready to work at 5:00 p.m.

1  Q.  Did he ever arrive after 5:00 p.m.?

2  A.  No.  He was pretty good with being there.  Occasionally

3  depending on the trains and whatnot, but he was pretty good

4  about being there by 5:00 to be ready to work.

5  Q.  After your father passed away, did he maintain the same

6  hours?

7  A.  Yes, he did.

8  Q.  Did all of the plaintiffs maintain the same hours after

9  your father passed away?

10  A.  Yes, they did.

11  Q.  Were all the plaintiffs paid the same amounts, with the

12  exception of Mr. Diaz who we'll get to in a second?  But all

13  the other plaintiffs were they paid the same wages after your

14  father passed away?

15  A.  Yes, they were.

16  Q.  What time did Mr. Arizmendi usually leave the restaurant?

17  A.  During the week between 10:45 and 11:15, 11:30.  On the

18  weekends between 12:00 and 12:30.  On Sunday -- Sundays no

19  later than 10:30.

20  Q.  When did Mr. Diaz start working at the restaurant?

21  A.  In September of 2014.

22  Q.  Who hired Mr. Diaz?

23  A.  I did.

24  Q.  This was after your father passed away?

25  A.  Yes, it was.

H3h6pin11                     Migliorini - direct

1   Q.   How long did Mr. Diaz work at Piccolo Angolo?

2   A.   Less than a year.

3   Q.   Do you know how much less than a year?

4   A.   September -- five months.

5   Q.   Is Mr. Diaz related to Mr. Jaquez?

6   A.   Yes, he is.  It is his cousin.

7   Q.   Did Mr. Jaquez recommend to you that you hire his cousin?

8   A.   Yes, he did.

9   Q.   Why did you decide to hire him?

10  A.   Because I knew Eddie to be a good worker, hard worker, and

11  I trusted his recommendation to bring in somebody who was

12  equally as good a worker and hard as a worker.

13  Q.   Was Mr. Diaz as good as a worker as he was told to be?

14  A.   Yes, he was.

15  Q.   Prior to any of the plaintiffs' leaving the restaurant

16  February 7, 2015, did you have a problem with any of their

17  work?

18  A.   No, I did not.

19  Q.   What was Mr. Diaz's position again at the restaurant?

20  A.   He was hired to sweep and mop the kitchen floor before the

21  start of service.  And then he was -- twice a week he was to

22  vacuum underneath-- where you couldn't really get a broom or

23  mop to sweep.  He was hired to vacuum underneath storage areas

24  and refrigeration.  He did that twice a week.  He was the

25  dishwasher during the evening.

1    Q.  Do you know what Mr. Diaz's compensation was at the

2    restaurant?

3    A.  He was paid $550 a week.

4    Q.  Did you set Mr. Diaz's compensation?

5    A.  Yes, I did.

6    Q.  How was Mr. Diaz paid his wages?

7    A.  Cash.

8    Q.  Was he paid weekly?

9    A.  Yes, he was.

10   Q.  What time did Mr. Diaz start working usually each day at

11   the restaurant?

12   A.  We had hired him to come in at 2:30, but if he -- he would

13   occasionally come in at 3:00.  So long as he could get the

14   floors swept and mopped so that they could be dry before the

15   start of service and other than the days he was required to

16   vacuum.  It could depend on whether he had to vacuum, he would

17   come in closer to 2:30.  If he didn't had to vacuum that day,

18   and he only did that twice a week, he would come in closer to

19   3:00 p.m.

20   Q.  When would he usually leave?

21   A.  Tuesday through Thursday he would normally leave around

22   11:15 to 11:45.  Friday and Saturday between 11:45 and 12:15

23   And Sunday between 10:00 and 10:30.

24   Q.  How long would it normally take him to clean up each night

25   after the kitchen closed?

1    A.  We -- as the dishwasher -- we lease our dishwashing

2    machine.  So we have a certain number of runs per month that

3    we're allowed.  So we don't -- my dad's policy and then mine

4    after was not to run it empty or a half filled load.  So he

5    needed to run the last full load and then he was allowed to

6    leave any unwashed, be it glasses if they were not full not to

7    run them but to leave them, which meant he didn't have to wait

8    for the final tables to finish if he didn't have a full load to

9    run.  If it was two dessert plates and coffee cups, he didn't

10   have to wait for that to be cleared to bring to the back.  He

11   was allowed to start cleaning his area and clean the machine

12   and clean the top of the dishwashing machine and just changing

13   the water in the machine which was two buttons, and then

14   mopping his area and the small area between the kitchen and the

15   bathrooms.

16   Q.  So did he ever --

17   A.  And also taking out the trash and recycling, which the

18   other guys in the kitchen also helped him with because he would

19   bundle them and on their way out if they were before him, they

20   could grab them and help him do that.

21   Q.  Did he ever have to stay and wait for diners or customers

22   in the dining room to finish washing dishes?

23   A.  No.  He just had to run the last full load.

24   Q.  So what would he do next after finishing his

25   responsibilities for the night?

1   A.  Would go downstairs to change.

2   Q.  After that?

3   A.  He would either go home.  When I say "go home," they would

4   come in to the dining room to say good night.  Everybody would

5   come in to say good night to whoever was in the dining room.

6   He could either go home or if he came into the dining room and

7   wanted to stay, he could stay and have a beer, a glass of wine.

8   Q.  When the employees stayed, this was all voluntarily?

9   A.  Yes.

10  Q.  They didn't have to stay?

11  A.  No.

12  Q.  It was their choice?

13  A.  Yes.

14  Q.  On any given night how, long would it take to clean up the

15  restaurant before it closed?

16  A.   Including the dining room -- again, this is why we didn't

17  sweep and mop at the end of the night in the dining room, we

18  did that prior to service because we didn't want to keep

19  anybody there later than they had to be.  I would say half an

20  hour total for everything.

21  Q.  Does it make sense to you that any of the plaintiffs would

22  have stayed at the restaurant one to two hours after closing

23  cleaning up the restaurant?

24  A.  Not unless they were watching a baseball game or basketball

25  game or a sporting event like that and they were enjoying them.

1    Q.  Would customers ever stay late at the restaurant?

2    A.  They would try to, but we would encourage them to move to

3    another location.  We all wanted to go home.

4    Q.  After your father passed away, did you keep in place your

5    father's policies in terms of running the restaurant, how he

6    ran the restaurant?

7    A.  Yes, I did.

8    Q.  When did you first figure out how your father calculated

9    each employee's compensation, meaning how they were paid and in

10   what manner?

11   A.  I had an idea from counting and bundling on Mondays.  Then

12   when he became ill -- that Monday he was taken to the hospital

13   and --

14   Q.  Let me put bookends around the dates.

15           Do you recall the dates?

16   A.  I don't recall the exact date.  I know it was three weeks

17   prior to his passing.  That Monday he told me exactly how much

18   everybody needed to be paid on Tuesday.

19   Q.  Before your father became so ill that he could not speak

20   when he was in the hospital, would he still tell you how much

21   everyone needed to be paid and what they needed to do at the

22   restaurant?

23   A.  Regarding pay it was only that one week.  It was that one

24   time after that I knew.  I had actually written it down because

25   I wanted to make sure I had it right.  Following that he -- the

1    week after his first surgery, he was still in contact with the

2    employees of the restaurant and his recovery -- he was still

3    able to speak.  He had his cell phone in his hospital room and

4    he would constantly be checking in the restaurant with Angel.

5    He would ask for the phone to be passed around at the time that

6    he called.

7    Q.  With respect to the wages that were paid to each employee

8    by your father, can you describe to us the difference between

9    the amounts reflected on their W-2s and the checks they were

10   issued -- not the checks, the amounts that they were actually

11   paid in cash?  Do you know why there was a difference?

12   A.  My understanding was that that is what they wanted to be

13   put on the books for and that is what they had arranged with my

14   father and he was trying to help them out and he wanted to

15   make -- their actual pay he wanted to make sure they were

16   compensated properly and compensated well for the work that

17   they did.

18   Q.  Can you please describe to me what happened on the evening

19   of February 7th, 2015?

20   A.  It goes more to than just that evening.  It goes to even

21   the month and the two months prior after New Years.  January --

22   after the holidays January, February tend to be our two slowest

23   months of the year.  In particular that week prior Superbowl

24   Sunday was -- I wasn't there that evening.  I tended to not be

25   at the restaurant on Sundays when my dad was alive.  After my

1  dad passed, I wasn't at the restaurant on Sundays, but I would

2  go at closing to get all of the -- to gather all of the

3  evenings receipts, any cash that was left over, and to see

4  if -- make sure everything was okay, anything I needed to do

5  for Monday and Tuesday in the way of orders.

6          That Superbowl Sunday I was not at the restaurant.  I

7  was at a friend's house and my sister called me at 7:00 and

8  said to me, Peter, we've made four customers and it is 7:00.

9  There is no one on the streets.  What should I do?  And I said,

10  There is no sense.  Just close the kitchen.  So she closed the

11  kitchen.  They were pretty much cleaned up and the restaurant

12  was locked at 8:00 p.m.

13          The following part of that week, that Wednesday, there

14  was -- a not as -- this past snowstorm was much worse than this

15  so-called blizzard we had that Wednesday.  It called for a huge

16  blizzard that Wednesday, and the business was terrible again.

17  We made maybe 15 customers.  I proceeded to close the kitchen

18  again early.  I believe it was around 9:00 p.m.  They were gone

19  by 9:30.  They were home -- not home, but they were out of the

20  restaurant by 9:30.  I was home by 9:45 because I live 15

21  minutes away.

22          So that Saturday we had a nice set of reservations

23  and -- a nice amount of reservations for that evening and we

24  had some walk-in traffic as well and we were busy.  It was a

25  little bit of a hectic Saturday, but after a calm -- a very

quiet week, it was something that I needed for the business and we needed the revenue.

I had a 10:00 p.m. reservation, which was actually our last reservation, but between our peak hours we were full solid the whole night.  Our 10:00 p.m. reservation had to wait for their table.  There was nothing available for them when they came at 10:00 p.m.  They had to wail until 10:30.  They were seated at 10:30.  Fernando took their order.  There was no appetizers.  It was I believe two pastas and two kitchen parms.  So he placed the order.

As he was placing the order, I noticed that Eddie had already started to -- he was already starting to clean his stovetop.  And I said to him, Eddie, what you are doing?  We have people we have to feed, and he just kind of brushed me off.  I wasn't thinking anything of it.  The food didn't -- wasn't being prepared.  So I went back to the kitchen.  It took a lot longer than it should.

I went back to the kitchen and Eddie wasn't preparing the food.  I said Eddie, Why aren't you preparing the food?  These people have to eat.  If you want to go home, you have to prepare the food.  This way I can close the kitchen.  These are the last customers I have for the evening.  We have no more reservations.  We have been busy.  I want to close the kitchen, but I have to feed these people.

He said to me, I don't work past 10:30.  I am done

1    cooking for the night.  I already started cleaning my station.

2    I want to go home.  I said, Eddie, no, really the kitchen

3    doesn't close until 11:30 on Saturdays and you know we feed

4    people up to 11:00 if we're busy.  He said, I don't care what

5    you say.  We went back and forth and it got heated.

6         Finally, he prepared the dishes in a very haphazard

7    way.  He plated them very poorly.  Once the food came out, it

8    was loud because we were arguing.  I said, Fine, now you can

9    leave.  I went back out to the dining room.  He came out into

10   the dining room, walked past me.  I was standing by the bar

11   talking to a table that was by the service bar.  I was talking

12   to them, regular customers, that come all the time.

13        So I was talking to them.  He didn't say anything to

14   me as he walked by me.  He stopped almost near the front door,

15   turned around and preceded to give me the middle finger and

16   curse me out loudly in front of a pretty -- pretty busy dining

17   room.  I said to him at that point, I didn't fire you earlier,

18   but now you are fired.  He went downstairs.  The guys proceeded

19   to go downstairs.  I didn't think anything of it.  When they

20   were downstairs, they were unsupervised.

21        There was nobody in the dining room at that point but

22   myself and a couple of straggling customers and the two to

23   regulars that were kind of in shock of what happened.  They

24   were like, What was that all about.

25        And so then the plaintiffs all came up and I was still

standing in the same area and they surrounded me in a

semicircle and all demanded their pay for the week.  I said,

Well, you don't get paid until -- individually, aside from

Luis, you don't get paid until Tuesday.  So why would -- they

said, We're quiting.  I said, Well, you still don't get paid

until Tuesday.  I don't know what, why you are quiting for.

And they said, Well, the way you treated Eddie wasn't right and

we don't like the way you treated him tonight so we're quiting.

Eddie was with them in that group.  I said to Eddie, I

said I don't feel comfortable with you right now.  I fired you.

Now, can you please leave the premises.  And he refused to.

And I said, If you don't leave the premises, Eddie, I am going

to call the police because I feel threatened by you, and he

left.

And I explained to the other people about their pay.

I said to Luis, Luis, I cannot I give you your tips because I

have not finished entering the credit cards for the day.  You

can come back for your tips tomorrow as would be the norm.  As

to the rest of you, your pay will be available on Tuesday like

a regular pay day.  If you show up for your shift tomorrow,

Sunday at your regular time, you still have a job.  I didn't

fire any of you except for Eddie.

I said to Robinson in particular, this especially goes

for you, you being his cousin, if you still want to work here,

you can come show up tomorrow for your shift and you will have

1   a job.

2   Q.  Did they say anything else to you before heading out?

3   A.  The only one that did was Angel.  He gave me the keys to

4   the front door.  And I looked at him and I tried to get him to

5   look me in the eyes and I said, Really, after all of these

6   years, Angel, for everything to be part of our family this is

7   what you are going to do to us?  And he wouldn't look me in the

8   eyes and he just walked out.

9   Q.  Were you able to open the next day?

10  A.  Yes.  It was a strange day to say the least.  Fernando

11  had -- I had the help of a lot of friends.  I called everybody

12  I could.  My girlfriend came in to help wait tables.  Some

13  friends of mine came into help wait tables.  Another friend of

14  mine that is in the restaurant business came in.  He was doing

15  the dishes and the dishwashing machine.  Fernando came in to

16  help me clean the pots and pans in the kitchen.  And I ran the

17  kitchen by myself.

18  Q.  All three stations?

19  A.  Yeah.  Needless to say we only took reservations, no

20  walk-ins.  It was very limited business but we opened.

21  Q.  Did you eventually hire new employees?

22  A.  Yes, I did.

23  Q.  Same number?

24  A.  Yes.  Well, except for less one because I have assumed

25  Angel's position.

1   Q.   Why do you believe the plaintiffs quit that evening?

2   A.   I have been thinking about that a lot over the course of

3   two years now and I really think it is because they did not see

4   me as their boss.  They saw me as their peer.  And after my dad

5   died, I had to take the mantle of boss.  And I am going to be

6   honest, I don't have my dad's personality.  I -- I am -- my dad

7   is a lot -- was a lot more easy going than me.  A lot of stuff

8   just kind of rolled off his back and, Okay, just let it go.  It

9   is not that big of a deal.

10          As I took over the mantle of ownership, I saw the

11  financial situations we were in and my dad's mantra was pay the

12  rent, pay your employees.  Those are the two most important

13  things when it comes to the restaurant.  Make sure those are

14  done.  You want happy employees.  You have happy employees, you

15  happy customers.

16          When I got in and I started to see where we were

17  financially, I realized we needed to make some tweaks to the

18  way the business was run, in so much as I started to check more

19  on the inventory and see what Angel was ordering, have more of

20  a hands-on grasp of what was going on in the basement with the

21  inventory.  Because I noticed a lot of excess ordering and I

22  was trying to lower the bills so we could make more money.  I

23  don't think -- just a lot of waste in the kitchen.

24          I would call -- I would call them out on that, you

25  know.  Whereas my dad would let them handle their station

1    according to how they felt.  Making mistakes, I would call them

2    out on that more.  Guys, you have to be more careful.  He

3    ordered a chicken parm and you made a veal parm.  We cannot

4    sell that now.  That is waste.  That is costing us money.  I

5    would call them out more on that.  My dad would go, You eat it.

6    Don't worry.  It still cost us money, but he had a way of doing

7    it a little bit differently than me.

8           I don't think they appreciated that.  I don't think

9    they liked it.  I think they hated it.

10   Q.  You said even when you assumed the mantle of ownership

11   after your father died, you still had a good relationship with

12   the employees?

13   A.  I thought we did.

14   Q.  You mentioned your father became ill roughly three to four

15   weeks before he passed away?

16   A.  Yes.

17   Q.  Can you tell us what happened during that time?

18   A.  The Friday leading up to his surgery, that Monday, he was

19   at the restaurant.  He was in the back.  He was complaining

20   about a stomach ache.  He was talking to everybody.  Everyone

21   was, Renato, you should go home.  You should go to the doctor.

22   You shouldn't have this pain.  He had had the pain for a number

23   of days.  Everybody was telling him, Renato, you should go to

24   doctor, trying to convince him to go to the doctor.

25          He went home.  They convinced him to go home a lot

1    earlier than he ever did.  He went home.  He didn't come in

2    Saturday.  He still wasn't feeling well.  He didn't come in

3    Sunday.  Monday we had finally convinced him to go to the

4    hospital.  At that point I was in my apartment.

5           My mother called me.  He couldn't get his pants on and

6    he was having a hard time walking.  It is a five -- six-story

7    walkup building.  They live on the fourth floor.  I had to help

8    him down the stairs and get him and my mother into a cab and

9    they went to Beth Israel emergency room.  I went back upstairs

10   to call -- to get the number for his physician who wasn't at

11   Beth Israel at the time to call him to get him to go over

12   there.  I called my sister to tell her to come into the city.

13   She went straight to Beth Israel.

14          I proceeded to take care of all the other stuff

15   regarding the phone calls my mother asked me to make.  I went

16   to Beth Israel.  They had to perform emergency surgery on his

17   bowel.  He had an obstruction.  They performed the emergency

18   surgery on Monday -- Monday evening.  He went into recovery.

19   We were in the waiting area until he came out of recovery.  The

20   surgery had gone well.

21          That Tuesday he was in a room in a -- he was in the

22   urgent care area for Tuesday, but he was not on any

23   respirators.  He was breathing on his own.  The first

24   questioned he asked me was, Who is at the restaurant.  I said,

25   I am going here after I get here.  He said, Okay, make sure you

1    get all orders from Angel or have him call me.  He didn't have

2    the cell phone.  Get all the orders from Angel and make sure

3    they are in place for Wednesday.  Okay, Dad, don't worry.  I

4    have got it.  Taken care.  Go, go, I am fine.

5         He continued to get better.  He moved into a regular

6    room Wednesday I believe.  From Wednesday to Saturday he was in

7    a regular room.  Had access to the cell phone, access to a

8    phone, constantly checking into the restaurant, talking to

9    Angel about everything regarding orders and preparation.

10        That Monday when he was supposed to be released, they

11   did an X ray, one final X ray, to check to make sure everything

12   was okay and they saw some bleeding in his large intestine and

13   they had to do another emergency surgery.  After that surgery

14   when he came out, he was on a respirator.  He was not able to

15   speak.  He took a downturn towards the course of two weeks.

16   After that surgery, we were actually -- the surgeon and his

17   doctor told us that we needed to prepare for the worse.

18        So we started making arrangements with the funeral

19   parlor.  Miraculous he came out of it, not completely, but he

20   did survive for two weeks.  Me and my sister and my mom spent

21   most days at the hospital at his bedside.  And I would go to

22   the restaurant around 2:30 3:00 because I knew it was his wish.

23   If he woke up, he would be, Why are you here?  Why aren't you

24   at the restaurant.  And also to give Angel a hand because he

25   was missing my dad because it was a lot of work for him.

1        I would stay at the restaurant until closing and most

2   nights I would go from the restaurant and closing back to the

3   hospital, sit at his bedside until about 5:00 or 6:00 in the

4   morning.  Go home and sleep for a couple hours.  Go back to

5   hospital.  Go back to the restaurant.  I was back and forth all

6   over the place.  And then that Saturday we were there at the

7   hospital on our normal schedule and I was going to go back to

8   the hospital and his doctor told me, Don't.  Don't go back to

9   the hospital.  I was, like, he is not going to make it through

10  the night.  At 5:00 -- 5:05 p.m. that evening he passed away

11  and we were all around him when he did.

12       After that we went to -- we went back to the

13  restaurant as a whole, as a family with our other family

14  members there.  We went back to the restaurant and we told

15  our -- told his employees, our employees, what happened.

16  Basically we all just stood around and hugged each other and we

17  were all crying, employees included.  I proceeded to explain to

18  anybody waiting for a table what happened, anybody that was

19  eating, closed.  That was it.

20  Q.  When did the restaurant reopen?

21  A.  Monday and Tuesday were his wake and Wednesday was his

22  funeral mass and burial and we reopened on that Friday.

23  Q.  You say you assumed the mantle of ownership after your

24  father passed away.  Why was it you?

25  A.  I -- it was just -- I just assumed that was the line that

1    it went down.  You know, when he was in the hospital, he never

2    said to my hospital, What are you doing here?  Why don't you go

3    to the restaurant?  He said it to me so I just assumed that is

4    how it had to go.

5    Q.  By the way was either Piccolo Angolo or your father for

6    that matter, had they ever been defendants in a wage per hour

7    suit before this case?

8    A.  No.

9    Q.  How di you react when you found out that plaintiffs had

10   sued you, your uncle, sister, your father, and the restaurant?

11   A.  I mean, I have been -- since the night of them all leaving,

12   I have been just -- I am still to -- this moment I am trying to

13   process everything.  And the fact of that letter, I just didn't

14   understand.  I didn't know what they wanted from us.

15             MR. KUBLANOVSKY:  No further questions.

16             THE COURT:  Cross-examination.

17             MR. ELLIS:  Thank you, your Honor.

18   CROSS-EXAMINATION

19   BY MR. ELLIS:

20   Q.  Can turn to Plaintiff's Exhibit 12, please.

21             Are you familiar with that document?

22   A.  Yes.

23   Q.  Did you sign this document?

24   A.  Yes, I did.

25   Q.  Is it accurate?

1   A.  It is not accurate and I was not authorized to give that

2   letter to Angel.

3   Q.  So why did you?

4   A.  Because he had approached me and said that he had asked my

5   dad for a letter regarding his wages and my dad refused him and

6   he said he really needed it to get his children on Medicaid or

7   Medicare.  I am sorry but I get those confused all the time.

8        He sounded very desperate about it and I wanted to

9   help him.  So I copied -- copied a letter he had as an example

10  for me on top of our letterhead that we just standard

11  letterhead that we had available and I gave it to him.  When my

12  dad found out, I had gotten in trouble for that.

13       THE COURT:  Sorry.  It is my fault because I pulled

14  some of your exhibits.  Would you show this to Mr. Ellis.  I

15  want to make sure I am looking at the same thing as you.  The

16  letter dated July 12th.

17       MR. ELLIS:  Yes.

18       THE COURT:  Thank you.

19       Go ahead, Mr. Ellis.

20       MR. ELLIS:  Thank you, your Honor.

21  Q.  So was this letter in fact written then or around

22  July 11th, 2012?

23  A.  It may have been before.  I think he needed it dated for

24  the date he was going to the -- told me he needed it dated a

25  specific date when he was going to the Medicaid office.

1   Q.  In that time frame generally, July 2012, you really in fact

2   were the vice president of Frisoling, Inc.; is that correct?

3   A.  I was listed as a shareholder and as vice president, yes.

4   Q.  That was since when?

5   A.  I believe it was in 2005 when my uncle relinquished his

6   shares.  My dad -- the way they had spread his shares out were

7   25 percent to myself and 25 percent to my sister, I believe.

8   Q.  Did anything change in terms of your duties or

9   responsibilities when the shares shifted ownership?

10  A.  No.

11  Q.  Do you know if your sister took on any added

12  responsibilities in terms of corporate -- strike that.

13          Did your sister take on any added corporate

14  responsibilities when she became an owner in the business?

15  A.  Not that I know of.

16  Q.  I would like to turn your attention to Plaintiff's

17  Exhibit 15 that is not in the notebook.  It is your affidavit.

18  A.  Okay.

19  Q.  That's it.

20          September 4th, 2016.

21  A.  I don't see a date on there.

22  Q.  I would like to turn your attention to page 2.

23          THE COURT:  Where are you?  In your exhibit book?

24          MR. ELLIS:  It is not in the exhibit book.  It is the

25  affidavit of Peter Migliorini.

1           THE COURT:  Yes.

2   Q.  Page 2, paragraph six.  This is discussing you and the

3   responsibilities that you and your sister had after you became

4   shareholders.

5           The second sentence, Likewise, we did not exercise any

6   control over Frisoling or the restaurant prior to our father's

7   death --

8           THE COURT:  Slow down and start over.

9           Where are you reading from?

10          MR. ELLIS:  Page 2, paragraph six, your Honor.  Second

11  sentence.

12          THE COURT:  Read it slowly.

13  Q.  Likewise, we did not -- "we" here is a reference to Peter

14  and Maria Migliorini -- did not exercise any control over

15  Frisoling or the restaurant prior to our father's death as he

16  solely controlled the operations and management of Frisoling

17  and the restaurant.

18          Is that accurate?

19  A.  Yes, it is.

20          MR. KUBLANOVSKY:  Your Honor, I would like to mark

21  into evidence as plaintiff's Exhibit 16 the affidavit of Maria

22  Migliorini, dated September 8, 2016.

23          THE COURT:  Okay.

24          MR. KUBLANOVSKY:  Your Honor, I am going to object to

25  the extent that the witness is going to be asked about the

1    statements of somebody else.

2              THE COURT:  Depends on what is asked.

3              MR. KUBLANOVSKY:  Very well.

4              MR. ELLIS:  Does your Honor have a copy?

5              THE COURT:  I do not.

6              MR. ELLIS:  Sorry, your Honor.

7              THE COURT:  Should I have a copy in the binder?

8              MR. ELLIS:  No.  It is not in the binder, your Honor.

9              THE COURT:  This is exhibit?

10             MR. ELLIS:  16.

11             Sorry, your Honor.  I cannot find my copy.

12             THE COURT:  Take it back.

13             What is your question?

14             MR. ELLIS:  My question was about one specific

15   paragraph.

16   BY MR. ELLIS:

17   Q.  My question is about paragraph six.  I will read it into

18   the record.  Again, this is the affidavit of Maria Migliorini

19   Cintron to dated September 8, 2016.

20             Paragraph six:  At all times since I worked at the

21   restaurant, both prior to my father's death in late April 2014

22   and to the current day, I have not had any managerial or

23   operational control of either Frisoling or the restaurant.  I

24   did not and do not make any personnel decisions, establish work

25   schedules, handle payroll, or handle the restaurant's finances.

1          Is that statement accurate to the best of your

2     knowledge?

3     A.  Yes, it is.

4               THE COURT:  Are you offering this into evidence?

5               MR. ELLIS:  Yes, your Honor.

6               THE COURT:  Which exhibit number is it?

7               MR. ELLIS:  Exhibit 16, your Honor.

8               THE COURT:  Do you have any objection?

9               MR. KUBLANOVSKY:  No objection.

10              THE COURT:  It is admitted.

11              (Plaintiffs' Exhibit 16 received in evidence)

12    BY MR. ELLIS:

13    Q.  Now I would like to offer into evidence Plaintiff's

14    Exhibit 17.  These are a series of sales tax payments made by

15    Frisoling, Inc. to New York State with each quarterly filing.

16    And these date back as far as 2010.  With each quarter filing

17    there is a check and payment for the sales taxes.  If you look

18    through at the end, you can see that each of those checks is

19    signed by your sister.

20              Were you aware that she was signing checks on behalf

21    of the corporation in 2010 or 2011 or 2012 prior to your

22    father's death?

23    A.  No, I wasn't.

24    Q.  Are you aware of what your sister's title was at that time,

25    her corporate title?

1   A.   I believe it was secretary.

2   Q.   Do you know how payroll -- excuse me, sales taxes were

3   handled at that time?

4   A.   I would assume that our accountant in New Jersey handled

5   those.

6   Q.   Does it surprise you to find out that your sister was

7   signing checks on behalf of the corporation in 2010?

8   A.   No, it doesn't.  Because our accountants is located in New

9   Jersey and was not able to come into New York to get said

10  checks to file the taxes.  She lived two towns over from my

11  sister and my sister and myself did have access to sign checks.

12  Q.   You had access to sign checks; is that correct?

13  A.   We did access to the account and we had to be put on as

14  signers because Chase Bank had changed the policy on being able

15  to go to the bank and get -- make any transactions and that

16  includes getting change for the business.  If you weren't on

17  the account, you could not get change.

18  Q.   So you had to be on the account?

19  A.   So you had to be on the account to get change.  You didn't

20  have to have a bank card, but you had to be on the account to

21  get change.  So my dad would often send either one of the two

22  of us to get change for the evening's business.  I do know

23  myself and my sister were allowed to sign checks for that

24  reason.

25  Q.   Is that a separate account from the tax account?  If you

1    see on the checks it says underneath Frisoling, Inc., tax

2    account.  I am curious were you a signatory to that account or

3    are you referencing a different account aside from the tax

4    account?

5    A.  They probably are all linked as a business.  They were --

6    all accounts are linked.  As of this date they are still

7    linked.

8             MR. ELLIS:  Your Honor, I move that these documents be

9    admitted.

10             THE COURT:  Any objection?

11             MR. KUBLANOVSKY:  No objection.

12             THE COURT:  They will be admitted into evidence as 17,

13   did you say?

14             MR. ELLIS:  Yes, your Honor.

15             THE COURT:  Exhibit 17 is admitted.

16             (Plaintiffs' Exhibit 17 received in evidence)

17   BY MR. ELLIS:

18   Q.  I would like to go back and discuss tips with you really

19   quickly.

20             You testified earlier that you were not paid a salary

21   or wages but that you just made tips; is that accurate?

22   A.  Yes, it is.

23   Q.  On an average day, how much did you personally make in

24   tips?

25   A.  On average, I would say anywhere between -- again, it

1    varied from day-to-day and season to season.  It is hard to

2    give a really accurate average because it depends on the

3    business and what the customers are spending.  Most tips are

4    not a solid number that you can just say -- some people tip

5    15 percent, some customers tip up to 30 percent.  You are

6    putting a very wide range.  It a very big range.

7    Q.  If you would like to break it down seasonally, we can do

8    that?

9    A.  Okay.  I mean, the slower months obviously from January

10   to -- it is not just seasonally.  It is also daily.  Business

11   is better on the weekends than it is during the week.  It is a

12   daily situation.  Weather can be a factor in that as well.  It

13   is not -- you are dealing in a customer service industry that

14   tips are not a based on anything.  It is based on the

15   customer's experience.  You are trying to put a hard number on

16   something that cannot really have a hard number to it.  We're

17   open 50 weeks a year, six days a week.  Every day is different.

18   Every day is different.

19   Q.  Let's say a weekend in the winter, a Saturday in the

20   winter?

21   A.  Winter meaning?

22   Q.  January.

23   A.  $200.

24        THE COURT:  Sorry.  I am just not following.  $200 is

25   an answer to what question?

1              MR. ELLIS:  How much Mr. Migliorini himself made in

2    tips.

3              THE COURT:  Is that correct?

4              THE WITNESS:  Yes.

5    Q.  Let's take Saturdays again.  A Saturday in June, is that a

6    busy time?

7    A.  Busier than in January.

8    Q.  What is the busiest month?

9    A.  Probably around the holidays.  November to December is our

10   best months.  Again, June, July, us being a neighborhood

11   restaurant, a lot of people go out of town.  We don't base our

12   business on tourism.  We are a local restaurant.  Our business

13   is different than, say, a business in Times Square or a

14   business that is down by the 9-11 Memorial.  We are a

15   neighborhood restaurant.

16   Q.  Let's take a Saturday in June.  What would you make on

17   average on a Saturday in June?

18   A.  250, 275.

19   Q.  How much would you make on a Saturday in December in tips?

20   A.  300.

21   Q.  Who exactly shared in the tip pool?

22   A.  Three nights a week myself, Fernando, and Luis.  And the

23   other three nights a week maria, Fernando and Luis.

24   Q.  Is that the same both before and after your father died?

25   A.  Yes.

1   Q.  Did your schedule change after your father died?

2   A.  Only in that I was coming earlier.  I was coming in at

3   around noon, 12:30 in afternoon.

4   Q.  How many days per week?

5   A.  Six.  Sorry.  Five.  I didn't come in around noon on

6   Sundays because -- no one came in around noon on Sundays

7   because there are no deliveries to be received.  Those are the

8   only reasons you would be in early is because of deliveries.  I

9   still continue that practice.

10  Q.  You testified earlier that Sunday was your day off; is that

11  correct?

12  A.  Correct.

13  Q.  I would like to turn your attention back to your affidavit,

14  Plaintiff's Exhibit 15, page 3, paragraph eight.  The last

15  sentence reads, Since my father's death in late April, 2014, I

16  now work approximately 10 to 11 hours per day, six days per

17  week at the restaurant.

18          That is the second to last sentence in the paragraph.

19  In any event, is that accurate that you worked 10 to 11 hours a

20  day, six days a week?

21  A.  No.  Because as I said before Sundays we didn't come in at

22  12:00.  There was no reason to come in at 12:00.  Sundays I was

23  allowed to -- I allowed myself to go home after the opening of

24  the restaurant and come back at the close.

25  Q.  I would like to turn your attention in the notebook to

1   Plaintiff's Exhibit 5.   These are pay stubs for Eddie Jaquez?

2   A.   Okay.

3   Q.   The number here on the first sheet -- this is a pay stub

4   dated September 30th, 2014.   It says here under earnings that

5   Mr. Jaquez was paid a salary of $400 then there are taxes

6   deducted and then the net for Mr. Jaquez is supposedly 315 --

7   $315.50.

8           Is this document accurate?

9   A.   It's not.

10  Q.   In what way is it not accurate?

11  A.   He was paid $725 a week.

12  Q.   Were taxes deducted?

13  A.   There were taxes deducted in his name, but his pay was not

14  deducted of taxes.

15  Q.   The taxes that were deducted were based on a salary of $400

16  rather than a salary of $725; is that correct?

17  A.   Yes, it is.

18  Q.   I would like to turn to Exhibit 6.   This is an employee

19  earnings record from September 16, 2014 to December 31st, 2014

20  for plaintiff Eddie Jaquez.

21          Do you recognize this document?

22  A.   Yeah.   I have seen it before, yeah.

23  Q.   This is just a summation of all of the pay stubs that were

24  issued to Mr. Jaquez during that period, September to

25  December 2014?

1  A.  No.  They are not because the first two quarters were not

2  the responsibility of the payroll company.

3  Q.  Right.  I think this just refers to quarter four, September

4  to December 2014?

5  A.  Well, no.  Partial of quarter three as well because that is

6  when I hired the payroll company.

7  Q.  Okay.  Is this document accurate insofar as it reports to

8  show these pay stubs that were issued to Mr. Jaquez?

9  A.  It is not.

10  Q.  Is it an authentic document?

11  A.  It is.

12        MR. ELLIS:  I move it be admitted into evidence, your

13  Honor.

14        THE COURT:  Any objection?

15        MR. KUBLANOVSKY:  No objection.

16        THE COURT:  It will be admitted into evidence.

17        (Plaintiffs' Exhibit 6 received in evidence)

18  BY MR. ELLIS:

19  Q.  Let's look at Exhibit 8.  Same set of questions.  Were

20  these pay stubs issued to Mr. Robinson Ortega?

21  A.  Yes.

22  Q.  Was Mr. Ortega paid a salary of $400?

23  A.  No, he was not.

24  Q.  Were these taxes that are listed here on this first one,

25  this first pay stub dated 9-30-2014, were these taxes actually

1    deducted from Mr. Ortega's paid?

2    A.   They were paid for in his name, but they were not deducted

3    from his pay.

4    Q.   I would like to turn to Exhibit 9.  Again, this is an

5    employee earnings record for plaintiff Robinson Ortega Diaz.

6    Covers checks dated September 16th, 2014 to December 31st,

7    2014.

8            Is this an authentic document, sir?

9    A.   It is.

10   Q.   I move it be admitted into evidence, your Honor?

11           THE COURT:  Any objection?

12           MR. KUBLANOVSKY:  No objection.

13           THE COURT:  Admitted.

14           (Plaintiffs' Exhibit 9 received in evidence)

15   BY MR. ELLIS:

16   Q.   Exhibit 13, please.  This is an earning record for Angel

17   Guayllasac covering checks dated September 16, 2014 to

18   December 31st 2014.

19           Is this an authentic document?

20   A.   It is.

21           MR. ELLIS:  I move it be admitted into evidence, your

22   Honor.

23           THE COURT:  Any objection?

24           MR. KUBLANOVSKY:  No objection.

25           THE COURT:  It will an admitted.

1          (Plaintiffs' Exhibit 13 received in evidence)

2    BY MR. ELLIS:

3    Q.  I would like to turn your attention to the posters that you

4    referenced earlier in the photographs.

5          THE COURT:  Did you mean to offer these into evidence?

6          MR. KUBLANOVSKY:  I did.  I was going to wait.  If it

7    is okay to do it now, I would offer them into evidence.

8          MR. ELLIS:  No objection.  My previous objection is

9    withdrawn.

10          THE COURT:  I will admit all of these photos.

11          (Defendants' Exhibit E received in evidence)

12    BY MR. ELLIS:

13    Q.  I believe the sixth and seventh pages of this document are

14    photographs of posters that are posted in your restaurant; is

15    that correct?

16    A.  Yes.

17    Q.  Did you --

18    A.  Were posted.

19    Q.  Say it again.

20    A.  Were posted.

21    Q.  Were posted.

22          They are not posted anymore?

23    A.  Not these particular posters.  They are outdated.

24    Q.  Do you know who posted these posters?

25    A.  I did.

H3h6pin11                    Migliorini - cross

1    Q.  About when did you do that?

2    A.  I believe it was -- I am having a hard time seeing.  I

3    believe it was in December or January.  December or January of

4    2014 or 2015.  I am not 100 percent sure.  It was when I got --

5    this came in an envelope from the payroll company.  It was

6    after I hired them.

7    Q.  Did you read the posters when you posted them?

8    A.  I glanced at them.  I didn't read them.  They are rather

9    large posters.

10   Q.  Okay.

11   A.  Half of it is in Spanish, which I don't speak so...

12   Q.  You testified earlier it was the restaurant policy to

13   handwrite tickets for orders and eventually the restaurant

14   installed a point of sale system.  When was the point of sale

15   system installed?

16   A.  I don't remember.

17   Q.  Do you recall how many years it has been there?

18   A.  Honestly, I don't because it was a cold sale with my dad.

19   Somebody came in and sold him on putting in the point of sale

20   system and they set it up entirely for him.  So I don't really

21   recall when it was.  It was probably around 2011, 2012.  I

22   wasn't there for the meeting so I don't really recall.

23   Q.  To the best of your knowledge it happened around 2011 or

24   2012?

25   A.  To the best of my knowledge, yes.

1    Q.  Did Angel have the power to hire people?

2    A.  That power he did not have.  Only one person had that

3    power, my dad, while he was alive.

4    Q.  Right.

5          Did Angel have the power to set people's pay?

6    A.  No, did he not.

7    Q.  Did he have the power to set people's schedules?

8    A.  No, he did not.  He could request to my dad if he felt

9    someone needed to be there a little bit earlier or a little bit

10   longer.  He would express that to my dad especially when it

11   came to the kitchen.  If he felt they weren't meeting up the

12   standards that he needed in the kitchen, he was allowed to go

13   to my dad about that.

14   Q.  You testified earlier that you on occasion would help your

15   dad by actually physically delivering wages to employees and

16   that your sister would do this, too; is that correct?

17   A.  Yes.

18   Q.  You also testified that your dad used to leave around 9:00,

19   9:30 when you were there but only when you were there; is that

20   right?

21   A.  Yes.

22   Q.  What if you weren't there, what would he do?

23   A.  He would stay until the door was locked.

24   Q.  You said that on these days when he would leave, would he

25   call at around 10:30 when he got home to check in?

1    A.  Not when he initially got home.  Sometimes he would take

2    food home with him.  He would take a cab home so he would be

3    home by 9:45.  He would give it some time.

4    Q.  Then he would call to check in later in the evening?

5    A.  Right.

6    Q.  So who was in charge when he would leave the restaurant?

7    A.  It was nobody in charge.  Everybody knew what they had to

8    do.  They had all been working for us, the restaurant for so

9    long the responsibilities were understood.  There was never an

10   issue of who needed to be in charge.  Like I said, if anything

11   my dad was 10-minute cab ride away if a situation would have

12   arisen where he needed to be there.

13   Q.  So one more follow-up question on the point of sale system.

14          How did it actually work?  Because there was some

15   discussion both in your testimony and then in the testimony of

16   Eddie and Angel about the tickets that would be printed out.

17   Am I understanding this right that -- you are a waiter; right?

18   A.  Not anymore.

19   Q.  When you were a waiter, when you would take an order from

20   the customer, would you go to the point of sale device and

21   input that order and then that would generate a ticket in the

22   kitchen so they could start making the food; is that correct?

23   A.  Right.

24   Q.  It was done right when you received an order; right?

25   A.  Not right when we received an order.  Sometimes I get

1    interrupted, another table asks for another glass of wine.  It

2    was whoever took the order.  Sometimes there was someone else

3    at the computer putting in an order.

4    Q.  Right.

5    A.  We only had one monitor, touchscreen.  It was not like we

6    have multiple.  It is a small space.  You had to wait.

7    Sometimes would you stray off to get something else because you

8    wanted to make sure the customers were being tended to.

9    Q.  My question really is that it was done basically

10   contemporaneously when the order was placed?

11   A.  Yes.  We tried to keep it --

12   Q.  Okay.  It was your testimony earlier that you never spoke

13   to your father about taking over the restaurant; is that

14   accurate?

15   A.  Yes, it is.

16   Q.  Even toward the end you never talked to him about it?

17   A.  No.  Because the day he was supposed to come home, I had

18   already left the hospital and I had gotten a phone call from my

19   sister telling me he had to have another emergency surgery and

20   I never actually spoke to him after that.

21   Q.  Now, your testimony earlier that you never sat people after

22   11:00 p.m.; is that right?

23   A.  Yes, it is.

24   Q.  Even on weekends?

25   A.  Even on weekends.

H3h6pin11                    Migliorini - cross

1              MR. ELLIS:  Your Honor, I have a series of documents I

2     would like to enter.

3              THE COURT:  Tell me when it is convenient to do the

4     lunch break.  We can do it now and I can wait on this.

5              MR. ELLIS:  Up to you.

6              THE COURT:  Let's take the lunch break.  We'll break

7     until 2:15.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3h6pin22

A F T E R N O O N   S E S S I O N

2:15 p.m.

THE COURT:  You may continue, Mr. Ellis.

MR. ELLIS:  Thank you, your Honor.

BY MR. ELLIS:

Q.  I just wanted to touch upon something that we discussed
earlier.  You had testified earlier that you have since
replaced all of the employees who -- or all the positions you
have hired people to fill all of the positions that plaintiffs
used to work at the restaurant; is that correct?

A.  Yes, it is.

Q.  Are the new employees paid similar salaries as the
plaintiffs?

A.  Similar, yes.  But they are paid on an hourly basis.

Q.  Do they punch in and out?

A.  They don't punch in and out.  We have a -- I have a
application on my phone that I can log when they came in and
when they leave.  So they check in with me.

MR. ELLIS:  I would like to introduce a series of
documents, your Honor.

The first is a set of W-3s and W-2s that pertain to
Frisoling, Inc., from 2010 through 2014.

THE COURT:  Give it an exhibit number.

MR. ELLIS:  Yes, your Honor.  It is going to be
Exhibit 18.  I will bring you one in a second, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

H3h6pin22

1              Your Honor, I would also like to introduce as Exhibit

2     19 forms 1120-S for Frisoling, Inc., for the years 2010 through

3     2014.  And as Exhibit 20 I would like to introduce NYC 3L

4     general corporation tax returns for Frisoling, Inc. for the

5     years 2011 through 2014.

6              THE COURT:  You are offering 18, 19 and 20?

7              MR. ELLIS:  Yes, your Honor.

8              THE COURT:  Any objection?

9              MR. KUBLANOVSKY:  I have not seen them, your Honor.

10             I have no objection.

11             THE COURT:  They will be admitted.

12             (Plaintiffs Exhibits 18, 19, 20 received in evidence)

13             MR. ELLIS:  The last exhibit I would like to introduce

14    is a spreadsheet that.  This is a summation of the previous

15    Exhibits 18, 19 and 20 that I created.

16             THE COURT:  Do you have a copy?

17             MR. KUBLANOVSKY:  I do.

18             THE COURT:  Any objection?

19             MR. KUBLANOVSKY:  To the extent it is a demonstrative,

20    no, but the exhibits do speak for themselves.  I would object

21    to the admission of this document speaking for the others.

22             THE COURT:  What do you want me to do with it?

23             MR. KUBLANOVSKY:  I would object to the admissibility

24    of this document on those grounds.

25             THE COURT:  Have you seen this before?

H3h6pin22

1              MR. KUBLANOVSKY:  I have not.

2              THE COURT:  Have you checked it against the documents?

3              MR. KUBLANOVSKY:  I have not, your Honor.

4              THE COURT:  I don't have a foundation for admitting

5      this.

6              MR. ELLIS:  Fair enough.

7              THE COURT:  You are not a witness.

8              MR. ELLIS:  Understood.  If we might use it just for

9      the quick reference aspect with respect to the year 2014.  That

10     is really the purpose of it.

11             THE COURT:  It depends.  What do you intend to do with

12     it, ask questions?

13             MR. ELLIS:  About W-2s and tax returns.

14             THE COURT:  Let's see what the questions are.  It

15     should hopefully reflect what you want it to reflect.

16     BY MR. ELLIS:

17     Q.  In Exhibit 18, Mr. Migliorini, in the bottom right-hand

18     corner there is Bates stamp.  There is a number Frisoling0933

19     on the first page.  If you turn to 9063, and these are in

20     numerical order per the Bates numbers.  Actually, the last

21     document in the packet.

22             Do you recognize that document?

23     A.  Yes, I do.

24     Q.  What is that document?

25     A.  That is my W-2.

H3h6pin22

1   Q.   For the year?

2   A.   2014.

3   Q.   Just for the record what is the total wages reflected in

4   box number one?

5   A.   $85,057.54.

6   Q.   If we flip back to 9061, it is a W-2 for 2014 for Maria

7   Cintron with wages reflected in the amount of $74,587.83.

8          If we flip back to document 9060, a W-2 for 2014 for

9   Fernando to Ortiz wages reflected in amount of $51,876.82.

10          If we flip to 9062 this is a W-2 for 2014 for

11   Plaintiff Eddie Jaquez reflecting wages in the amount of

12   $19,600.

13          THE COURT:  Is this the duplicate of exhibits we

14   already have in evidence?  Is this the same as what is in your

15   binder?

16          MR. ELLIS:  Yes.  It is for ease of reference.  It is

17   the W-2s and 3s reflected in chart and then the 1120s and then

18   all of the New York City returns.

19          THE COURT:  Is there something in 18 that is not

20   already in evidence?

21          MR. ELLIS:  Yes.  There are quite a few documents in

22   Exhibit 18 that are not already in evidence.

23          THE COURT:  All right.

24   BY MR. ELLIS:

25   Q.   So if we turn to document 9058 this is one of the documents

1    previously entered into evidence.  It is W-2 for 2014 for

2    Robinson Ortega Diaz for a total of 6,000.

3             If we go to document 9059, a W-2 for 2014 for

4    Plaintiff Angel Guayllasac showing total wages of 19,200.

5             If we're to do some math with all of those W-2s, which

6    are all of the W-2s produced in the matter for 2014 and we sum

7    all those sums, we get the sum $256,322.49.

8             Now, if we turn to document 9057, do you recognize

9    this document, Mr. Migliorini?

10   A.  I don't.

11   Q.  Did you deal with the taxes for the year 2014, the company

12   taxes Frisoling, Inc.'s taxes for 2014?

13   A.  I did not.  We had an accountant handling that.

14   Q.  At that point your father already passed away and you were

15   by your own admission running Frisoling, Inc. at that point; is

16   that correct?

17   A.  Yes.

18   Q.  So you didn't review any of these documents before your

19   accountant filed them; is that your testimony?

20   A.  I looked at the documents.  I don't recall -- I don't

21   recall this document itself.

22   Q.  Do you know what a W-3 is?

23   A.  I don't actually.

24   Q.  For the record a W-3 a summation of W-2s, which is why if

25   we add up all of those W-Ss we get $256,322.49.

H3h6pin22

        If we look at document 9057, on that W-3 we see that
number in box one, 256,322.49; is that correct?

A.   Yes.

Q.   Now, if we turn back one page to document 9506, this is a
W-3C, which is a correction on the W-3 for Frisoling, Inc. for
the year 2014.  If we look at box one, there is a different
number.  It is 211,522.49.  Again, if we do some math and we
subtract that number 211,522.49 cents, if we subtract that
number from from the number on the W-3 at 9057, that number was
$256,322.49, the difference is $44,800.

        If we add up the W-2s for the plaintiffs -- Eddie
Jaquez, Robinson Ortega Diaz and Angel Guayllasac for 2014, if
you add 19,600 plus 6,000 plus 19,200 you yield $44,800.

        So my question to you first of all is why was this
form W-3 C submitted?

A.   I don't know.

Q.   Did your accountant talk to you about it?

A.   No, they did not.

Q.   You don't recall having a conversation with your accountant
that there was a problem with your taxes and that a correction
needed to be filed for 2014?

A.   No, I do not.

Q.   Do you know why your accountant would have filed this
document without your permission?

A.   I do not.

H3h6pin22

```
1    Q.  Do you have any ideas as to why this document would
2    subtract the amount of plaintiffs' declared wages?
3    A.  I do not.
4    Q.  The other thing I want to point out --
5            MR. ELLIS:  I actually should have done this earlier,
6    your Honor.
7    Q.  The one person who I left off earlier when I was reading
8    off the W-2s was Fernando Ortiz.  9060 is the document.  This
9    is the W-2 2014 for Fernando Ortiz reflecting wages of -- I did
10   do this $51,876.82.
11           Just as a basic question why does your W-2, Maria's
12   W-2, and Fernando's W-2 all contain cents, decimal points; do
13   you know?
14   A.  Because as far as I can gather the tip amounts would have
15   had change involved in them.  They weren't exact amounts at the
16   end of each night.  Some people left tips to round up to $100
17   on a tab.  They would leave change.  Tip amounts had change in
18   them.
19   Q.  Did you ever pay Luis Pineda in change?
20   A.  No.  We rounded up for Luis and rounded down for ourselves.
21   Q.  So is it also then your testimony that no tips are
22   reflected for any other employees aside from yourself, Maria
23   Migliorini Cintron and Fernando Ortiz?
24   A.  Yes.
25   Q.  I would like to turn to document 19 form 11-S for the year
```

H3h6pin22

1    2011.

2    A.   Which one is 19?

3              THE COURT:  It has a yellow sticker.

4              THE WITNESS:  Yes.

5    Q.  We're going to have some flipping back and forth.

6              So if we go to document 18, this is the W-2s and W-3s

7    for the year 2011.  If we go to document 9040, this is the W-2

8    in 2011 for your father Renato Migliorini.  At the bottom is

9    reflected wages in the amount of $50,000.  If we turn to the

10   next page at the top, document 9041, this is the W-2 for Peter

11   Migliorini in 2011 reflecting wages of $81,440.  If we go to

12   the next document 9042, at the bottom it this is the W-2 for

13   Maria Cintron, 2011, reflecting wages of $73,170.

14             If we compare those numbers and if we turn then to

15   Plaintiffs' Exhibit 20, the NYC form 3-L general corporate tax

16   return for the year 2011 and if we turn to 9091 at the bottom,

17   the salaries and all other compensation received from the

18   corporation by corporate owners are listed.  Specifically it

19   states Peter Migliorini received $28,240 and that Maria Cintron

20   received $27,720 and that Renato Migliorini received $50,000.

21             THE COURT:  I didn't catch your page?

22             MR. ELLIS:  9191 in Exhibit 20.

23             THE COURT:  9191 of 20?

24             MR. ELLIS:  Yes, at the bottom.

25   Q.  My question to you, Mr. Migliorini, is why is it that your

H3h6pin22

1    father's income on his W-2 for 2011 matches this New York City

2    general corporate tax return but that the amounts do not match

3    for yourself and your sister?

4           MR. KUBLANOVSKY:  Your Honor, I am going to object to

5    the question.  Earlier Mr. Migliorini testified that he had

6    never seen any tax documents for the corporation and was not

7    involved in the preparation of any of the tax documents for the

8    corporation until after he became an owner.

9           THE COURT:  He can explain that if he would like.  He

10   can answer the question if he understands it.

11   A.  I do and I have never seen these documents before and I

12   don't know what -- why there is a difference on that.

13   Q.  If we turn back in Exhibit 18 to page 9045, it is a W-2 for

14   2012 at the bottom for Renato Migliorini reflecting wages of

15   $21,000.

16          If we turn to the next page 9046, the top is your W-2

17   for 2012, Peter Migliorini, showing wages in the amount of

18   $80,066.

19          If we turn to the next 09047 at the bottom we have a

20   w-2 for Maria Cintron for 2012 showing wages in the amount of

21   $72,471.

22          Again, if we turn to Plaintiff's Exhibit 20 at page

23   9155, at the bottom again this is the Frisoling, Inc.'s New

24   York City tax return for the year 2012.  Again, salary and all

25   the compensation received from the corporation for the

H3h6pin22

1    shareholders.  And it lists Peter Migliorini received $27,930

2    and Maria Cintron received $27,930 and Renato Migliorini

3    received $21,000.

4            So again if we can compare this New York City tax

5    return to the W-2s, again we're faced with the same scenario

6    where your father's income is the same as stated on the W-2 and

7    in this tax return, but there is a difference, and quite a

8    significant one for yourself and your sister.

9            Do you know why that is?

10   A.  I do not.

11   Q.  Do you know why Fernando was treated differently for tax

12   purposes?

13           MR. KUBLANOVSKY:  Objection to the form of the

14   question.

15           THE COURT:  Overruled.  He can answer if he knows.

16   A.  I don't understand.  What do you mean treated differently?

17   Q.  You testified that his tips are reported as income and you

18   also testified that for at least for Mr. Pineda that his tips

19   are no reported as income.

20           My question is why are some employees' tips reported

21   as income and some are not?

22   A.  Because as I knew it Luis Pineda was here in this country

23   illegally and did not have a social security number to file

24   paperwork for that.

25   Q.  You decided not to pay him -- not report the tips that he

1  received because of that?

2  A.  I didn't decide that.  My dad and the accountant decided

3  that.  I don't know how that got established.  I just know that

4  he didn't have a social security number to report it after I

5  took over.

6  Q.  Did he ever attempt to give you a tax ID number?

7  A.  No, he did not.

8  Q.  What about other plaintiffs, what was your understanding as

9  to why Eddie Jaquez one number was reported on his W-2 and

10  another number you claim he was actually paid?

11  A.  Because he told me that the deal he had with his father was

12  to be on books for $400 a week.

13  Q.  Now, earlier you testified that when orders would come in,

14  you would put them into the point of sale system

15  contemporaneously with when those orders were placed; is that

16  correct?

17  A.  Yes.

18        MR. ELLIS:  Your Honor, I would like to introduce

19  Plaintiffs; Exhibit 22.  This is a selection.  We produced an

20  8400-page document of all the receipts from Piccolo Angolo

21  covering two and a half to three years.  This a selection from

22  this.  I have a summation similar to the other.  I don't know

23  if there is an objection to that.  I would like that marked

24  into evidence as well.

25        THE COURT:  Mr. Kubanovsky.

H3h6pin22

```
 1              MR. KUBLANOVSKY:  I never seen the summation.  I would
 2      object to this.
 3              THE COURT:  Object to which?
 4              MR. KUBLANOVSKY:  Your Honor, I object to I guess 23,
 5      the sheet that was created by counsel for plaintiffs.  I
 6      believe that also this characterizes by the title at the top
 7      what was placed when orders was placed or assumes facts not in
 8      evidence for that purpose.  So I have no objection to the
 9      compilation, which is Exhibit 22, but I do have the objection
10      to the admissibility of the document that was created by
11      counsel.
12              THE COURT:  Let me start with 22.  22 will be admitted
13      into evidence.
14              (Plaintiffs' Exhibit 22 received in evidence)
15      BY MR. ELLIS:
16      Q.  We can pick a random page or start at the top.  Let start
17      at the top.  This is document 3837.  This shows an order was
18      placed at 12:7 a.m.
19      A.  Sorry.  Where am I finding that number?
20      Q.  The first -- the very first sheet.
21      A.  I don't have that.  The same as the other pages where it
22      says Friz?
23      Q.  Yes.
24      A.  Mine says 223 on the top.
25              THE COURT:  Let's save some time here.  You are giving
```

H3h6pin22

1    me Plaintiffs Exhibit 22?

2              MR. ELLIS:  Yes.

3              THE COURT:  Plaintiffs Exhibit 22 represents the

4    ticketed items of what orders were placed after midnight?

5              MR. ELLIS:  Correct.  Each sheet.

6              THE COURT:  How many are in this stack?

7              MR. KUBLANOVSKY:  Your Honor, I would object to that

8    characterization of when the orders were placed.  The witness

9    has not testified as to the times reflect when the orders were

10   actually placed.

11             THE COURT:  That is what I am asking.  Is that what he

12   offered this as?  It is in evidence.

13             MR. ELLIS:  Yes, your Honor.

14             THE COURT:  How does that represent that?

15             MR. ELLIS:  Well, the version I had had some

16   documents.  On the top sheet it should be Friz00223.

17             THE COURT:  Yes.

18             MR. ELLIS:  And in the middle we have -- or excuse me

19   the bottom invoice number 493.  This is dated April --

20   March 8th, 2013, and it shows an order placed at 12:09:43 a.m.

21             MR. KUBLANOVSKY:  Your Honor, there is date and time.

22   There is nothing to indicate when the order was placed.

23             THE COURT:  The document is in evidence.  I am trying

24   to figure out what I am supposed to be looking at.  Take one

25   and you ask him whether or not what is on this document.  How

H3h6pin22

1    many of these are there that you have given me?

2            MR. ELLIS:  Your Honor, this was -- one of my

3    paralegals compiled this.  I don't know the exact number of

4    pages in this.  The summation that I created --

5            THE COURT:  How many orders in the summation?

6            MR. ELLIS:  42.

7            THE COURT:  Does this represent 42 orders?

8            MR. ELLIS:  No.  Much more.

9            THE COURT:  Your summation is not --

10           MR. ELLIS:  Exhaustive.

11           THE COURT:  Not the total of these documents?

12           MR. ELLIS:  No.

13           THE COURT:  These documents are supposed to be what?

14           MR. ELLIS:  Each of these documents in 22 has at least

15   one order that was placed after midnight.

16           THE COURT:  So what is the reason why it is not on the

17   chart that is not admitted?

18           MR. ELLIS:  There is no good reason, your Honor.  I

19   and didn't have time.

20           THE COURT:  That is what I am trying to follow.

21   Because then there is a legitimate objection to 22.  23 doesn't

22   accurately give me what is reflected in 22.

23           MR. ELLIS:  Correct.

24           THE COURT:  So 22 you are offering this as the tickets

25   that show orders that were placed after midnight?

H3h6pin22

1          MR. ELLIS:  Correct.

2          THE COURT:  How many of these tickets are in this pile

3     over what period of time approximately?

4          MR. ELLIS:  The first document is March 7, 2013 and

5     the final document is dated December 20th, 2015.

6          THE COURT:  They are in that order?

7          MR. ELLIS:  Yes, they are.  They are in chronological

8     order, your Honor.  Again, this is just excerpts from an

9     8400-page document.

10          THE COURT:  If there some relevant information on here

11     that you want to ask this witness about, then ask him whether

12     he can verify or not verify whether it is what it purports to

13     be.

14     BY MR. ELLIS:

15     Q.  Let's just take the first page Friz00223 and let's look at

16     invoice number 493.

17          Is this date timestamp accurate that an order was

18     placed at 12:09 a.m. on March 8th, 2013?

19     A.  It is not accurate.  Because these are not the kitchen

20     tickets.  The way the point of sale system works, these are

21     reprints of customer invoices that they were used to pay the

22     bill.  The way the system works is a ticket is opened.  It

23     could be opened at any period of time.  A drink can be entered

24     on that.  That opens the ticket on the customer invoice.  When

25     food orders are placed, you press send and the ticket goes to

1   the kitchen.  The ticket stays open until we close said ticket.

2   That means when the customer paid and I need to free that table

3   up for another customer.

4          So as you can see on the ticket invoice above 492 that

5   ticket was closed and given to the customer at 9:10 p.m.  The

6   ticket underneath wasn't closed on the point of sale system

7   until 12:09 p.m.  That does not mean that the order went in at

8   12:09 p.m.  It means it was physically closed on the computer

9   system as in the table -- the payment process was paid.

10         So there could be times where a table would remain

11  open because they were the last table and we didn't need to

12  free it up and it just stayed open until we hit the table and

13  the way the payment was paid.  So in this case this table was

14  probably in the time frame of closing the ticket around 9:20 to

15  9:10 p.m. right after the previous ticket.  That ticket was

16  processed.  So however the 492 was paid it was put into the

17  system either credit card or cash and it was closed.  That time

18  indicates what time the actual ticket was closed.

19         So the one at 12:09 p.m. doesn't mean anything as to

20  when the order was placed in the kitchen.  He simply means that

21  is when we physically closed the ticket for the processing of

22  the payment.

23  Q.  That is when the customer paid then?

24  A.  No.  The credit card system and the computer system are not

25  integrated.  They can pay with a credit card.  We have to

1   physically press the table, press how the table was paid so.

2   In the case of a credit card, I don't necessarily have to close

3   that out.  The only time I have to close that out is when I

4   want to close out the end of -- the end -- when I want to close

5   out the shift for myself.

6   Q.  So is it your testimony then that you would leave all these

7   tickets open until the end of the night and then close them all

8   out at the end of the night?

9   A.  Not all of them.  Some of the ones towards the end paid on

10  credit cards.  As I was trying to get other things done, I

11  could leave them open because I didn't need to free up the

12  table to place another order.  It could sit there until I was

13  ready to leave and shut down the computer.  That was more

14  accurate to when I was leaving and locking up.

15  Q.  If we turn Friz00903.

16  A.  I don't have that.

17          THE COURT:  On which exhibit?

18          MR. ELLIS:  Again, this is 22, your Honor.

19          THE WITNESS:  I don't have that.

20          THE COURT:  00 what?  I don't think I have it either.

21          MR. ELLIS:  903.

22          THE WITNESS:  I don't have it.

23          THE COURT:  There not such a document.

24          MR. ELLIS:  It is before the thousands, your Honor.  I

25  think you are looking at 8,000, 7,000.

H3h6pin22

1              THE COURT:  I am looking at the whole thing.

2              MR. ELLIS:  It is towards the beginning.

3              THE COURT:  The first document I have is 00223.

4              MR. ELLIS:  Yes.

5              THE COURT:  How much farther is that is the 009.

6              MR. ELLIS:  About that much further (indicating).

7   Maybe 20 page.

8              THE COURT:  903?

9              MR. ELLIS:  Yes.

10             THE COURT:  Down in the corner it has 820?

11             MR. ELLIS:  Yes.  Specifically if we all look at

12  invoice 2610.

13             MR. KUBLANOVSKY:  Can you confirm with the witness he

14  has the page.

15             THE WITNESS:  Yes, I do.

16  BY MR. ELLIS:

17  Q.  So invoice 2610 dated May 18th, 2013, 12:27 a.m.  This

18  shows a credit card charge here on the left-hand side cash zero

19  credit 223.08, which matches the grand total.

20             What is that credit number and why does it match the

21  grand total?

22  A.  Because that check was closed out to a credit card.

23  Q.  As opposed to cash?

24  A.  Correct.

25  Q.  Did these people pay at or about 12:27 a.m.?

1   A.  Not necessarily.

2   Q.  What do you mean "not necessarily"?

3   A.  I could run a credit card at 11:20 and close out the tab on

4   the point of sale machine at 12:27.  It wasn't an integrated

5   system.  The credit card machine was separate from the point of

6   sale.  So everything was done separate.  All that simply

7   indicated was that it was a credit sale.

8   Q.  What does the timestamp mean, 12:27 a.m.?

9   A.  That is when I closed the table on the point of sale.

10  Physically hit payment and how it was paid.

11  Q.  Why would you wait until the end of the night to do that?

12  A.  It was irrelevant to any of the end of the night other

13  things that I had to do.  It was simply on the computer.  The

14  computer order was separate from the credit card machine.  The

15  credit card machine could print its own reports.  I didn't need

16  it to print anything for the any of the tips or anything like

17  that.  The computer -- really we didn't use the computer except

18  for placing orders and printing invoices for the customers.  It

19  was two separate entities, the credit card machine and

20  computer.

21  Q.  Say that again.  When you say "computer," are you talking

22  about the point of sale system?

23  A.  Yes.

24  Q.  You only use the computer for what again?

25  A.  To place orders and print invoices for the customers.

1   Q.  Why would you print invoice for your customers?

2   A.  So they knew what to pay.

3   Q.  Oh, you are talking about the check?

4   A.  Right.  An invoice.

5   Q.  When they requested the check, that is what are you talking

6   about?

7   A.  That is what these are copies of, customer checks.

8   Q.  Doesn't it tell you on the check what time -- it gives you

9   a date and time on the check?

10  A.  Correct, when I print it for the customer.  This is a copy

11  of the checks that involves them being closed.  So for instance

12  if I had not closed a table and a customer asked for a -- I am

13  sure in here you may find that some were closed in the

14  afternoon.  Sometimes we forgot to close a table.  You will see

15  dates that is a 2:00 p.m. or 3:00 p.m.  That is the next day

16  when we started up the program, we realized, oh, we forgot to

17  close Table 24, which is the most popular table.  I forgot to

18  do that.  Let me close that now so I can do end of day, which

19  we did at the beginning of each shift.  We didn't have a

20  printer.  That needed a computer printer.  We had to take that

21  out and put that on the bar.  It is rather large.  It wasn't

22  from the regular small invoice printer.

23  Q.  So at the end of the night after everyone was done and all

24  the plaintiffs were done with their work, did you and they

25  leave at around the same time?

H3h6pin22

1   A.   Not always.

2   Q.   How often?

3   A.   I was usually the last person out.

4   Q.   How long before you would leave would they leave?

5   A.   It could be up to two hours.

6   Q.   What would you do during those two hours?

7   A.   Some times friends would come to see me at the end of the

8   night and we would be sitting there talking, having a glass of

9   wine.

10  Q.   What if they wanted to put in an order?

11  A.   Never.  The kitchen was closed.  The kitchen was closed.

12  Q.   So if they did want anything, it would never show up in

13  these records?

14  A.   I never ordered any food after the kitchen was closed.

15  Q.   Do these records only show orders that were placed with the

16  kitchen?

17  A.   Yes.

18  Q.   What was the latest that you ever saw an order placed with

19  the kitchen?

20  A.   The latest I ever saw an order placed with the kitchen was

21  around 11:00 p.m.

22  Q.   Yesterday Fernando Ortiz testified that on Fridays and

23  Saturdays that the last reservation at the restaurant was taken

24  at 11:00, 11:30 p.m.; is that correct?

25  A.   No, it wasn't.

H3h6pin22

1   Q.   What time is the last reservation on Fridays and Saturdays?

2   A.   Every day the last reservation was 10:30.  In the way of

3   reservations even now we have an online system and every day,

4   except for Sunday, the last reservation you can make is 10:30.

5   That doesn't include walk-ins, but there were no reservations

6   after 10:30.

7   Q.   Yesterday Fernando Ortiz testified that the restaurant was

8   closed on Fridays and Saturdays at midnight; is that correct?

9   A.   Closed as in locking the door, yes.

10  Q.   Do you always lock the door at midnight on Fridays and

11  Saturdays?

12  A.   Not always.  As I said before sometimes I would stay later

13  by myself or with friends.

14  Q.   Yesterday Fernando testified that the average amount of

15  tips that he would receive were about 200 to $220 a day; is

16  that accurate?

17  A.   I was not always there when Fernando was collecting tips so

18  I --

19  Q.   Did you ever see his tips?

20  A.   I did for three nights a week.  I split them with him.

21  Q.   So on average during the three nights a week and you would

22  split tips were your tips the same?

23  A.   When we split them they were the same.  But not an average.

24  Your averages -- you are asking for an average on a small

25  restaurant that is a local restaurant that business is affected

1   by weather, the seasons, and the time of the week, and the

2   amount of money that the customers spend.  Nothing in our

3   restaurant was ever hard.  We weren't -- we're not a Bennigans

4   in that sense where things were set up that way.  Everything

5   would vary with our customers and some customers were very

6   generous and some were not as generous.  It varied greatly.

7   Q.  It would vary greatly between you and Fernando even on the

8   same day?

9   A.  No.  The amount of tips on a nightly basis would vary

10  greatly.

11  Q.   when it was just you when Fernando working, you received

12  the same amount of tips for that day; is that correct?

13  A.  Minus Luis's 15 percent, yes.

14  Q.  On days where you and your sister and Fernando were

15  working, all three of you would receive the same amount of

16  tips; is that correct?

17  A.  No.

18  Q.  How would that differ who received more?  Who received

19  less?

20  A.  There were -- either myself or Maria and Fernando split the

21  tips.  It wasn't the three of us ever.  It was Fernando and

22  Maria or Fernando and myself.  Minus the 15 percent for Louis

23  every night.

24  Q.  So it never happened that yourself, Maria and Fernando

25  would split the 85 percent remainder?

H3h6pin22

1    A.   Never.

2    Q.   What was the latest you ever saw an order go into the

3    kitchen?

4    A.   11:15 was the latest I ever seen an order go into the

5    kitchen.

6    Q.   Why would plaintiffs lie and say they were paid less than

7    they were really paid?

8    A.   I don't know.  I don't know why they quit the night that

9    they quit.  And I still don't know what -- what we're even

10   still doing here when I considered them and we considered them

11   part of our family and we always felt we treated them above and

12   beyond what was necessary.

13   Q.   I want to turn briefly back to Angel Guayllasac.  In your

14   mind what was it that made him a manager?

15   A.   He handled all of the inventory in the restaurant.  And

16   then when it comes to the kitchen, it is -- the kitchen is a

17   very organized, disorganized area.  There is a lot of things

18   going on at once and you need someone to conduct the orchestra

19   in the kitchen.  That was his job, to conduct the orchestra in

20   that kitchen and manage how that kitchen operated.  In the

21   sense you cannot have in a kitchen that size -- you cannot have

22   three people taking a ticket and looking at it.  It is not

23   optimal.  It is not functional.  I know that for a fact because

24   I am doing that myself.  You need one person to be the

25   conductor and to operate the kitchen and to tell each

1    instrument when they need to be played and at what time.  That

2    is the best analogy I can give you when it comes to the

3    kitchen.  That was his job.

4    Q.  You testified earlier that there were times when neither

5    you nor your father were at the restaurant; correct?

6    A.  No, that is not true.

7    Q.  You didn't work on Sundays; isn't that true?

8    A.  When my dad was alive, he was there all day Sunday.

9    Q.  There was never a time then where neither you nor your

10   father -- before your father's death obviously -- when neither

11   you nor your father were at the restaurant?

12   A.  No.  My dad didn't feel comfortable leaving my sister there

13   alone.

14   Q.  After your father passed has there been a time when you

15   haven't been to the restaurant?

16   A.  Very rarely.

17   Q.  During those rare occasions, who is in charge?

18   A.  I was still.

19   Q.  Even though you are not there?

20   A.  I was 15 minutes away.

21   Q.  What if something came up and nobody could get ahold of

22   you?

23   A.  My cell phone is always on.  My home phone is always on and

24   I am 15 minutes away.

25   Q.  You testified earlier that each of the stations in the

1   kitchen has a very specific function, role, and that the person

2   who works at that station has a very specific duty associated

3   with that station; is that correct?

4   A.   Yes.

5   Q.   What are those three stations again?

6   A.   Starting from the left of the kitchen, the first station

7   has two low boy refrigerators and in them are the poultry and

8   meat.  That's only a two-door low boy.  Then there is another

9   two-door low boy.  It is three-door low boy with a table.  The

10  left was the meat station.  The middle was where the fish was

11  stored.  The right was the pasta.

12          So Eddie's station is where he had all the meat and

13  where he prepared for veal paries, chicken parms, anything that

14  had to go in the boiler or meat that had to be cooked.  That

15  was his job.  And any hot appetizers.

16          And Angel was in charge of the fish and pasta, cooking

17  them.  Israel made any cold appetizers and salads.

18  Q.   My question then is if it is extremely clear what the

19  function of each station is and what the duty is of each person

20  who is working at each station, why does there need to be a

21  conductor of the orchestra?

22  A.   I don't know if you ever actually worked inside of a

23  kitchen, but tickets come in at random periods of time.  Some

24  come with appetizers, some don't.  Eddie may be preparing a hot

25  appetizer, say, off the top of my head baked claims that go

H3h6pin22

```
 1    into the boiler.  Angel or myself will get a ticket without any
 2    appetizers.  Two of them were chicken parms, two of them were
 3    pastas.  Angel needed to tell Eddie, I need two chicken parms
 4    and I need -- the term I use now is I need them to fly now,
 5    meaning prepare them now.  Don't wait.  Whereas when you order
 6    the baked claims, he could have two chicken parms and you would
 7    tell Eddie -- I phrase it now in the kitchen to my current
 8    employees if I need four chicken parms but I need two to fly
 9    and I need two don't fly or hold them.  So prepare them but
10    have them ready so when the wait staff says table so and so is
11    done with their baked claims, we need their food, Angel with
12    say to Eddie, fly those two chicken parms that you are holding
13    for me.
14    Q.  When you are in the back working in the kitchen, do you see
15    every ticket that comes through as it comes through?
16    A.  I do because I am now the person in charge of the kitchen.
17    Q.  But you said that it is really chaotic.  So isn't it
18    possible you would be busy and you wouldn't see a ticket that
19    comes through?
20    A.  No.  Because the printer has a very distinct printing sound
21    to it.  It is a very loud printer.  In the back of my head is a
22    bad dream some nights from busy nights.  You hear that printer
23    and you just want it to stop.  So, no, you know when it is
24    coming through even when you are busy.  As my job I have to
25    know when that ticket is coming through.  I have to take it
```

H3h6pin22

1    down and read it and know what it needed and that was Angel's

2    job as well.

3    Q.  Did you ever see Eddie read out a ticket or Israel?

4    A.  No, I did not.

5    Q.  What would you have done if you had seen that?

6    A.  It wasn't my place to tell them anything if I had seen

7    that.  That was Anglo's job to handle what was going on in the

8    kitchen.

9    Q.  Could he have delegated that responsibility to Eddie as

10    well?

11    A.  If that was his choice he could have, but that that would

12    have been his choice not my choice.  I don't think he would

13    have.  Knowing what I know now, you just don't function that

14    way.  It is not feasible to function that way.  Our kitchen

15    isn't set up like that.

16          I know Eddie's testimony he used the word "line."  We

17    don't have a line.  Some kitchens, bigger restaurants, kitchens

18    the size of my restaurant, have lines.  Various tickets come

19    out of various machines.  We don't operate lines.  One ticket

20    comes out.  Not everybody getting their own ticket.  That is

21    what that means by a line.  We don't have lines.  We have one

22    station for the printer.  One ticket for the order.  One person

23    handling the ticket.

24    Q.  You testified earlier that Angel called in sick sometimes.

25    How would the kitchen function on days when he was sick?

H3h6pin22

1    A.   I would come in to work the kitchen.

2    Q.   Again, just to touch upon this one last time.  You

3    testified there were never days when you and Maria and Fernando

4    collectively split the 85 percent of tips not given to Luis?

5    A.   Correct.

6              MR. ELLIS:  No further questions, your Honor.

7              THE COURT:  Do you have any further questions?

8              MR. KUBLANOVSKY:  No, your Honor.

9              THE COURT:  You can step down, sir.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  Do you have anything further on behalf of

13   defendant.

14             MR. KUBLANOVSKY:  No, your Honor.

15             Defense rests.

16             THE COURT:  Anything further from plaintiffs?

17             MR. ELLIS:  No, your Honor.  Plaintiffs rests.

18             THE COURT:  How do you want to proceed at this point?

19   Do you want to argue?  Do you want to submit something?  How

20   did you want to proceed?

21             MR. KUBLANOVSKY:  Your Honor, Mr. Ellis and I had a

22   chance to discuss this, but we believe at this point there is

23   no need for summation, however, that posttrial briefing is

24   something that we would want to submit to the Court.

25             THE COURT:  What kind of schedule would you like?

H3h6pin22

```
1            MR. ELLIS:  We need to obtain the transcripts.

2            45 days, your Honor.

3            THE COURT:  How are you going to do your submissions?

4            MR. ELLIS:  How would you like them?

5            THE COURT:  It's up to you.  Are you going to do it

6   simultaneous.  One is going to submit and the other one

7   afterwards?  What are you going to do?

8            MR. ELLIS:  We would like to do simultaneous posttrial

9   briefs with a chance to respond.

10           THE COURT:  My suggestion would be this:  How much

11  time do you want to respond after you make the submission?

12           MR. ELLIS:  15 days to respond, your Honor.

13           THE COURT:  Why don't we do this:  You can make your

14  summations either by the 28th of April or the 5th of May.

15           MR. KUBLANOVSKY:  5th of May, your Honor.

16           THE COURT:  5th of May I will give you until the 23rd

17  of May.  So it can be before Memorial weekend so you don't have

18  to work on Memorial Day weekend.  That will be a Tuesday.  That

19  will give you some time to get that to me.  May 5th for

20  simultaneous submissions, responses May 23rd.

21           I will move as quickly as possible to give you a

22  decision.

23           MR. ELLIS:  Thank you, your Honor.

24           MR. KUBLANOVSKY:  Thank you, your Honor.

25                              o0o
```

```
 1                    INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    PETER MIGLIORINI
 4    Direct By Mr. Kublanovsky  . . . . . . . . . 291
 5    Cross By Mr. Ellis . . . . . . . . . . . . .368.
 6                    PLAINTIFF EXHIBITS
 7    Exhibit No.                           Received
 8     4   . . . . . . . . . . . . . . . . . . 345
 9     16   . . . . . . . . . . . . . . . . . . 373
10     17   . . . . . . . . . . . . . . . . . . 375
11     6   . . . . . . . . . . . . . . . . . . 380
12     9   . . . . . . . . . . . . . . . . . . 381
13     13   . . . . . . . . . . . . . . . . . . 382
14     18, 19, 20   . . . . . . . . . . . . . . 389
15     22   . . . . . . . . . . . . . . . . . . 399
16                    DEFENDANT EXHIBITS
17    Exhibit No.                           Received
18     D   . . . . . . . . . . . . . . . . . . 291
19     E   . . . . . . . . . . . . . . . . . . 382
20
21
22
23
24
25
```