**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LUIS PINEDA, EDDY F. JAQUEZ, ROBINSON           :
ORTEGA DIAZ, ANGEL GUAYLLASAC, and              :
ISAEL ARIZMENDI, *on behalf of themselves and*   :
*FLSA Collective Plaintiffs*,                      :
                                                 :
                  Plaintiffs,    :
                                                 :
      -against-                                :
                                                 :
FRISOLINO, INC. and PETER MIGLIORINI,           :
                                                 :
                 Defendants.    :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

15 Civ. 3774 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

On March 13, 15, 16, and 17, 2017, this Court held a bench trial in this wage-and-hour matter in which Plaintiffs allege violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL"). Plaintiffs Luis Pineda, Eddy F. Jaquez, Robinson Ortega Diaz, Angel Guayllasac, and Isael Arizmendi each testified, as did Defendant Peter Migliorini and Fernando Ortiz, a current employee of the Defendants. Subsequently, both parties filed proposed findings of fact and conclusions of law, as well as damages calculations.

This Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. This Court finds for Plaintiffs and awards damages in the amounts indicated below.

## I.    PROCEDURAL HISTORY

Plaintiffs brought this action on May 15, 2015 against Defendants Frisolino, Inc., Peter Migliorini, Mario Migliorini, and Maria Migliorini Cintron. (Compl., ECF No. 1.) Frisolino, Inc. was formed by brothers Renato and Costanzo "Mario" Migliorini around 1992 to begin operating Piccolo Angolo (the "Restaurant"), a family Italian restaurant located at 621 Hudson Street, New

York, New York 10014.  (Joint Pretrial Order, ECF No. 68, at 4, 6.)  Peter Migliorini and Maria Migliorini Cintron are Renato's children who have worked continuously in the Restaurant.  (*Id.* at 7.)

On January 3, 2017, this Court dismissed Costanzo Migliorini and Maria Migliorini Cintron as individual defendants.  (Order, ECF No. 58.)  In March 2017, this Court held a four-day bench trial to address whether Defendants Frisolino, Inc. and Peter Migliorini are liable for violations of the FLSA and NYLL.  (*See* Trial Tr., ECF Nos. 72, 74, 76, 82.)  Plaintiffs seek an award of unpaid minimum wages, overtime wages, spread of hours pay, liquidated damages, interest, costs, and attorneys' fees under both statutes.  (Pls.' Proposed Findings of Fact & Conclusions of Law, ECF No. 79, ¶ 2.)  At the conclusion of trial, this Court permitted the parties to submit supplemental briefing regarding Defendants' liability and damages.

## II.   FINDINGS OF FACT

### a.  *Plaintiffs' Employers*

In or around 1993, Renato Migliorini hired his son, Peter, and daughter, Maria, to work at the Piccolo Angolo Restaurant.   (Joint Pretrial Order at 7.)  On or around January 1, 2006, following Costanzo Migliorini's retirement, Renato elected Peter to serve as Vice President and Maria to serve as Secretary of Frisolino, Inc., and transferred to each a 25% interest in the company.  (*Id.*)

Renato became ill and was hospitalized in the spring of 2014.  (Trial Tr. at 356:15-18.) After three weeks in the hospital, he died on or about April 19, 2014.  (*Id.* at 302:6.)  Upon Renato's death, Peter and Maria became the sole shareholders of Frisolino, Inc.  (Joint Pretrial Order at 6.) Both currently work full-time at the Restaurant.  (*Id.* at 7.)

The evidence at trial clearly shows (and Defendants do not dispute) that Peter Migliorini assumed responsibility for managing the Restaurant after his father's death. (*See, e.g., id.* at 4.) The more pertinent question is the extent to which Peter assumed that responsibility in earlier years. Peter testified that his father set the compensation and work schedules for all Plaintiffs. (Trial Tr. at 309:16-19.) Peter or Maria would sometimes hand employees their wages at their father's request, but Peter claims that they were not responsible for calculating wages. (*Id.* at 312:18-25.) On the other hand, Peter admitted that he (and his sister) had authority to sign checks on Restaurant accounts. (*Id.* at 374:12-17.) Peter also admitted signing a letter in July 2012 that confirmed Plaintiff Guayllasac's salary; the letter was on Frisolino, Inc. letterhead and listed Peter as a Vice President. (*Id.* at 368:20-24; Pls.' Ex. 12.) Peter also admitted that on nights when he was working, his father would leave the Restaurant at 9:00 PM or 9:30 PM, while Peter would stay until close. (Trial Tr. at 314:8-12, 384:18-21.)

Peter further testified that for the first week after his father was hospitalized in 2014, Renato continued to manage the Restaurant and direct operations from his hospital bed, giving orders to Peter to carry out and instructing him how much each employee should be paid. (*Id.* at 356:19-357:6, 365:21-367:19.) Peter acknowledged that he and his father never spoke explicitly about Peter taking over the Restaurant. (*Id.* at 386:12-15.)

All Plaintiffs in this case testified regarding Peter's authority over them. Plaintiff Guayllasac testified that he was supervised by Renato until his death, and then by Peter and Maria, and that Peter fired him. (*Id.* at 20:25-21:11, 80:11-12.) He also testified that Peter began giving orders to other employees about a year before his father died. (*Id.* at 13:12-14.) Plaintiff Arizmendi testified that he followed Peter's orders regardless of what anyone else said (including Renato), and that that Peter always handed out his wages. (*Id.* at 130:1-17, 131:12-23.) He also

testified that all employees would wait around the Restaurant until Peter or Maria told them they could leave, and that Peter extended Arizmendi's hours during his last year. (*Id.* at 132:10-13, 133:15-19.) Plaintiff Ortega testified that Peter hired him in September 2014 and set his hours, and that Peter fired all the Plaintiffs in February 2015. (*Id.* at 89:5-14, 90:20-22, 94:17-22.)

Plaintiff Pineda testified that Renato hired him as a busboy after consulting with Peter. (*Id.* at 165:3-16.) Although Renato set his schedule, Peter later changed it. (*Id.* at 168:12-21.) Pineda considered both Renato and Peter his "boss"; he said that Peter or Maria supervised his work and either Peter or Maria would pay him. (*Id.* at 167:4-8, 169:7-8, 170:11-12.) He said it was rare that both Renato and Peter were not at the Restaurant. (*Id.* at 167:9-10.) Finally, he agreed that the employees could not leave until Peter or Maria said they could, and that Peter fired him. (*Id.* at 187:16-17, 220:15-18.)

Plaintiff Jaquez testified that both Peter and Maria ordered the Plaintiffs just like any other boss, and that Peter was "the one who would take [sic] all of the decisions pertaining to the restaurant," including while Renato was alive. (*Id.* at 226:10-11, 236:13-22.) Jaquez stated that Peter supervised him after Renato left each day, and that Renato, Peter, or Maria paid him until Renato's death, after which Peter paid him. (*Id.* at 229:3-4, 231:9-11.) Jaquez also confirmed that Peter or Maria dismissed the kitchen employees at night by sending a ticket saying the Restaurant was closed, at which point he would clean up his station. (*Id.* at 227:25-228:11.) Jaquez also testified that Peter told employees that they had to follow his orders and could only leave when he said so, and that Peter increased Plaintiffs' hours after Renato died. (*Id.* at 233:7-17.)

### b. *Plaintiffs' Hours*

Peter Migliorini testified that the Restaurant was open from 5 PM to 11 PM on Tuesdays, Wednesdays, and Thursdays, from 5 PM to 11:30 PM on Fridays and Saturdays, and from 4 PM

to 10 PM on Sundays.  (*Id.* at 300:16-21.)  The Restaurant was open, on average, for 37 hours per week.

Defendants admit that Plaintiffs' maximum hours at times exceeded 40 hours per week. (*See id.* at 328:21-329:10; Defs.' Wage & Overtime Calculations, ECF No. 78, Ex. 6.)  However, Defendants did not maintain timestamp machines or keep any other records of Plaintiffs' hours, and there is great disagreement as to the average hours Plaintiffs worked each week.  (*See, e.g.*, Trial Tr. 19:10-18, 91:5-7, 133:20-25, 168:22-169:1, 227:14-16, 273:15-18, 388:15-18.)[1]

Where an employer fails to maintain adequate or accurate records of its employees' hours, the employee need only "produce[] sufficient evidence to show the amount and extent of [his or her] work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  This burden is "not high" and may be met "through estimates based on [the employee's] own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88.  If the employer fails to carry this burden, the employees' damages may be calculated based on his or her reasonable approximation. *Id.* at 688; *see also id.* ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA].").

---

[1] At trial, Peter Migliorini testified that the Restaurant still does not use a machine for its employees to clock in and out; rather, Peter has an application on his phone through which he can record check-in and check-out times.  (Trial Tr. at 388:12-18.)

### i. *Luis Pineda*

Plaintiff Pineda worked at the Restaurant from 2000 through February 7, 2015. (Trial Tr. at 163:24-164:4.) He was hired by Renato Migliorini as a busboy. (*Id.* at 164:13-16.)

Pineda testified that he worked six days per week, typically arriving at about 4 PM and leaving 20 to 30 minutes after the last customer was served. (*Id.* at 167:13-20, 186:21-187:7.) He did not take any breaks. (*Id.* at 169:2-3.) Testimony from other witnesses generally supports Pineda's recollection. (*Id.* at 135:23-25, 262:21-263:12, 341:7-15.) This Court credits Pineda's testimony and finds that, on average, he worked 49 hours per week (starting approximately one hour before the Restaurant opened and leaving approximately one hour after closing).

### ii. *Eddy Jaquez*

Plaintiff Jaquez worked at the Restaurant from May 29, 2011 through February 7, 2015. (*Id.* at 224:18-22.) He was hired by Renato Migliorini as a cook. (*Id.* at 224:23-225:3.)

Jaquez testified that he worked six days per week, arriving at 2 PM for the first two years and at 3 PM thereafter. (*Id.* at 226:12-227:4.) He did not take any breaks. (*Id.* at 227:17-18.) After Peter or Maria closed the kitchen, he would spend approximately 40 minutes cleaning his station and would then leave with other employees. (*Id.* at 227:22-228:11.) Testimony from other witnesses generally supports his recollection. (*Id.* at 63:10-17, 93:25-94:3, 134:20-21, 346:17-25.) This Court credits Jaquez's testimony and finds that, on average, he worked 49 hours per week (starting approximately one hour before the Restaurant opened and leaving approximately one hour after closing).

### iii.  Robinson Ortega Diaz

Plaintiff Ortega worked at the Restaurant as a dishwasher from the first week of September 2014 through February 7, 2015.  (*Id.* at 89:3-10.)  He testified that Peter Migliorini both hired and fired him.  (*Id.* at 89:13-14, 94:17-22.)

Ortega testified that he worked six days per week, and that he arrived at 2 PM and typically left around 12:30 AM.  (*Id.* at 89:24-90:19.)  He did not take any breaks.  (*Id.* at 91:11-12.) Testimony from other witnesses supported that he arrived around 2 PM and left within an hour of closing.  (*Id.* at 268:15-21, 353:10-23.)  This Court finds that, on average, Ortega worked 60 hours per week (starting at 2 PM and leaving approximately one hour after closing).

### iv.  Angel Guayllasac

Plaintiff Guayllasac worked at the Restaurant from April 1993 through February 7, 2015. (*Id.* at 11:2-7.)  He was hired by Renato as a dishwasher but, after about six years, became a salad preparer and, later, a cook.  (*Id.* at 11:12-12:8.)  He testified that Peter fired him.  (*Id.* at 81:4-6.)

Guayllasac testified that he worked six days per week, arriving at 11 AM and working until 12 AM or 1 AM.  (*Id.* at 18:16-19:7.)  Aside from cooking and prep work, his responsibilities included meeting with delivery vendors and coordinating with Renato on inventory and orders. (*Id.* at 51:4-14, 53:7-15, 66:6-12.)  Guayllasac also placed orders directly with one vendor, without going through Renato.  (*Id.* at 319:13-320:7.)

Guayllasac testified that the Restaurant typically closed around 11:30 PM and it took him 30 minutes to clean up his station.  (*Id.* at 18:5-13.)  He did not punch a time clock and did not take any breaks.  (*Id.* at 19:10-20.)  He testified that all employees typically left at the same time.[2]

---

[2] Guayllasac acknowledged that, in later years, the Restaurant closed in August for two weeks but employees were paid.  (*Id.* at 78:11-79:5.)  Neither side accounted for this time in their proposed hours

(*Id.* at 20:13-14.) Testimony from other witnesses generally supports Guayllasac's recollection. (*Id.* at 94:7-11, 134:20-21, 260:25-261:2, 314:19-21, 328:24-330:12.) This Court credits Guayllasac's testimony and finds that, on average, he worked 78 hours per week (starting at 11 AM and leaving approximately one hour after closing).

### v.  Isael Arizmendi

Plaintiff Arizmendi worked at the Restaurant from June 2012 through February 7, 2015. (*Id.* at 127:14-17.) His responsibilities included salad prep and cleaning. (*Id.* at 127:19-22.)

Arizmendi testified that he worked six days per week from 4 PM to midnight. (*Id.* at 131:24-132:6.) He did not take any breaks. (*Id.* at 134:10-11.) Testimony from other witnesses supports Arizmendi's recollection that he worked from 3:30 PM or 4 PM to within an hour of the Restaurant's closing. (*Id.* at 94:4-6, 188:10-16, 351:16-19.) This Court finds that, on average, Arizmendi worked 49 hours per week (starting approximately one hour before the Restaurant opened and leaving approximately one hour after closing).[3]

### c.  Plaintiffs' Wages

Defendants paid Plaintiffs fixed weekly salaries irrespective of the number of hours worked. (*See, e.g., id.* at 22:15-23:1, 91:17-19, 134:2-7, 169:23-170:15, 230:8-11.)[4] All Plaintiffs were paid in cash and did not receive a wage notice upon hiring or weekly payroll wage statements detailing their hours or hourly rate of pay. (*Id.* at 23:2-3, 28:15-17, 89:15-19, 136:13-22, 170:16-

---

determinations. (*See* Defs.' Wage & Overtime Calculations; Pls.' Damages Calculation Chart, ECF No. 79, Ex. A.)

[3] Arizmendi testified he was out for six to eight weeks at one point and was not paid. He was also not paid when the Restaurant was closed, including for Thanksgiving. (Trial Tr. at 154:3-19.) Neither side accounted for those hours in their proposed hours determinations. (*See* Defs.' Wage & Overtime Calculations at 3; Pls.' Damages Calculation Chart.)

[4] In his direct testimony, Peter Migliorini acknowledged that Guayllasac, Arizmendi, Ortega, and Jaquez received fixed weekly salaries, but claimed that Pineda's compensation fluctuated based on tips. (Trial Tr. at 325:5-6, 336:6-8, 346:3-5, 350:8-9, 353:1-3.)

22, 231:12-19.)[5]  In their last year of employment, following Renato Migliorini's death, at least

some Plaintiffs received pay stubs stating their weekly wages and deductions; the record contains

a handful of pay stubs and related earnings records for Plaintiffs Guayllasac, Jaquez, and Ortega

covering roughly September 2014 through December 2014.  (Pls.' Exs. 5, 6, 8, 9, 11, 13.)  That

period corresponds with Peter Migliorini's hiring of a new payroll service in late 2014.  (Trial Tr.

at 80:5-8, 326:10-13, 380:5-6.)  However, those documents omit Plaintiffs' hours and hourly rates

of pay.[6]

While there is limited documentation of Plaintiffs' wages, the documents that exist

generally align with Plaintiffs' testimony.  In addition to the 2014 pay stubs and Employee

Earnings Records, there is also a sampling of W-2's and employer letters for several Plaintiffs.

Overall, these documents further support Plaintiffs' testimony as to their weekly wages and

indicate that Plaintiffs were paid much less than Defendants claimed.

Defendants have not provided documents contradicting Plaintiffs' claimed wages (or

hours).  Rather, their defense relies almost entirely on the testimony of Peter Migliorini, who

asserted at trial that all Plaintiffs received much higher weekly wages than the testimony and

records reflect.  With one exception (Pls.' Ex. 4, containing letters indicating that Plaintiff Pineda

earned $400 per week), Defendants do not challenge the authenticity of the wage records put forth

---

[5] Peter Migliorini acknowledged that the Restaurant did not ask its employees to complete W-4 withholding forms until after his father passed away.  (*Id*. at 326:8-21.)  Defendants' witness Fernando Ortiz testified that he was informed of deductions from wages at the end of the year through a W-2.  (*Id*. at 274:2-4.)

[6] Peter Migliorini testified that he hung a poster regarding employee minimum wages in approximately December 2014 or January 2015, following the recommendation of his new payroll company.  (*Id*. at 382:13-383:6; Defs.' Ex. E.)  Plaintiffs Guayllasac and Arizmendi also testified that they recalled seeing the sign.  (*Id*. at 54:22-25, 148:6-9.)  This Court finds that the Restaurant first utilized the posters in approximately January 2015.

by Plaintiffs. Rather, their defense is that the Restaurant knowingly provided Plaintiffs with false records of their wages to keep them "off the books."[7]

At trial, Peter Migliorini testified that he signed a letter on behalf of the company falsely representing that Plaintiff Guayllasac earned a weekly gross salary of $420, when in fact his weekly salary was $1,050; Peter understood that Guayllasac intended to use the letter to obtain Medicaid benefits. (Trial Tr. at 325:4-6, 368:20-369:12.) As to Plaintiff Jaquez, Peter testified that the Restaurant provided inaccurate pay stubs (Pls.' Ex. 5) showing that Jaquez earned $400 per week, when in fact his weekly salary was $725. (Trial Tr. at 379:3-17.)[8] Further, Peter testified that the Restaurant deducted payroll taxes based on a salary of $400, but that Jaquez was paid $725 notwithstanding. (*Id.*) As to Plaintiff Ortega, Peter testified that the Restaurant provided inaccurate pay stubs (Pls.' Ex. 8) showing that Ortega earned $400 per week, when in fact his weekly salary was $550. (Trial Tr. at 353:1-3, 380:19-381:3.) Again, Peter testified that the Restaurant deducted payroll taxes based on a salary of $400, but that Ortega was paid $550 notwithstanding. (*Id.* at 380:19-381:3.)

Plaintiffs' wages can only be determined based on two general categories of evidence: (1) conflicting testimony by the Plaintiffs and by Defendant Peter Migliorini; and (2) a limited set of corporate documents generally supporting Plaintiffs' claims, which Defendant Peter Migliorini concedes are authentic but alleges are fraudulent.

---

[7] As Defendants asserted in their post-trial submission, "Peter Migliorini continued to pay plaintiffs in accordance with the agreement they had made with his father, which was that a portion of Plaintiffs' wages would be recorded on the books of the Restaurant, and they would also receive, separately, and not recorded on the books, an additional amount in compensation." (Defs.' Post-Trial Brief, ECF No. 78, at 11-12.)

[8] Peter also testified that Plaintiffs' Exhibit 6, an Employee Earnings Record that summarizes Jaquez's pay stubs, is not accurate. (Trial Tr. at 380:7-11.)

### i.  Luis Pineda

Plaintiff Pineda testified that he was paid $65 to $70 per day for an average of about $400 per week. (*Id.* at 169:23-170:6, 207:9-13.)  In contrast, Peter Migliorini testified that Pineda was paid $75 per day *plus* 15% of the daily tip pool. (*Id.* at 336:6-8.)  According to Peter, the tip pool was split between Fernando Ortiz (42.5%), Pineda (15%), and either Peter or Maria (42.5%). (*Id.* at 336:9-22, 410:11-13.)  Peter explained that most customers paid tips by credit card, which were tallied at the end of the night, and that he or Ortiz gave Pineda his tip share each night or the next morning. (*Id.* at 339:8-340:14.)  Ortiz also testified that the Restaurant made $180 to $650 per day in tips, which were split between Ortiz, Pineda, and either Peter or Maria. (*Id.* at 272:2-273:2.)

Pineda's testimony was that his daily wages were relatively consistent and did not vary according to the Restaurant's tip pool.  If Pineda were indeed paid $75 per day plus 15% of a $180 to $650 tip pool, his daily wages would have varied from approximately $102 ($75 plus $27) to $173 ($75 plus $98) for a weekly salary of $612 to $1,038.  No documents support those amounts, and no witness testified that Pineda's wages approximated those totals.  Having considered the testimony of Pineda, Peter Migliorini, and Ortiz, the evidence demonstrates that Pineda earned an average weekly wage of $450.

### ii.  Eddy Jaquez

Plaintiff Jaquez testified that he received $400 per week in cash. (*Id.* at 230:4-11.)  His testimony is supported by pay stubs (Pls.' Ex. 5) and Employee Earnings Records (Pls.' Ex. 6) which show a salary of $400 per week in 2014, less taxes and other deductions.  The pay stubs show an increase to $425 per week as of January 13, 2015, a few weeks before his termination. (Pls.' Ex. 5.)  In addition, W-2's for 2013 and 2014 show approximately $20,000 in total

compensation for those years, which suggest a gross weekly wage of around $400.  (Pls.' Exs. 7, 18.)

Peter Migliorini testified that Jaquez received $725 per week pursuant to a "verbal agreement," while admitting that Jaquez was only on the books for $400.  (Trial Tr. at 327:3-23.) Peter also testified on cross-examination that he provided Jaquez with inaccurate pay stubs and Employee Earnings Records.  (*Id.* at 379:3-380:11.)  No documents support Peter's assertion that Jaquez earned $725 per week.

Based on the available documents, relevant testimony, and credibility of the witnesses, the evidence supports the conclusion that Jaquez, on average, earned $400 per week.

### iii.   Robinson Ortega Diaz

Plaintiff Ortega testified that he received $400 per week in cash, regardless of hours worked.  (*Id.* at 91:15-19.)  His testimony is supported by pay stubs (Pls.' Ex. 8) and Employee Earnings Records (Pls.' Ex. 9), which show a salary of $400 per week in 2014, less taxes and other deductions.  His testimony is also generally supported by W-2's showing total compensation of $6,000 from September through December 2014.  (Pls.' Exs. 10, 18.)

Peter Migliorini testified that he paid Ortega $550 per week.  (Trial Tr. at 353:1-3.)  Peter also testified on cross-examination that he provided Ortega with inaccurate pay stubs.  (*Id.* at 380:19-381:3.)  No documents support Peter's assertion that Ortega earned $550 per week.

Based on the available documents, relevant testimony, and credibility of the witnesses, Ortega, on average, earned $400 per week.

### iv.   Angel Guayllasac

Plaintiff Guayllasac testified that he was paid $420 per week in cash.  (*Id.* at 22:18-23:3.) His testimony is supported by a letter, which Peter admits signing, that states Guayllasac's salary

as $420 per week.  (Pls.' Ex. 12; Trial. Tr. at 368:23-24.)  Frisolino, Inc. W-2's and W-3's, which show total compensation of $19,200 to $22,250 between 2009 and 2014, also support Guayllasac's assertion that he received approximately $400-420 per week.  (Pls.' Exs. 14, 18.)  Other documents, including pay stubs and Employee Earnings Records, indicate that Guayllasac earned $400 per week during the fourth quarter of 2014.  (Pls.' Exs. 11, 13.)

Peter Migliorini testified that Guayllasac was paid at least $1,050 per week, but only went on the books for $400.  (Trial Tr. at 325:5-6.)  No documents support Peter's assertion.  Given the lack of documentary support and the volume of written records contradicting his claims, Peter's testimony is not credible.  Having considered the available documents, relevant testimony, and credibility of the witnesses, Guayllasac, on average, earned $420 per week.

### v.  Isael Arizmendi

Plaintiff Arizmendi testified that he received $400 per week in cash.  (*Id.* at 134:1-4.)  Peter Migliorini testified that Arizmendi received $500 per week.  (*Id.* at 350:8-9.)  The parties have pointed to no documents backing up either assertion.  However, this Court generally credits the consistent testimony of the Plaintiffs as to their hours and wages, and does not find credible Peter's uncorroborated and contradicted figures.

Based upon the relevant testimony and credibility of the witnesses, Arizmendi, on average, earned $400 per week.

### vi.  Overtime Compensation

No Plaintiffs discussed with their employers their regular hourly rate or overtime rates.  (*Id.* at 28:15-17, 89:15-23, 136:11-22, 170:16-22, 231:12-19.)  Rather, the record shows that Renato Migliorini set a fixed weekly wage for each Plaintiff at an amount that he felt was appropriate.  Peter Migliorini testified that his father determined wages by making sure his

employees were "compensated properly and compensated well for the work that they did." (*Id.* at

357:12-17.) Similarly, in explaining Plaintiff Guayllasaca's compensation, Peter testified that his

father wanted to ensure he was "properly compensated for the hours and the overtime hours he put

in and he wanted to make sure he had extra added to that because he was a hard worker." (*Id.* at

325:11-15.) After Renato's death, Peter continued to pay Plaintiffs in the same manner. (*Id.* at

351:11-15.)

## III. CONCLUSIONS OF LAW

### a. Defendant Peter Migliorini's Liability as an Employer

The FLSA broadly defines "employer" as "any person acting directly or indirectly in the

interest of an employer in relation to an employee," and likewise "defines the verb 'employ'

expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S.

318, 326 (1992) (quoting 29 U.S.C. §§ 203(d), (g)). Each employer is jointly and severally liable

for all back wages and liquidated damages. *Moon v. Kwon*, 248 F. Supp. 2d 201, 234 (S.D.N.Y.

2002) (citing 29 U.S.C. § 216(b)).

In resolving the question of who is an "employer," "the overarching concern is whether the

alleged employer possessed the power to control the workers in question . . . . Under the 'economic

reality' test, the relevant factors include 'whether the alleged employer (1) had the power to hire

and fire the employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment

records.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). *See also Chung v.

New Silver Palace Rest., Inc.*, 272 F. Supp. 2d 314, 318 & n.6 (S.D.N.Y. 2003) (test for "employer"

under N.Y. Labor Law is same as *Herman* test under FLSA); *Andrade v. 168 First Ave Rest. Ltd.*,

14 Civ. 8268, 2016 WL 3141567, at \*12 (S.D.N.Y. June 3, 2016), *R. & R. adopted*, 2016 WL

3948101 (S.D.N.Y. July 19, 2016) (imposing joint and several liability on employers pursuant to both FLSA and NYLL).

Peter Migliorini was an "employer" under the FLSA and NYLL throughout the six-year period covered by this action. Defendants concede that Peter was an employer following his father's death. (Defs.' Post-Trial Brief at 18-19.) But testimony shows that Peter had operational authority over Plaintiffs well before that time, including the power to hire and fire, the power to set the terms of employment, and control over compensation.[9] Among other facts: Pineda, Jaquez, and Arizmendi all testified that Peter supervised them (Trial Tr. at 130:1-11, 167:4-6, 169:7-8, 226:10-11, 229:3-4, 236:19-22); Pineda testified that Peter was involved in hiring him in May 2000 (id. at 165:14-16, 189:7-15), and that it was rare that neither Renato nor Peter were at the Restaurant (id. at 167:9-10); and Jaquez testified that both Peter and Maria ordered the Plaintiffs just like any other boss even while Renato was alive (id. at 236:19-22).[10] Moreover, Peter himself acknowledged that he signed checks on Restaurant accounts as early as 2010 (id. at 374:6-24), and that there was never a time when he and his father were both absent from the Restaurant. (Id. at 412:4-13.) Further, his father would typically leave the Restaurant at 9:00 PM or 9:30 PM on nights that Peter was working, leaving Peter in charge until close. (Id. at 314:8-12, 384:18-21.) Peter also admitted to signing at least one letter (in July 2012) on company letterhead confirming Guayllasac's salary, and acknowledged that he was involved in paying Plaintiffs their wages. (Id. at 312:15-20, 368:20-369:12; Defs.' Post-Trial Brief at 14.)

---

[9] Given Defendants' failure to maintain employment records, as described above, the fourth *Herman* test factor is not relevant here.

[10] On January 3, 2017, this Court dismissed Maria Migliorini Cintron as a defendant in this action on the ground that she was not an "employer" under the FLSA or NYLL. (Order, ECF No. 58.)

It is also noteworthy that Peter and his father never explicitly discussed Peter taking over the Restaurant following Renato's death; rather, Peter just assumed that was the plan.  (*See* Trial Tr. at 322:7-11, 367:23-368:4; Defs.' Post-Trial Brief at 11 ("Although it was not discussed between him and his father, Peter Migliorini assumed the mantle of ownership at the Restaurant.").)  The fact that there was no formal transition of power underscores that Peter was a joint employer before his father's death. He thereafter took over sole control of the Restaurant's operations.  While it is not necessary to pinpoint a precise date on which Peter legally qualified as an employer, the clearest evidence of that transition is January 1, 2006, when Renato gave Peter a 25% ownership share and appointed Peter to serve as Vice President of Frisolino, Inc.  Because Peter qualified as an employer throughout the six-year period covering this action, he is jointly and severally liable with the company Defendant for the Plaintiffs' damages.

### b.  Statute of Limitations

The statute of limitations under the NYLL is six years with no showing of willfulness required.  (Joint Pretrial Order at 8.)  The statute of limitations for FLSA actions is two years, or three in cases of "willful" violations.  (*Id.* (citing 29 U.S.C. § 255).)

An employer willfully violates the FLSA where he "either knew or showed reckless disregard for the matter of whether [his] conduct was prohibited by the statute."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) ("Mere negligence is insufficient.").  "An employer may act unreasonably and yet not recklessly."  *McLean v. Garage Mgmt. Corp.*, No. 10 Civ. 3950, 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012) (citing *McLaughlin*, 486 U.S. at 135 n.13).  An employee can demonstrate his employer's reckless disregard of the FLSA's requirements by proving his employer was subjectively aware of a "substantial danger" that the violation existed.  *Id.*

Plaintiffs have established that Defendants acted in reckless disregard of the FLSA. Defendants make no argument that they were unaware of their obligations under the FLSA; to the contrary, their position is basically that Plaintiffs received a fair "deal" with the Restaurant that compensated them "properly" and "well"—regardless of whether that arrangement complied with the labor laws. (Trial Tr. at 325:12-15, 357:12-17; Defs.' Post-Trial Brief at 14-15.) The record shows that Defendants deliberately disregarded these laws by failing to keep any records of Plaintiffs' hours, failing to provide a wage notice or wage statements describing their regular and overtime rates of pay, and failing to compensate Plaintiffs for overtime, among other facts. *See Romero v. Anjdev Enterprises, Inc.*, No. 14 Civ. 457, 2017 WL 548216, at *8 (S.D.N.Y. Feb. 10, 2017) (finding that defendants willfully violated the FLSA by deliberately disregarding the statute's requirements, failing to keep records, failing to compensate for overtime, and at times failing to pay a minimum wage). These shortcomings persisted for years, well beyond the limitations periods for this action. Further, when Peter was advised by the Restaurant's payroll company in spring 2014 to post notices regarding his employees' minimum wage and other rights, he only "glanced at" but did not read those posters as they were "rather large." (Trial Tr. at 383:1-9.) Defendants' argument, at best, is that he deliberately falsified employment records to the employees' advantage. These facts establish that Defendants were "aware of a substantial danger that their compensation system violated the FLSA, but chose to stick with it nonetheless." *McLean*, 2012 WL 1358739, at *7.

Since Plaintiffs' Complaint was filed on May 15, 2015, the FLSA statute of limitations period runs from May 15, 2012. The NYLL limitations period runs from May 15, 2009.

### c. Plaintiff Pineda's Status as a Tipped Employee

"Both the FLSA and the NYLL permit tipped restaurant employees . . . to receive a cash wage lower than the statutory minimum if the cash wage and the employee's tips, combined, meet the minimum wage." *Romero*, 2017 WL 548216, at *8. "Under the FLSA, an employer seeking to apply a tip credit must first notify the employee of the FLSA provisions governing such credits, and the employee must retain all tips received." *Id.* at *9. The NYLL requires a similar notice, although the specific requirements changed in 2011. *Id.*

Defendants claim that Pineda was a food service tipped worker who made $450 per week plus 15% of the tip pool. (*See* Defs.' Wage & Overtime Calculations at 1.) However, Defendants are not eligible to claim any tip credit for Pineda's wages. First, as a factual matter, Pineda's compensation was roughly the same each night and did not vary with the amount in the tip pool. Second, there is no showing that Defendants met the statutory prerequisites for obtaining the tip credit, including notifying Pineda of their intent to apply credits against his wages, providing wage statements documenting those credits, or maintaining payroll records of those credits. Accordingly, Pineda, like all Plaintiffs, is entitled to unpaid minimum wages at the full minimum wage rate.

### d. Plaintiff Guayllasac's Status as an Exempt Employee

Section 213(a)(1) of the FLSA exempts "any employee employed in a bona fide executive . . . capacity" from the right to receive a premium for overtime hours. 29 U.S.C. § 213(a)(1).[11] While the FLSA does not define "bona fide executive," the Department of Labor's regulations define "employee employed in a bona fide executive capacity" as one:

---

[11] The NYLL contains an analogous exception for executives from the minimum wage and overtime requirements. *See* N.Y. Labor Law § 651(5)(c) (McKinney 2017).

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2017).

The Second Circuit has instructed courts to construe such exemptions narrowly "because the FLSA is a remedial act . . . ." *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (citing *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991)). Accordingly, an "employer bears the burden of proving that its employees fall within an exempted category of the Act." *Martin*, 949 F.2d at 614.

Defendants claim that Plaintiff Guayllasac was an executive employee who was exempt from the FLSA and NYLL overtime wage and spread of hours provisions. (Defs.' Post-Trial Brief at 14-15.) At trial, Peter Migliorini testified that Guayllasac had authority to manage inventory and was both a cook and the "conductor" of the kitchen. (Trial Tr. at 306:14-23, 411:15-412:3.) Although Guayllasac never hired or fired anyone who worked in the kitchen, he did request jobs for two of his cousins. (*Id.* at 21:22-22:5.) Guayllasac also acknowledged on cross-examination that he had a key to the Restaurant. (*Id.* at 51:15-16.)

On the other hand, both defense witnesses testified that Guayllasac did not hire employees or set pay or schedules. (*Id.* at 276:3-10, 384:1-13.) Additionally, Guayllasac said he was never alone in the Restaurant when customers were there. (*Id.* at 85:19-24.)

Guayllasac was not an exempt employee. First, Guayllasac earned an average weekly salary of $420, below the threshold in 29 C.F.R. § 541.100(a). Second, there is no evidence that he had the authority to hire or fire employees or that his recommendations as to employment decisions were given particular weight.

As to his role in the kitchen, the evidence does not show that he regularly directed the work of the back-of-the-house employees; rather, it appears that he performed a sort of expediting role—reviewing tickets and advising Arizmendi and Jaquez as to incoming orders—that involved routine tasks with little discretion. Further, none of the other Plaintiffs testified that they perceived Guayllasac as a manager or supervisor. (*See id.* at 228:17-18.) While there is evidence that Guayllasac worked as Renato Migliorini's "right-hand man" to oversee inventory and place orders with vendors, (*id.* at 318:11-321:9), the record indicates that he mainly acted in a non-discretionary supporting role. (*See id.* at 318:18-19 (stating that Guayllasac "assisted [Renato] in everything – inventory, orders, sometimes placing orders with vendors"); *id.* at 319:13-17, 320:23-24 (stating that Guayllasac would normally contact Renato to recommend vendor orders, but dealt with one vendor directly).)

Even assuming that Guayllasac performed some tasks normally associated with management, Defendants have not established that his *primary* duty was management of the Restaurant or even of the kitchen. "The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a) (2017).[12] While the record is not clear as to

---

[12] *See also* 29 C.F.R. § 541.700(b) (2017) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees

the percentage of Guayllasac's time that was spent performing his various responsibilities, it is reasonable to conclude that he spent the Restaurant's operating hours (37 hours per week) in the kitchen, plus an hour or two on both ends for prep work, clean-up, and related tasks (totaling 49 hours per week, at minimum).  Considering that Guayllasac worked 78 hours per week on average, Defendants cannot credibly claim that he spent the majority of his time performing exempt work. For all these reasons, Guayllasac does not fit into the narrow exception for "bona fide executives."

### e.  Regular and Overtime Wages

The FLSA specifies that an employer must pay employees who work in excess of forty hours during a workweek for the excess hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  The NYLL mirrors the FLSA as to the obligation to pay overtime compensation.  12 N.Y.C.R.R. § 142-2.2.

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel*, 643 F.3d at 361.  Employers who fail to pay proper wages are liable to their employees in the amount of their unpaid compensation plus liquidated damages. *See Amaya v. Superior Tile & Granite Corp.*, No. 10 Civ. 4525, 2012 WL 130425, at *5 (S.D.N.Y. Jan. 17, 2012) (citing 29 U.S.C. § 216(b)).  "An employer and employee cannot agree to waive the overtime requirements of the FLSA. . . .  A mistaken belief or misunderstanding of the law is not a valid defense to an FLSA overtime claim." *Id.* at *6.

Based on the evidence adduced at trial and the findings of fact set forth above, Defendants violated the FLSA and the NYLL by failing to pay overtime compensation to all Plaintiffs.  The

---

who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.")

record is bereft of any evidence that Defendants ever advised Plaintiffs as to their hourly or overtime rates, or how their compensation was calculated. Instead, Plaintiffs received fixed weekly salaries, calculated by Renato Migliorini and later continued by Peter Migliorini, which did not vary according to the hours actually worked each week.[13] As such, no Plaintiff was paid overtime compensation at a rate of one and one-half times his regular rate of pay for any hours worked above 40 each workweek. Plaintiffs are owed damages in the amounts of their unpaid overtime compensation.[14]

The appendix to this order sets out the calculations for the compensation owed to Plaintiffs. It begins by calculating Plaintiffs' regular rate of pay. Under the FLSA, the "regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked. . . ." 29 C.F.R. § 778.109 (2017). Before January 1, 2011, the NYLL calculated the regular rate of pay in the same way. *See Romero*, 2017 WL 548216, at *10; N.Y. Comp. Codes R. & Regs. tit. 12, § 137-3.5 (repealed 2011). Since that date, the NYLL has instead calculated the regular rate "by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked . . . ." *Id.* § 146-3.5(b).

Defendants' proposed wage calculations indicate that Plaintiffs' weekly payments included premiums for the hours Plaintiffs worked in excess of forty hours per week. However, "[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the

---

[13] As to Plaintiff Pineda, even if his wages varied to a minor degree each evening, it was not based on his hours worked.

[14] During the period May 15, 2009 through December 31, 2010, Plaintiff Guayllasac's regular rate of pay was below minimum wage. For that period, his "amount of minimum wages owed per hour" are determined "by subtracting the regular rate from . . . the statutory minimum wage." *Baltierra v. Advantage Pest Control Co.*, No. 14 Civ. 5917, 2015 WL 5474093, at *5 (S.D.N.Y. Sept. 18, 2015).

presumption by showing an employer-employee agreement that the salary cover a different number of hours." *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999). "Unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours." *Id.*; *see also Amaya*, 2012 WL 130425, at *9 ("An agreement for a fixed weekly salary for more than 40 hours of work per week only complies with the FLSA and Labor Law if there is an explicit understanding between the employer and employee as to regular and overtime rates.").

In this case, there is no evidence in the record of any agreement or understanding that the weekly salary included overtime hours at the premium rate. *See also Jacobsen v. Stop & Shop Supermarket Co.*, No. 02 Civ. 5915, 2003 WL 21136308, at *3 (S.D.N.Y. May 15, 2003) ("If an employer seeks to pay a non-exempt employee a weekly salary that includes a premium overtime component calculated at time and one half of an hourly rate, there must be an express agreement to such an arrangement."); *Amaya*, 2012 WL 130425, at *9 (the mere fact that plaintiffs regularly worked more than 50 hours per week "does not indicate that the employees' weekly salary was intended to include the overtime premium required by the FLSA and Labor Law"). Accordingly, Defendants have not overcome the presumption.

In actions to recover unpaid minimum wages and overtime pay under both the FLSA and the NYLL, Plaintiffs may recover under whichever statute provides the greater relief. *See, e.g., Xochimitl v. Pita Grill of Hell's Kitchen, Inc.*, No. 14-CV-10234, 2016 WL 4704917, at *6 (S.D.N.Y. Sept. 8, 2016) (collecting cases), *adopted by* 2016 WL 6879258, at *1 (S.D.N.Y. Nov. 21, 2016). In this case, greater relief is available under the NYLL. As in Plaintiffs' calculations chart, damages are calculated pursuant to the NYLL.

### f.  Spread of Hours

Under the NYLL, an employer must give an employee "one hour's pay at the basic minimum hourly rate, in addition to the minimum wage" for each day in which "the spread of hours exceeds 10 hours." N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.4 (2017). However, "recent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the minimum wage level." *Williams v. Tri-State Biodiesel, L.L.C.,* No. 13 Civ. 5041, 2015 WL 305362, at *16 (S.D.N.Y. Jan. 23, 2015) (citing cases).

In this case, Plaintiffs have demonstrated that Guayllasac worked more than ten hours in a day but received less than minimum wage between May 15, 2009 and December 31, 2010. Defendants are therefore liable to Guayllasac for spread-of-hours compensation during that time.

### g.  Liquidated Damages

Under Section 216(b) of the FLSA, "a district court is generally required to award a plaintiff liquidated damages equal in [an] amount to actual damages." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008). However, under 29 U.S.C. § 260, courts have "discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Id.* To establish "good faith," an employer must show that it took "active steps to ascertain the dictates of the FLSA and then act to comply with them." *Herman*, 172 F.3d at 142.

The NYLL also imposes liquidated damages, although the relevant provision has been amended several times since 2009. Prior to November 24, 2009, plaintiffs were entitled to recover liquidated damages under the NYLL "if plaintiffs could prove that employers' NYLL violations were 'willful.'" *McLean*, 2012 WL 1358739, at *8. "The NYLL now provides for a liquidated

damages award 'unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law.'" *Id.* (citing N.Y. Lab. Law § 198(1-a)). Defendants do not argue that the NYLL "good faith" standard differs from the FLSA "good faith" standard for liquidated damages.

Defendants have provided no credible evidence that they had a good faith basis to believe they were complying with the FLSA or the NYLL. That Defendants failed to provide Plaintiffs with a wage notice or wage statements describing Plaintiffs' regular and overtime rates of pay over a six-year period belies any such defense. Plaintiffs are therefore entitled to liquidated damages.

Prior to April 9, 2011, the NYLL imposed liquidated damages in an amount equal to twenty-five percent of the total amount of wages due to plaintiff. *See, e.g.*, *Chowdhury v. Hamza Express Food Corp.*, 666 F. App'x 59, 60 (2d Cir. 2016). The NYLL was amended, effective April 9, 2011, to be more in line with its FLSA counterpart, and it now provides for liquidated damages "equal to one hundred percent of the total of such underpayments found to be due." N.Y. Lab. Law §§ 198(1-a), 663(1) (McKinney 2017).

Plaintiffs seek double liquidated damages—*i.e.*, liquidated damages under both the FLSA and the NYLL for the same periods. However, they acknowledge that the weight of authority supports a single award of liquidated damages, and their proposed factual findings calculate liquidated damages in that manner. (*See* Pls.' Proposed Findings of Fact ¶ 65.)

Plaintiffs are granted a single liquidated damages award. *See Chowdhury*, 666 F. App'x at 60 (holding that NYLL's liquidated damages provision is satisfied by a similar award of liquidated damages under the federal statute); *Pinovi v. FDD Enterprises, Inc.*, No. 13 Civ. 2800, 2015 WL 4126872, at *6 (S.D.N.Y. July 8, 2015) (finding that even before *Chowdhury*, a number of district courts began shifting away from awarding liquidated damages under both statutes). Plaintiffs are

entitled to single liquidated damages at the state statutory rate of 25% of their minimum, overtime, and spread of hour wage claims before April 9, 2011, and 100% thereafter.

### h.  Statutory Penalties

Plaintiffs seek to recover damages for Defendants' failure to provide regular wage statements and annual wage notices as required by New York's Wage Theft Prevention Act ("WTPA"), an amendment to the NYLL effective April 9, 2011.  Section 195(1) of the NYLL requires that employers must provide each employee, at the time of hiring and each year thereafter, a notice in both English and the employee's primary language containing, *inter alia*, the rate of pay and basis thereof and any allowances claimed as part of the minimum wage.  N.Y. Labor Law § 195(1).  Section 195(3) requires employers to provide each employee "with a statement with every payment of wages" including "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." *Id.* § 195(3).  The WTPA does not apply retroactively, and thus prior to April 9, 2011, defendants were not obligated to provide plaintiffs with wage statements or a wage notice.  *See Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143-44 (2d Cir. 2013); *Inclan v. N.Y. Hospitality Grp., Inc.*, 95 F. Supp. 3d 490, 501 (S.D.N.Y. 2015).

### i.  *Wage Notice*

Defendants in this case did not provide Plaintiffs with the wage notice required by NYLL § 195(1) at any time during their employment.[15]  Prior to February 27, 2015, the WTPA entitled employees to recover statutory damages for violations of this requirement of $50 per work week, not to exceed $2,500.  *See* 2010 N.Y. Laws ch. 564 § 7, *amending* N.Y. Labor Law § 198(1-b).

---

[15] Although Defendants posted a notice entitled "New York Labor Law Poster" as of January 2015, those posters do not satisfy N.Y. Labor Law § 195(1), which requires individualized notices to each employee detailing their rate of pay and basis thereof.

Because Plaintiffs' employment terminated prior to the February 27, 2015 amendment, Defendants are liable for violations starting April 9, 2011 for a maximum of $2,500 in damages per Plaintiff.

Plaintiffs Pineda, Jaquez, Guayllasac, and Arizmendi all worked more than 50 weeks after April 9, 2011, and they are therefore entitled to the full $2,500 statutory penalty. Because Plaintiff Ortega only worked for a total of 22 weeks, he is entitled to a statutory penalty of $1,100.

### ii. Wage Statement

Defendants did not provide Plaintiffs with the wage statement required by NYLL § 195(3).[16]   Accordingly, Defendants are liable for violations starting April 9, 2011.  Because Plaintiffs' employment terminated prior to the February 27, 2015 amendment, they are entitled to recover statutory damages of $100 per work week, not to exceed $2,500.

Plaintiffs Pineda, Jaquez, Guayllasac, and Arizmendi all worked more than 25 weeks after April 9, 2011, and they are therefore entitled to the full $2,500 statutory penalty.  Because Plaintiff Ortega only worked for a total of 22 weeks, he is entitled to a statutory penalty of $2,200.

## i.  Interest

### i. Prejudgment Interest

Under the FLSA, "prejudgment interest may not be awarded in addition to liquidated damages." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) (citations omitted). However, "[c]ourts typically award prejudgment interest on damages for NYLL violations." *McLean*, 2012 WL 1358739, at *10.  The case law is clear that plaintiffs may recover prejudgment interest on unpaid wages due even where they also recover liquidated damages under the NYLL.

---

[16] Although Defendants provided at least some of the Plaintiffs with pay stubs beginning around the last quarter of 2014, those statements did not "include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked," as required by N.Y. Labor Law § 195(3).

*See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999); *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 150 n.7 (2d Cir. 2011).

Plaintiffs are entitled to prejudgment interest on their state law compensatory damages. Plaintiffs should receive prejudgment interest calculated from the midpoint of their employment to the date of entry of judgment at an interest rate of nine percent per year. *See, e.g.*, *Hernandez v. JRPAC Inc.*, No. 14 Civ. 4176, 2016 WL 3248493, at *36 (S.D.N.Y. June 9, 2016) (citing N.Y. C.P.L.R. §§ 5001(b), 5004) (finding that the statutory rate of interest is 9% "per annum simple interest from a single reasonable intermediate date.") Accordingly, Plaintiff Pineda should receive prejudgment interest on a principal of $35,921.32 as applied from March 27, 2012; Plaintiff Jaquez should receive prejudgment interest on a principal of $25,977.86 as applied from April 3, 2013; Plaintiff Ortega should receive prejudgment interest on a principal of $6,600.00 as applied from November 21, 2014; Plaintiff Guayllasac should receive prejudgment interest on a principal of $155,362.54 as applied from March 27, 2012; and Plaintiff Arizmendi should receive prejudgment interest on a principal of $18,591.43 as applied from October 11, 2013.

### ii. Post-Judgment Interest

Post-judgment interest is mandatory on awards in civil cases. *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008). Accordingly, Plaintiffs are entitled to post-judgment interest calculated pursuant to 28 U.S.C. § 1961.

## IV.   CONCLUSION

In light of Defendants' willful violations of the FLSA and NYLL, judgment is entered

against Defendants in the following amounts, as further explained in the attached appendix.

|            | Unpaid Wages + Overtime | Spread of Hours | Total NYLL Liquidated Damages | Statutory Damages | Total |
|------------|------------|-----------|----------------|-----------|-----------|
| Pineda     | $35,921.32 | --        | $31,712.76     | $5,000    | $72,634.08 |
| Jaquez     | $25,977.86 | --        | $25,977.86     | $5,000    | $56,955.71 |
| Ortega     | $6,600.00  | --        | $6,600.00      | $3,300    | $16,500.00 |
| Guayllasac | $151,677.17 | $3,685.37 | $128,423.26   | $5,000    | $288,785.80 |
| Arizmendi  | $18,591.43 | --        | $18,591.43     | $5,000    | $42,182.86 |
|            |            |           |                |           | $477,058.45 |

Plaintiffs are also entitled to prejudgment interest as described above, as well as post-judgment

interest after the Clerk of the Court has entered judgment in this case.[17]

Dated: August 29, 2017
      New York, New York

                                    SO ORDERED.

                                *George B. Daniels*

                                GEORGE B. DANIELS
                                United States District Judge

---

[17] This case is referred to the Magistrate Judge for a determination of reasonable attorneys' fees upon application of Plaintiffs' counsel.

## APPENDIX

| PLAINTIFF | Start | End | Weeks | Hrs / Wk | NY Min. Wage Rate | NY Min. Overtime (OT) | Actual Paid Wages | Regular Hourly Pay Rate | Hourly OT Pay Rate | Under-payment Per Wk | NYLL Total Unpaid Wages & OT | NYLL Liquidated Damages on Wages & OT | Unpaid SOH Pay | Liqd. Damgs. on SOH Pay | Wage Notice | Wage Stmnt. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Luis Pineda | 5/15/09 | 7/23/09 | 9.86 | 49 | 7.15 | 10.73 | 450 | 9.18 | 13.78 | 41.33 | 407.36 | 101.84 | 0 | 0 | 0 | 0 | |
| | 7/24/09 | 12/31/10 | 75.00 | 49 | 7.25 | 10.88 | 450 | 9.18 | 13.78 | 41.33 | 3,099.49 | 774.87 | 0 | 0 | 0 | 0 | |
| | 1/1/11 | 4/8/11 | 13.86 | 49 | 7.25 | 10.88 | 450 | 11.25 | 16.88 | 151.88 | 2,104.55 | 526.14 | 0 | 0 | 0 | 0 | |
| | 4/9/11 | 5/14/12 | 57.29 | 49 | 7.25 | 10.88 | 450 | 11.25 | 16.88 | 151.88 | 8,700.27 | 8,700.27 | 0 | 0 | 2,500 | 2,500 | |
| | 5/15/12 | 12/31/13 | 85.00 | 49 | 7.25 | 10.88 | 450 | 11.25 | 16.88 | 151.88 | 12,909.38 | 12,909.38 | 0 | 0 | N/A | N/A | |
| | 1/1/14 | 12/31/14 | 52.00 | 49 | 8.00 | 12.00 | 450 | 11.25 | 16.88 | 151.88 | 7,897.50 | 7,897.50 | 0 | 0 | N/A | N/A | |
| | 1/1/15 | 2/7/15 | 5.29 | 49 | 8.75 | 13.13 | 450 | 11.25 | 16.88 | 151.88 | 802.77 | 802.77 | 0 | 0 | 0 | N/A | |
| | | | | | | | | | | Total: | 35,921.32 | 31,712.76 | | | 2,500 | 2,500 | $72,634.08 |
| Eddy Jaquez | 5/29/11 | 5/14/12 | 50.14 | 49 | 7.25 | 10.88 | 400 | 10.00 | 15.00 | 135.00 | 6,769.29 | 6,769.29 | 0 | 0 | 2,500 | 2,500 | |
| | 5/15/12 | 12/31/13 | 85.00 | 49 | 7.25 | 10.88 | 400 | 10.00 | 15.00 | 135.00 | 11,475.00 | 11,475.00 | 0 | 0 | N/A | N/A | |
| | 1/1/14 | 12/31/14 | 52.00 | 49 | 8.00 | 12.00 | 400 | 10.00 | 15.00 | 135.00 | 7,020.00 | 7,020.00 | 0 | 0 | N/A | N/A | |
| | 1/1/15 | 2/7/25 | 5.29 | 49 | 8.75 | 13.13 | 400 | 10.00 | 15.00 | 135.00 | 713.57 | 713.57 | 0 | 0 | 0 | N/A | |
| | | | | | | | | | | Total: | 25,977.86 | 25,977.86 | | | 2,500 | 2,500 | $56,955.71 |
| Robinson Ortega Diaz | 9/5/14 | 12/31/14 | 16.71 | 60 | 8.00 | 12.00 | 400 | 10.00 | 15.00 | 300.00 | 5,014.29 | 5,014.29 | 0 | 0 | 800 | 1,700 | |
| | 1/1/15 | 2/7/15 | 5.29 | 60 | 8.75 | 13.13 | 400 | 10.00 | 15.00 | 300.00 | 1,585.71 | 1,585.71 | 0 | 0 | 300 | 500 | |
| | | | | | | | | | | Total: | 6,600.00 | 6,600.00 | | | 1,100 | 2,200 | $16,500.00 |
| Angel Guayllasac | 5/15/09 | 7/23/09 | 9.86 | 78 | 7.15 | 10.73 | 420 | 5.38 | 8.08 | 273.55 | 2,696.42 | 674.11 | 422.87 | 105.72 | 0 | 0 | |
| | 7/24/09 | 12/31/10 | 75.00 | 78 | 7.25 | 10.88 | 420 | 5.38 | 8.08 | 283.25 | 21,243.75 | 5,310.94 | 3,262.50 | 815.63 | 0 | 0 | |
| | 1/1/11 | 4/8/11 | 13.86 | 78 | 7.25 | 10.88 | 420 | 10.50 | 15.75 | 598.50 | 8,293.50 | 2,073.38 | 0 | 0 | 0 | 0 | |
| | 4/9/11 | 5/14/12 | 57.29 | 78 | 7.25 | 10.88 | 420 | 10.50 | 15.75 | 598.50 | 34,285.50 | 34,285.50 | 0 | 0 | 2,500 | 2,500 | |
| | 5/15/12 | 12/31/13 | 85.00 | 78 | 7.25 | 10.88 | 420 | 10.50 | 15.75 | 598.50 | 50,872.50 | 50,872.50 | 0 | 0 | N/A | N/A | |
| | 1/1/14 | 12/31/14 | 52.00 | 78 | 8.00 | 12.00 | 420 | 10.50 | 15.75 | 598.50 | 31,122.00 | 31,122.00 | 0 | 0 | N/A | N/A | |
| | 1/1/15 | 2/7/15 | 5.29 | 78 | 8.75 | 13.13 | 420 | 10.50 | 15.75 | 598.50 | 3,163.50 | 3,163.50 | 0 | 0 | 0 | N/A | |
| | | | | | | | | | | Total: | 151,677.17 | 127,501.92 | 3,685.37 | 921.34 | 2,500 | 2,500 | $288,785.80 |
| Isael Arizmendi | 6/15/12 | 12/31/12 | 28.43 | 49 | 7.25 | 10.88 | 400 | 10.00 | 15.00 | 135.00 | 3,837.86 | 3,837.86 | 0 | 0 | 2,500 | 2,500 | |
| | 1/1/13 | 12/31/13 | 52.00 | 49 | 7.25 | 10.88 | 400 | 10.00 | 15.00 | 135.00 | 7,020.00 | 7,020.00 | 0 | 0 | N/A | N/A | |
| | 1/1/14 | 12/31/14 | 52.00 | 49 | 8.00 | 12.00 | 400 | 10.00 | 15.00 | 135.00 | 7,020.00 | 7,020.00 | 0 | 0 | N/A | N/A | |
| | 1/1/15 | 2/7/15 | 5.29 | 49 | 8.75 | 13.13 | 400 | 10.00 | 15.00 | 135.00 | 713.57 | 713.57 | 0 | 0 | 0 | N/A | |
| | | | | | | | | | | Total: | 18,591.43 | 18,591.43 | | | 2,500 | 2,500 | $42,182.86 |
| | | | | | | | | | | GRAND TOTAL | 238,767.77 | 210,383.97 | 3,685.37 | 921.34 | 10,800 | 12,200 | $477,058.45 |